## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARISSA COLLINS, on her own behalf, and on behalf of all others similarly situated, and JAMES BURNETT, on behalf of his son, and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>ANTHEM, INC. and ANTHEM UM SERVICES, INC.,<br><br>          Defendants. | Case No. 2:20-cv-1969 |

## CLASS ACTION COMPLAINT

Plaintiff Marissa Collins, on her own behalf and on behalf of all others similarly situated, and Plaintiff James Burnett, on behalf of his son and on behalf of all others similarly situated, complain as follows against Defendants Anthem, Inc. and Anthem UM Services, Inc. (collectively, "Anthem" or "Defendants").

## INTRODUCTION

1.      This case arises from Defendants' development, adoption, and use of certain clinical coverage criteria for determining whether residential treatment of mental health conditions is "medically necessary," as that term is defined in the written terms of the employer-sponsored welfare benefit plans that Defendants administer. Those plans define medical necessity to mean, at least in part, that services are consistent with generally accepted standards of medical practice. Yet, Anthem's medical necessity criteria for residential mental health treatment are far more restrictive than those generally accepted standards. As such, Defendants' development, adoption, and use of these criteria violate the written terms of those plans and Anthem's fiduciary duties

under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

2.      Defendants' development, adoption, and use of these criteria also violated their duties under the Paul Wellstone and Pete Domenici Mental Health and Addiction Equity Act of 2008 ("MHPAEA"), which was incorporated into ERISA. By applying more restrictive coverage criteria to behavioral health insurance claims, such as Plaintiffs', than they apply to comparable medical/surgical insurance claims, Defendants also violated their duty to comply with MHPAEA.

## THE PARTIES

3.      Plaintiff Marissa Collins is a resident of New York. Since May 2019, Ms. Collins has been a beneficiary of the ADP Total Source Plan (the "Collins Plan"), which is sponsored by Ms. Collins's husband's employer and issued by Empire Healthchoice Assurance, Inc., a wholly-owned and controlled subsidiary of Defendant Anthem, Inc.

4.      Plaintiff James Burnett and his son are residents of Maine. From January 2018 through August 2019, Mr. Burnett was a participant in, and his son was a beneficiary of, the Maine Education Association Benefits Trust Health Plan (the "first Burnett Plan"), which was sponsored by Plaintiff Burnett's then-employer and issued by Anthem Health Plans of Maine, Inc., a wholly-owned and controlled subsidiary of Defendant Anthem, Inc. Since September 2019, Plaintiff Burnett has been a participant in, and his son a beneficiary of, the Learning Skills Academy Plan (the "second Burnett Plan"), which is sponsored by Mr. Burnett's current employer and issued by Anthem Health Plans of New Hampshire, Inc., a wholly-owned and controlled subsidiary of Defendant Anthem, Inc. Plaintiff Burnett has been designated as his son's agent pursuant to a Power of Attorney.

5.      Defendant Anthem, Inc. is headquartered in Indianapolis, Indiana. According to its website, "Anthem, Inc. is an independent licensee of the Blue Cross and Blue Shield Association

serving members in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia and Wisconsin; and specialty plan members in other states." Anthem, Inc. wholly owns and controls Empire Healthchoice Assurance, Inc., Anthem Health Plans of Maine, Inc., and Anthem Health Plans of New Hampshire, Inc., which insure the Collins Plan and the first and second Burnett Plans, respectively.

6.      Anthem, Inc.'s Office of Medical Policy & Technology Assessment ("OMPTA") and its Medical Policy & Technology Assessment Committee ("MPTAC"), are responsible for developing and authorizing coverage guidelines and clinical utilization management guidelines for use by Anthem's commercial health plans across the country, including the medical necessity criteria at issue in this litigation.

7.      Defendant Anthem UM Services, Inc. ("Anthem UM"), which is wholly-owned and controlled by Defendant Anthem, Inc., is also headquartered in Indianapolis, Indiana. Anthem UM makes final and binding coverage determinations, including medical necessity determinations, for Anthem's commercial health plans, such as those which cover Plaintiffs, based on the coverage and utilization management guidelines developed and authorized by Anthem, Inc.

8.      From July 26, 2013 through November 5, 2018, Anthem UM systematically applied Anthem, Inc.'s internally-developed guidelines to make medical necessity determinations for residential mental health treatment of children and adults. As of November 5, 2018, Anthem, Inc. abandoned its internally-developed medical necessity criteria in favor of criteria licensed from a for-profit publisher, MCG Health, LLC ("MCG"). Since then, Anthem UM has systematically applied the MCG Guidelines for Residential Behavioral Health Level of Care (the "MCG RTC Guidelines") described in this Complaint to render medical necessity determinations concerning residential treatment for mental health conditions, including the determinations at issue in this

case.

## JURISDICTION AND VENUE

9.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331.

10.     Personal jurisdiction exists over Defendants, and this District is the proper venue, because Plaintiff Collins resides in this District and because Defendant Anthem, Inc. authorizes clinical coverage guidelines for use by Anthem UM, which routinely conducts final and binding utilization reviews of mental health claims submitted by Anthem insureds who reside in this District.

## FACTUAL BACKGROUND

### I.      Plaintiffs' Health Plans

11.     The Collins Plan and both the first and second Burnett Plans are governed by ERISA.

12.     Marissa Collins has been a beneficiary of the Collins Plan since May 2019.

13.     James Burnett was a participant in the first Burnett Plan from January 2018 through August 2019, and his son was a beneficiary of the first Burnett Plan from January 2018 through August 2019. Since September 2019, Plaintiff Burnett has been a participant in and his son a beneficiary of the second Burnett Plan.

14.     The Collins Plan and both Burnett Plans cover medical/surgical services as well as services for mental health and substance use disorders, including residential treatment.

15.     Under the terms of the Collins Plan and both the first and second Burnett Plans, a key condition of coverage for any claim, regardless of whether it is for treatment of a medical/surgical condition or a mental health and/or substance use condition, is that services for which coverage is sought must be "medically necessary." The Collins Plan defines "medically necessary" services to mean services that are, among other things, "provided in accordance with

4

generally-accepted standards of medical practice." Both the first and second Burnett Plans define "medically necessary" services to mean services that are, among other things, "consistent with generally accepted standards of medical practice." Thus, all of the Plaintiffs' plans require, as one essential condition for coverage, that the services for which coverage is requested must be consistent with generally accepted standards of medical practice.

## II.    Defendants' Fiduciary Roles

16.    At all times relevant to the Complaint, Anthem, Inc. has been responsible for the development and approval of clinical policies and coverage guidelines that interpret the terms of its subsidiaries' health plans. One such guideline, Anthem's Coverage Guideline ADMIN.00004, entitled "Medical Necessity Criteria," has been in effect since at least 2005. Coverage Guideline ADMIN.00004 operationalized a company-wide definition of "medically necessary" to mean health care services that are, among other things, "in accordance with generally accepted standards of medical practice." The guideline further states that "'generally accepted standards of medical practice' means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, national physician specialty society recommendations and the views of medical practitioners practicing in relevant clinical areas and any other relevant factors."

17.    Anthem, Inc.'s Coverage Guideline ADMIN.00001, entitled "Coverage Guideline Formation," which has been in effect since at least 2001, currently states that "[t]to reach decisions regarding the medical necessity or investigational status of new or existing services and/or procedures, MPTAC (and its applicable subcommittees) relies on the medical necessity or investigational criteria included in ADMIN.00004 Medical Necessity Criteria." Coverage Guideline ADMIN.00001 further states that the MPTAC "is also responsible for reviewing and authorizing the use of Coverage Guidelines used in making determinations of medical necessity

or investigational determinations which are developed by external entities (for example, MCG care guidelines or InterQual® criteria)."

18.     Thus, pursuant to Coverage Guidelines ADMIN.00001 and ADMIN.00004, MPTAC (and/or its subcommittees) developed Clinical UM Guideline CG-BEH-03 regarding "Psychiatric Disorder Treatment." Anthem's Clinical UM Guideline CG-BEH-03 was in effect from July 26, 2013 through November 5, 2018, and established company-wide medical necessity criteria for residential mental health treatment. For the reasons described below, these criteria were inconsistent with generally accepted standards of medical practice.

19.     Pursuant to Coverage Guideline ADMIN.00001 and Coverage Guideline ADMIN.00004, MPTAC subsequently authorized company-wide use of the MCG RTC Guidelines from November 5, 2018 through the present for residential mental health treatment. For the reasons described below, these criteria were and are also inconsistent with generally accepted standards of medical practice.

20.     Utilization management of mental health claims under Plaintiffs' health plans has been delegated to Anthem UM, which makes final and binding medical necessity determinations for Anthem, Inc.'s subsidiary health plans. When rendering such medical necessity determinations, Anthem UM necessarily evaluates whether services for which coverage is sought are consistent with generally accepted standards of medical practice. In doing so, Anthem UM systemically applies the coverage guidelines and medical policies developed and approved by Anthem, Inc., including Clinical UM Guideline CG-BEH-03 and the MCG RTC Guidelines. Because it has systematically relied on defective medical necessity criteria that were and continue to be far more restrictive than generally accepted standards of medical practice, however, Anthem UM could not reasonably make such determinations. Any benefit denials based on these flawed guidelines were

inherently unreasonable.

### III.   Generally Accepted Standards of Medical Practice

21.    Generally accepted standards of medical practice, in the context of mental health and substance use disorder services, are standards that have achieved widespread acceptance among behavioral health professionals. The generally accepted medical standards at issue in this case do not vary state-by-state.

22.    In the area of mental health and substance use disorder treatment, there is a continuum of intensity at which services are delivered. There are generally accepted standards of medical practice for matching patients with the level of care that is most appropriate and effective for treating patients' conditions. These generally accepted standards of medical practice are described in multiple sources, including consensus guidelines from professional organizations and guidelines and materials distributed by government agencies, such as: (a) the American Association of Community Psychiatrists' ("AACP's") Level of Care Utilization System ("LOCUS"); (b) the Child and Adolescent Level of Care Utilization System ("CALOCUS") developed by AACP and the American Academy of Child and Adolescent Psychiatry ("AACAP"), and the Child and Adolescent Service Intensity Instrument ("CASII"), which was developed by AACAP in 2001 as a refinement of CALOCUS; (c) AACAP's Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers; (d) the Medicare Benefit Policy Manual issued by the Centers for Medicare and Medicaid Services; (e) the American Psychiatric Association ("APA")'s Practice Guidelines for the Treatment of Patients with Eating Disorders, Third Edition; (f) the American Society of Addiction Medicine ("ASAM") Criteria; and (g) the APA Practice Guidelines for the Treatment of Patients with Substance Use Disorders, Second Edition.

23.    Generally accepted standards of medical practice for matching patients with the

level of care that is most appropriate and effective for treating patients' mental health conditions and substance use disorders include the following:

      (a)    **First**, many mental health and substance use disorders are long-term and chronic. While current or acute symptoms are typically related to a patient's chronic condition, it is generally accepted in the behavioral health community that effective treatment of individuals with mental health or substance use disorders is not limited to the alleviation of the current or acute symptoms. Rather, effective treatment requires treatment of the chronic underlying condition as well.

      (b)    **Second**, many individuals with behavioral health diagnoses have multiple, co-occurring disorders. Because co-occurring disorders can aggravate each other, treating any of them effectively requires a comprehensive, coordinated approach to all of the individual's conditions. Similarly, the presence of a co-occurring medical condition is an aggravating factor that may necessitate a more intensive level of care for the patient to be effectively treated.

      (c)    **Third**, in order to treat patients with mental health or substance use disorders effectively, it is important to "match" them to the appropriate level of care. The driving factors in determining the appropriate treatment level should be safety and effectiveness. Placement in a less restrictive environment is appropriate only if it is likely to be safe and *just as effective* as treatment at a higher level of care.

      (d)    **Fourth**, when there is ambiguity as to the appropriate level of care, generally accepted standards call for erring on the side of caution by placing the patient in a higher level of care. Research has demonstrated that patients who receive treatment at a lower level of care than is clinically appropriate face worse outcomes than those who are

treated at the appropriate level of care. On the other hand, there is no research that establishes that placement at a higher level of care than clinically indicated results in an increase in adverse outcomes.

(e)     **Fifth**, while effective treatment may result in improvement in the patient's level of functioning, it is well-established that effective treatment also includes treatment aimed at preventing relapse or deterioration of the patient's condition and maintaining the patient's level of functioning.

(f)     **Sixth**, the appropriate duration of treatment for behavioral health disorders is based on the individual needs of the patient; there is no specific limit on the duration of such treatment. Similarly, it is inconsistent with generally accepted standards of medical practice to require discharge as soon as a patient becomes unwilling or unable to participate in treatment.

(g)     **Seventh**, one of the primary differences between adults, on the one hand, and children and adolescents, on the other, is that children and adolescents are not fully "developed," in the psychiatric sense. The unique needs of children and adolescents must be taken into account when making level of care decisions involving their treatment for mental health or substance use disorders. One of the ways practitioners should take into account the developmental level of a child or adolescent in making treatment decisions is by relaxing the threshold requirements for admission and continued service at a given level of care.

(h)     **Eighth**, the determination of the appropriate level of care for patients with mental health and/or substance use disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about

the patient. Except in acute situations that require hospitalization, where safety alone may necessitate the highest level of care, decisions about the level of care at which a patient should receive treatment should be made based upon a holistic, biopsychosocial assessment that involves consideration of multiple dimensions.

24.     As functional ERISA fiduciaries, one of Defendants' fiduciary duties is to apply due care in interpreting benefit plans, including when developing and/or selecting the criteria they will use to make determinations about whether requested services are consistent with generally accepted standards of medical practice and thus medically necessary.

25.     When Anthem, Inc. developed Clinical UM Guideline CG-BEH-03 and subsequently adopted the MCG RTC Guidelines for Anthem UM to use in making medical necessity decisions under the Plaintiffs' and class members' benefit plans, Anthem, Inc. had access to the independent, publicly available sources referenced above, which describe generally accepted standards of medical practice for behavioral healthcare. In the exercise of due care, Anthem, Inc. thus knew, or should have known, what the generally accepted standards of medical practice actually were and continue to be. Likewise, in making discretionary determinations about medical necessity under Plaintiffs' and class members' benefit plans, Anthem UM also knew, or should have known, what the generally accepted standards of medical practice for behavioral healthcare actually were and continue to be.

## IV.   Anthem Clinical UM Guideline CG-BEH-03 Was Inconsistent with Generally Accepted Standards of Medical Practice

26.     In effect from July 26, 2013 through November 5, 2018, Anthem's Clinical UM Guideline CG-BEH-03 provided "medical necessity criteria for levels of care relating to psychiatric disorder treatment," including residential treatment.

27.     Although year after year, Clinical UM Guideline CG-BEH-03 included the same

footnote citations to peer-reviewed medical literature and physician specialty society recommendations that purportedly substantiated the guideline's medical necessity criteria for residential treatment, in reality, the cited sources did not support the actual criteria that Anthem, Inc. had created. At the same time, Anthem, Inc. conspicuously failed to reference far more contemporaneous and relevant sources (such as LOCUS and CASII/CALOCUS) that specifically reflect generally accepted standards of medical practice for patient placement selection. Unsurprisingly, the resulting residential mental health criteria in Anthem's Clinical UM Guideline CG-BEH-03 were inconsistent with generally accepted standards of medical practice for the treatment of behavioral health disorders, as explained below.

28.     Anthem, Inc. devised medical necessity criteria for evaluating residential mental health treatment that were more restrictive than generally accepted standards, including by improperly heightening the relevance of acute behavioral health symptoms while minimizing the relevance of non-acute behavioral health symptoms and conditions—that is, chronic mental health conditions and symptoms that are persistent and/or pervasive and could not necessarily be effectively treated with short-term doses of residential treatment.

29.     For example, as of April 25, 2018, Anthem's Clinical UM Guideline CG-BEH-03 included criteria in two categories—Severity of Illness and Continued Stay. For admission to residential treatment, each of the Severity of Illness criteria, describing a member's condition and circumstances, had to be met. These included *independent* satisfaction of *all* of the following:

(a)     The member is manifesting symptoms and behaviors which represent a *deterioration* from the member's *usual status* and include either self injurious or risk taking behaviors that risk *serious harm* and cannot be managed outside of a 24 hour structured setting or other appropriate outpatient setting; and

(b)     The social environment is characterized by ***temporary*** stressors or limitations that would ***undermine*** treatment that could potentially be improved with treatment while the member is in the residential facility; and

(c)     There should be a reasonable expectation that the illness, condition or level of functioning will be stabilized and improved and that a ***short term***, subacute residential treatment service will have a likely benefit on the behaviors/symptoms that required this level of care, and that the member will be able to return to outpatient treatment; and

(d)     Member's clinical condition is of such severity that an evaluation by physician or other provider with ***prescriptive authority*** is indicated at admission and weekly thereafter.

(emphasis added).

30.     Clinical UM Guideline CG-BEH-03 further required that, "For continued authorization of the requested service, Continued Stay criteria must be met along with Severity of Illness criteria." That is, for coverage to continue after admission, all of the Severity of Illness criteria still had to apply, along with additional "Continued Stay" criteria.

31.     These requirements were far more restrictive than generally accepted standards of medical practice. For example, Anthem's Clinical UM Guideline CG-BEH-03 only provided coverage for residential mental health treatment if a member presented with high-risk behaviors reflecting deterioration from a "usual status," ignoring that behavioral health disorders: (a) are often chronic such that the "usual status" may itself be significantly compromised independently of further deterioration; and (b) result in long-term, debilitating functional impairments rather than transient risk of harm.

32.     Additionally, Anthem's Clinical UM Guideline CG-BEH-03 affirmatively required members' social environments to temporarily undermine outpatient treatment. While generally

accepted standards of medical practice require a multidimensional consideration of the social environment, generally accepted standards of medical practice do ***not*** condition residential mental health treatment on the social environment being compromised. In other words, while the presence of (temporary or long-term) recovery-undermining environmental factors can favor residential admission, the absence of a recovery-undermining social environment most certainly does not disqualify residential treatment (which may be warranted for reasons, such as chronic functional impairment, that are not directly attributed to the social environment).

33.    Furthermore, while generally accepted standards of medical practice do not place artificial time limits on residential mental health treatment, particularly for chronic and refractory conditions, Clinical UM Guideline CG-BEH-03 improperly limited coverage for such care to a ***short term*** dose—irrespective of actual clinical need.

34.    Moreover, Clinical UM Guideline CG-BEH-03 conditioned residential treatment on ***weekly*** evaluations by clinical providers with ***prescriptive authority***, irrespective of whether patients' mental health conditions (such as impulse-control and oppositional/conduct disorders) were even amenable to treatment with medications. This all but ensured denials for residential treatment coverage for members who required sustained behavioral (rather than pharmaceutical) interventions at the residential level of care.

35.    Notably, Anthem's Clinical UM Guideline CG-BEH-03 did not account at all for the presence or impact of medical, psychiatric, substance-related, or developmental comorbidities, and did not contain any separate coverage criteria for children/adolescents and adults, despite developmental differences between the groups clearly warranting such consideration.

36.    To make matters worse, Anthem's Clinical UM Guideline CG-BEH-03 compounds these critical departures from generally accepted standards of medical practice by incorporating

13

them into a static decision tree (e.g., each criterion must be independently satisfied) that lacks nuanced, holistic factors that must be considered individually *and* in the aggregate. For example, risk of self-harm that is neither severe nor imminent may be impacted by a treatment-undermining social environment, lack of resilience, or lack of prior treatment response to warrant residential treatment, while serious functional impairment may independently warrant residential admission independently of additional multi-dimensional considerations.

## V.   The MCG RTC Guidelines Are Inconsistent with Generally Accepted Standards of Medical Practice

37.     MCG, a for-profit publisher, develops behavioral health guidelines that it licenses to benefit administrators, including Defendants, with the express purpose and intention that benefit administrators will rely upon them to make medical necessity determinations under welfare benefit plans, including plans governed by ERISA.

38.     MCG describes its service as creating "care guidelines" to "provide fast access to evidence-based medicine's best practices and care plan tools across the continuum of treatment, providing clinical decision support and documentation which enables efficient transitions between care settings." *See* https://www.mcg.com/about/company-overview/. The MCG behavioral health guidelines themselves, however, are not publicly accessible.

39.     Like Anthem's Clinical UM Guideline CG-BEH-03, the MCG RTC Guidelines include footnote citations to peer-reviewed medical literature and physician specialty society recommendations that purportedly "support" their criteria. Like Anthem's criteria, however, the annually-revised MCG RTC Guidelines have been inconsistent with the primary sources on which they purport to rely and have distorted the generally accepted standards of medical practice for the treatment of behavioral health disorders, as explained below.

40.     Nonetheless, effective November 5, 2018, Anthem, Inc. authorized company-wide

14

use of the MCG RTC Guidelines, which Anthem UM thereafter has systematically applied to make medical necessity determinations under the Plaintiffs' and class members' benefit plans.

41. Since November 5, 2018, Defendants authorized and applied the 22nd edition and the virtually identical, subsequent 23rd edition of the MCG RTC Guidelines. At all times relevant to this Complaint, the applicable version of the MCG RTC Guidelines was inconsistent with generally accepted standards of medical practice.

42. As a threshold matter, the MCG RTC Guidelines assert that "[s]ymptoms or conditions used to determine the appropriate treatment intensity should be due to the underlying behavioral health diagnosis or represent factors that contribute to destabilization of the underlying diagnosis, *and* are *acute* in nature or represent a *significant worsening over baseline*" (emphasis added). Thereafter, the MCG RTC Guidelines specify that, to be medically necessary upon admission, residential treatment must satisfy a number of threshold conditions, *all* of which must be met:

> (a) First, patient risk or severity of behavioral health disorder is appropriate to proposed level of care as indicated by 1 or more of the following: (1) danger to self; (2) danger to others; or (3) a behavioral health disorder is present and appropriate for residential care with ALL of the following: (a) moderately severe psychiatric, behavioral, or other comorbid conditions for adult and (b) serious dysfunction in daily living.
>
> (b) Second, *all* of the following must be true (in addition to other requirements): (1) treatment at a lower level of care is not "feasible"; (2) *"[v]ery short-term* crisis intervention and resource planning for continued treatment at a nonresidential level is unavailable or inappropriate"; (3) "[p]atient is *willing* to participate in treatment

within highly structured setting voluntarily"; *and* (4) "biopsychosocial stressors have been assessed and are absent or *manageable* at proposed level of care"

(emphasis added).

43.     These requirements are inconsistent with generally accepted standards of medical practice and are contradicted by the primary sources on which the MCG Guideline purports to rely (*e.g.*, LOCUS). For example, contrary to generally accepted standards of medical practice, the MCG RTC Guidelines necessitate that risk of harm and/or functional impairment be "acute" and/or "represent significant worsening over baseline," effectively ruling out coverage for residential treatment for anyone with long-standing risk of harm and/or chronic functional impairments that would benefit from such care and not be expected to improve with outpatient treatment.

44.     Even if patients meet the unjustifiably stringent acuity thresholds described above, the MCG RTC Guidelines provide that residential treatment is not medically necessary if treatment at a lower level of care is "feasible." As described above, however, under generally accepted standards of medical practice, treatment at a less intensive level of care must be "as effective" as the more intensive level of care—not merely "feasible."

45.     The MCG RTC Guidelines' stringent criteria also require that "very short-term crisis intervention" at a non-residential level be unavailable or inappropriate—thus cementing that care at a residential level is expected to be for "very short-term crisis intervention." This requirement is inconsistent with generally accepted standards of medical practice, which do not restrict residential treatment to "crisis intervention" and which do not limit residential treatment to artificially predetermined durations, let alone to "very short-term" stays.

46.     The MCG RTC Guidelines also improperly limit the scope and duration of residential treatment by providing that biopsychosocial stressors—which, according to MCG,

include comorbid conditions—need only be "manageable" at the proposed level of care, thus setting the expectation that "management" of comorbid conditions is all that is required. Generally accepted standards of medical practice, however, recognize that biopsychosocial stressors, if present, must be "effectively treated"—not merely "managed."

47. Furthermore, to meet medical necessity under the MCG RTC Guidelines, patients must be "willing" to participate in treatment in a highly structured setting "voluntarily." This criterion, too, is inconsistent with generally accepted standards of medical practice, which recognize that a lack of motivation for treatment may necessitate *higher* levels of care and that treatment might not be sought at one's own initiative (*e.g.*, a court, conservator, or guardian may demand or require it).

48. At the same time as the MCG RTC Guidelines unjustifiably restrict admission to residential treatment, they generously allow for discontinuation of such care as soon as risk of harm, functional impairments, and comorbidities can be "managed"—rather than "effectively treated"—at lower levels. As discussed above, under generally accepted standards of medical practice, treatment at a less intensive level of care is warranted only if it is just as effective as the more intensive level of care. Superficially "managing" a patient's condition is not sufficient.

49. Like Anthem's Clinical UM Guideline CG-BEH-03, the MCG RTC Guideline compounds these fatal departures from generally accepted standards of medical practice by incorporating them into a static decision tree (e.g., each criterion must be independently satisfied) that lacks nuanced, holistic factors that must be considered individually and in the aggregate. For example, the MCG RTC Guideline improperly conditions admission to residential treatment on the presence of *both* comorbidities *and* serious functional impairments, despite *either* being sufficient to warrant residential treatment pursuant to generally accepted standards of medical

practice.

50.     In sum, on their face, the MCG RTC Guidelines provide that residential behavioral health treatment is only medically necessary for crisis stabilization or other circumstances in which a patient is suffering from acute symptoms. As such, the MCG RTC Guidelines are much more restrictive than generally accepted standards of medical practice, which recognize that persistent and/or pervasive behavioral health disorders cannot necessarily be as effectively treated on a short-term and/or outpatient basis as they could be in residential care and that determining appropriate treatment requires a much broader and more interconnected assessment of factors.

## VI.    Anthem's Adoption and Use of the MCG RTC Guidelines Violate MHPAEA

51.     MHPAEA, codified at 29 U.S.C. § 1185a, amended ERISA to prohibit discrimination with respect to mental health and substance use disorder benefits. Because the parity provisions were inserted into ERISA, they are enforceable through ERISA's enforcement provision, 29 U.S.C. § 1132.

52.     Since the addition of the parity provisions, ERISA requires any group health plan (like the Plaintiffs' Plans), which "provides both medical and surgical benefits and mental health or substance use disorder benefits," to ensure that, among other things:

> (ii) the treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

53.     MHPAEA's implementing regulations explain that "treatment limitations," which limit the scope or duration of benefits for treatment, may be quantitative (a "QTL"), *i.e.*, expressed numerically, or non-quantitative (an "NQTL"). The regulations prohibit the imposition of an NQTL on behavioral health benefits unless, as written *and* in operation, the processes, strategies,

evidentiary standards, and other factors used in applying the NQTL to behavioral benefits are comparable to, and are applied no more stringently than, those used in applying the NQTL with respect to medical/surgical benefits in the same classification.  The regulations expressly provide that medical necessity standards are NQTLs. The MCG RTC Guidelines, therefore, constitute an NQTL, as defined by the regulations.

54.     In addition to licensing the MCG guidelines applicable to behavioral health, Anthem also licenses and uses MCG guidelines applicable to medical/surgical services, including those providing criteria for "Inpatient & Surgical Care," "General Recovery Care," "Recovery Facility Care," and "Chronic Care."

55.     As MCG admitted in a 2017 white paper, MCG views intermediate levels of care (including residential treatment) for behavioral health conditions very differently from intermediate levels of care for medical/surgical conditions:

> While inpatient and outpatient levels of care are common to both [mental health and substance use disorder ("MHSUD") benefits] and physical health conditions, there is a divergence in how intermediate levels of care (*e.g.*, services less intensive than would be available in an inpatient hospital setting, but more expansive than care that could be provided in most outpatient clinics) are managed.
>
> . . . Intermediate levels of care for ***medical/surgical conditions are designed to improve functional status among people with impairments that, while potentially significant, generally are not acute, and are not offered as alternatives to inpatient admission.*** As an example, the presence of an acute pulmonary infection, such as pneumonia, likely would lead to a denial of admission to a pulmonary rehabilitation program [an intermediate level of care].
>
> In contrast***, intermediate levels of care for MHSUDs are designed to support acute management of patients with MHSUDs. They often service as alternative to inpatient care, and are intended to have the ability address acute symptoms or provide crisis stabilization*** . . . .

"Mental Health Parity: Where Have We Come From? Where Are We Now?," available at https://www.ahip.org/wp-content/uploads/2017/06/MCG-White-Paper-Mental-Health-Parity.pdf

(emphasis added).

56.    As the MCG white paper demonstrates, MCG takes the position that while intermediate care for medical/surgical services is designed to address sub-acute conditions in order to improve functional status, intermediate care for behavioral health services is only intended "to support acute management" and to "address acute symptoms or provide crisis stabilization."

57.    For most of the class period, MCG's website also reflected its view that residential treatment is only available for "acute" behavioral health conditions. Until at least October 30, 2019, MCG publicly touted a set of "Level of Care Comparison Charts" that "allow[ed] a side by side comparison of behavioral health level of care criteria" to "facilitate placement decisions for behavioral health levels of care." As MCG's own description of its chart made clear, MCG recognizes only "5 levels of care" for behavioral health treatment: "inpatient, *acute* residential, partial hospital, intensive outpatient, and *acute* outpatient care" (emphasis added).

58.    After being named in a lawsuit challenging its acuity-focused guidelines, MCG scrubbed its website to remove references to "acute" RTC and "acute" outpatient services. That cosmetic change, however, does not alter the fact that the MCG RTC Guidelines themselves are improperly acute-focused and otherwise in conflict with generally accepted standards of medical practice, as detailed herein.

59.    Consistent with the views MCG expressed in its 2017 white paper that intermediate care for behavioral health services is intended "to support acute management" and to "address acute symptoms or provide crisis stabilization," the MCG RTC Guidelines condition coverage of residential treatment for mental health conditions on the presence of acute factors.

60.    On information and belief, the MCG Guidelines for intermediate care of medical and surgical conditions, including its guidelines for "Recovery Facility Care," similarly reflect

20

MCG's stated view that intermediate care for medical/surgical services is designed to address *sub-acute* conditions in order to improve functional status—meaning that, unlike the MCG RTC Guidelines, the medical/surgical guidelines do not condition coverage on the presence of acute factors.

61.     Defendants' adoption and use of the MCG RTC Guidelines thus constitute the application of treatment limitation(s) to inpatient (intermediate) mental health and substance use disorder benefits that are "separate" and/or "more restrictive" than Defendants' treatment limitation(s) for inpatient (intermediate) medical/surgical benefits. Under the MCG RTC Guidelines, moreover, medical necessity determinations for inpatient (intermediate) mental health and substance use disorder services use factors that are not comparable to, or used the same way as, factors in determining medical necessity for inpatient (intermediate) medical/surgical services, including acuity. For these reasons, Defendants' adoption and use of the MCG RTC Guidelines violate MHPAEA.

## VII.   Financial Considerations Have Infected Defendants' Decision to Develop, Adopt, and Use Clinical UM Guideline CG-BEH-03 and the MCG RTC Guidelines

62.     Defendants have tremendous financial incentives to artificially suppress behavioral health costs by restricting coverage for treatment of chronic behavioral health conditions.

63.     Anthem, Inc.'s wholly-owned subsidiaries, and ultimately Anthem, Inc. itself, make money by charging fees for their services, including behavioral health claims administration:

        (a)     For fully-insured plans, Anthem, Inc.'s subsidiaries charge a premium, from which all benefits approved by Anthem UM are paid. Anthem, Inc.'s subsidiaries, and ultimately Anthem, Inc., therefore, bear the risk that benefit reimbursements will exceed the fixed premiums and/or any per-member, per-month rates that they allocate for behavioral health expenditures.

(b)    For self-funded plans, Anthem, Inc.'s subsidiaries are paid an administrative fee and the employers, as the plan sponsors, pay the medical expenses that Anthem UM approves. To mitigate this risk, Anthem's employer customers typically pair such an administrative-services only plan with a stop-loss policy, pursuant to which Anthem bears the risk of paying approved claims in excess of a specified amount. Defendants thus not only have an incentive to reduce medical expenses in order to retain business and market their services as "cost-effective," they also bear risk directly in much the same way as they do with respect to fully-insured plans.  Indeed, because Defendants administer both fully-insured and self-funded plans, and those plans often contain identical terms (*e.g.*, the definition of medical necessity or generally accepted standards), Defendants' financial self-interest vis-à-vis administration of fully-insured plans also infects their administration of self-funded plans. After all, Defendants know that they could not possibly justify interpreting identical words in two different plans to mean different things.

64.    By developing, adopting, and applying Clinical UM Guideline CG-BEH-03 and the MCG RTC Guidelines as their interpretations of the terms of the plans they administer, Defendants narrowed the scope of coverage otherwise available under the terms of those plans, decreased the number and value of covered claims, and shifted some of the risk from themselves and their employer-customers to the participants and beneficiaries of the plans.

65.    Residential treatment, though widely recognized as a critical component in the behavioral health continuum of care, can be quite expensive. Avoiding benefit expense associated with providing coverage for residential treatment, therefore, directly benefitted Defendants' bottom line.

66.     On information and belief, these financial incentives have infected the development and company-wide adoption (i.e., for use in administering benefits under both fully-insured and self-funded plans) of Clinical UM Guideline CG-BEH-03 and the company-wide adoption of the MCG RTC Guidelines at issue herein, since these guidelines are the primary clinical tools Defendants use to ration access to behavioral healthcare, including expensive residential treatment, and thereby artificially reduce medical expense.

## VIII. Defendants Used their Defective Guidelines to Deny Benefits to Plaintiffs in Contravention of Their Plans' Written Terms

67.     As Defendants' denial letters reflect, Anthem UM denied residential mental health treatment coverage for Plaintiff Burnett's son and for Plaintiff Marissa Collins based on, respectively, Clinical UM Guideline CG-BEH-03 and the MCG RTC Guideline – *i.e.*, acuity-driven, treatment-undermining criteria that are inconsistent with the "generally accepted standards of medical practice" required by Plaintiffs' Plans. Prior to issuing these denial letters, while Plaintiffs were beneficiaries and participants of their respective Plans, Defendants developed and/or adopted these defective guidelines, which constituted Defendants' interpretation of the terms of the Collins and Burnett Plans from the time the guidelines were adopted through their final denials of Plaintiffs' requests for coverage of residential mental health treatment.

68.     Defendants' development and adoption of the guidelines thus narrowed the scope of coverage available under Plaintiffs' Plans and shifted risk that otherwise would have been borne by Plaintiffs' Plans directly to Plaintiffs, thereby making their benefits less valuable.

69.     Plaintiff Burnett's young adult son suffers from, among other conditions, major depression, multiple anxiety disorders, and cannabis use disorder. On September 26, 2018, Plaintiff Burnett's son was admitted for residential treatment of his mental health conditions at Sierra Tucscon, an in-network facility. He remained in residential treatment and incurred

unreimbursed expenses until October 22, 2018. Through Sierra Tuscon, Plaintiff Burnett's son timely requested coverage for his residential treatment.

70.      By letter dated September 27, 2018, Plaintiff Burnett's son was informed that his preauthorization claim was "reviewed for your plan by Anthem UM Services, Inc." The letter explained that Plaintiff Burnett's son's request for coverage was denied on the ground that residential treatment was not medically necessary. Anthem UM based its determination on Clinical UM Guideline CG-BEH-03. Following his discharge, Plaintiff, on behalf of his son, submitted a timely post-service appeal.

71.      By letter dated May 7, 2019, Plaintiff Burnett's son was informed that his appeal was reviewed by Anthem UM The letter explained that Plaintiff Burnett's son's appeal was denied on the ground that residential treatment was not medically necessary. Anthem UM again based its determination on Clinical UM Guideline CG-BEH-03. Because the first Burnett Plan mandated only one level of internal appeal, Plaintiff Burnett's son exhausted his administrative remedies with respect to his RTC services at Sierra Tucson.

72.      Plaintiff Collins suffers from, among other conditions, major depression and PTSD. On August 27, 2019, Plaintiff Collins was admitted for residential treatment of her mental health conditions at Rogers Memorial Hospital ("Rogers"), an in-network facility. She remained in residential treatment and incurred unreimbursed expenses until September 24, 2019. Through Rogers, Plaintiff Collins timely requested coverage for her residential treatment.

73.      By letter dated August 28, 2019, Plaintiff Collins was informed that her preauthorization claim was "reviewed for your plan by Anthem UM Services, Inc." The letter explained Plaintiff Collins' request for coverage was denied on the ground that residential

treatment was not medically necessary. Anthem UM based its determination on the MCG RTC Guidelines. Rogers submitted an urgent appeal of the denial the next day.

74.     By letter dated August 30, 2019, Plaintiff Collins' was informed that her appeal was "reviewed for your plan by Anthem UM Services, Inc." The letter explained that Plaintiff Collins' appeal was denied on the ground that the residential treatment was not medically necessary. Anthem UM Services, Inc. again based its determination on the MCG RTC Guidelines in its "final adverse determination."

75.     Following Plaintiff Collins' discharge, Rogers submitted a post-service appeal seeking coverage for Plaintiff Collins' residential treatment. By letter dated December 27, 2019, Rogers was informed that the post-service appeal was "reviewed for your plan by Anthem UM Services, Inc." The letter explained that the post-service appeal was denied on the ground that the residential treatment was not medically necessary. Again, Anthem UM based its determination on the MCG RTC Guidelines in its "final adverse determination."

76.     Plaintiff Collins, therefore, also exhausted her administrative remedies with respect to Anthem's denial of coverage for her RTC services.

## CLASS ACTION ALLEGATIONS

77.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

78.     The policies and practices that Defendants followed with respect to the benefit claims filed by Plaintiffs are the same as those that have been applied by Defendants to other similarly-situated insureds seeking coverage under their health plans for residential behavioral health treatment, including Defendants' development and use of Clinical UM Guideline CG-BEH-

25

03 and subsequent adoption and use of the MCG RTC Guidelines, both of which contained excessively restrictive medical necessity criteria.

79.     As such, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs brings each of their claims, set forth in the counts below, on behalf of the following class ("Class") of similarly-situated individuals:

> Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment services for a behavioral health disorder was denied by Anthem UM Services, Inc., in whole or in part, within the applicable statute of limitations, based on Clinical UM Guideline CG-BEH-03 or the MCG Guidelines for Residential Behavioral Health Level of Care.

80.     The members of the Class can be objectively ascertained through the use of information contained in Defendants' files because Defendants know who their insureds are, which plans they are insured by, what type of claims they have filed, and how those claims were adjudicated.

81.     Upon information and belief, there are so many persons within the putative class that joinder is impracticable. While Plaintiffs do not have access to the identity of the putative class members, such information is within the possession and control of Defendants.

82.     Certification of the Class is desirable and proper because there are questions of law and fact in this case that are common to all members of the Class. Such common questions of law and fact include, but are not limited to: (a) whether Clinical UM Guideline CG-BEH-03 and the MCG RTC Guidelines are consistent with generally accepted standards of medical practice; (b) whether Defendants breached their fiduciary duties when they developed and/or adopted Clinical UM Guideline CG-BEH-03 and the MCG RTC Guidelines; (c) whether Defendants violated MHPAEA by adopting and applying the MCG RTC Guidelines for making coverage decisions relating to behavioral health conditions; (d) whether Anthem UM breached its fiduciary duties

when it applied Clinical UM Guideline CG-BEH-03 and the MCG RTC Guidelines to deny requests for benefits for residential treatment; (e) whether Anthem UM's use of Clinical UM Guideline CG-BEH-03 and the MCG RTC Guidelines to deny requests for benefits for residential treatment of behavioral health disorders violated the terms of the class members' plans; (f) whether Anthem, Inc. violated its duties as a co-fiduciary under ERISA due to its failure to make reasonable efforts to remedy the breaches of fiduciary duty by Anthem UM, and (g) what remedies are available to the Class.

83. Certification is desirable and proper because the Plaintiffs' claims are typical of the claims of the members of the Class Plaintiffs seek to represent.

84. Certification is also desirable and proper because the Plaintiffs will fairly and adequately protect the interests of the Class they seek to represent. There are no conflicts between the interests of the Plaintiffs and those of other members of the Class, and the Plaintiffs are cognizant of their duties and responsibilities to the entire Class. Plaintiffs' attorneys are qualified, experienced and able to conduct the proposed class action litigation.

85. It is desirable to concentrate the litigation of these claims in this forum. The determination of the claims of all class members in a single forum, and in a single proceeding would be a fair and efficient means of resolving the issues in this litigation.

86. The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the Class through numerous separate actions.

## COUNT I

**Claim for Breach of Fiduciary Duty**
**(against both Defendants)**

87.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

88.     Plaintiff Collins brings this count on her own behalf and on behalf of the Class pursuant to 29 U.S.C. § 1132(a)(1)(B). Plaintiff Burnett brings this count on behalf of his son as his son's agent and on behalf of the Class pursuant to 29 U.S.C. § 1132(a)(1)(B).

89.     As explained above, both Defendants are responsible for interpreting the plans they administer and developing and/or adopting policies and guidelines interpreting plan terms. Defendant Anthem UM is also responsible for making final and binding decisions about whether to approve coverage requested by plan members. As such, both Defendants exercise discretionary authority with respect to the administration of the plans and the payment of plan benefits. Defendants are therefore ERISA fiduciaries as defined by 29 U.S.C. §§ 1002(21)(A) and 1104(a).

90.     As ERISA fiduciaries, and pursuant to 29 U.S.C. § 1104(a), Defendants have a duty of loyalty to plan participants and beneficiaries which requires them to discharge their duties "solely in the interests of the participants and beneficiaries" of the plans they administer and for the "exclusive purpose" of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the plans. Defendants also owed plan participants and beneficiaries a duty of care, which requires them to act with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans, so long as such terms are consistent with ERISA.

91.     Defendants violated these duties by adopting Clinical UM Guideline CG-BEH-03 and the MCG RTC Guidelines discussed herein as their interpretation of terms in Plaintiffs' Plans

and the putative Class members' plans. Despite the fact that the health insurance plans that insure Plaintiffs and the Class members require medical necessity determinations concerning residential behavioral health treatment to be made consistent with generally accepted standards of medical practice, and the fact that generally accepted standards of medical practice are widely available and well-known to Defendants, Defendants in fact created, selected and adopted clinical coverage criteria that were far more restrictive than generally accepted standards of medical practice and, in the case of the MCG RTC Guidelines, also more restrictive than the criteria Anthem has licensed for medical/surgical conditions. In doing so, Defendants did not act "solely in the interests of the participants and beneficiaries" for the "exclusive purpose" of "providing benefits." They did not use the "care, skill, prudence, and diligence" ERISA demands of fiduciaries. They did not act in accordance with the terms of the Plaintiffs' or the Class members' plans.

92.     Instead, Defendants elevated their own interests above the interests of the plan participants and beneficiaries. By interpreting plan terms in this manner, Defendants artificially decreased the scope of coverage available under the plans, thereby transferring risk from themselves and their employer customers to the participants and beneficiaries of the plans and severely limiting the availability of residential treatment services to Plaintiffs and the class members. In so doing, Defendants harmed the Plaintiffs and the Class.

93.     Moreover, as ERISA co-fiduciaries, each Defendant is liable under 29 U.S.C. § 1105(a) for the breaches of fiduciary duty attributable to the other Defendant.  Both Defendants were aware of each others' breaches with respect to the creation, adoption, and use of the flawed and overly restrictive coverage guidelines, and yet both failed to make reasonable efforts under the circumstances to remedy those breaches.

94.     Plaintiffs and the members of the Class seek the relief identified below to remedy

29

this claim.

## COUNT II

### Unreasonable Benefit Denials
### (against Anthem UM)

95.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

96.     Plaintiff Collins brings this count on her own behalf and on behalf of the Class pursuant to 29 U.S.C. § 1132(a)(1)(B). Plaintiff Burnett brings this count on his son's behalf as his son's agent and on behalf of the Class pursuant to 29 U.S.C. § 1132(a)(1)(B).

97.     Anthem UM denied the requests for coverage of residential treatment services submitted by Plaintiffs and other members the Class using criteria that violated the terms of the applicable plans. Defendant Anthem UM denied benefits to Plaintiffs and the class members, at least in part, based on restrictive clinical coverage guidelines that it adopted in violation of its fiduciary duties, as set forth above.

98.     Moreover, Anthem UM violated MHPAEA, which is incorporated into ERISA, *see* 29 U.S.C. § 1185a, by applying the MCG RTC Guidelines to claims for residential treatment of behavioral health conditions, because the MCG RTC Guidelines are more stringent than the MCG guidelines Anthem uses for medical/surgical conditions in the same classification, both as written and in operation.

99.     Plaintiffs and the members of the Class were harmed by Defendant Anthem UM's improper benefit denials because Anthem UM denied their requests for benefits using clinical coverage criteria that were inconsistent with the applicable plan terms and thus violated ERISA. Defendant Anthem UM could not reasonably deny coverage to Plaintiffs or the class members using such restrictive, plan-violating criteria.

100.    Plaintiffs and the members of the Class seek the relief identified below to remedy this claim.

## COUNT III

**Claim for Injunctive Relief**
**(against both Defendants)**

101.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

102.    Plaintiff Collins brings this count on her own behalf and on behalf of the Class, pursuant to 29 U.S.C. § 1132(a)(3)(A), only to the extent that the Court finds that the injunctive relief available pursuant to 29 U.S.C. § 1132(a)(1)(B) is inadequate to remedy the violations alleged in Counts I and/or II. Plaintiff Burnett brings this count on his son's behalf as his son's agent and on behalf of the Class, pursuant to 29 U.S.C. § 1132(a)(3)(A), only to the extent that the Court finds that the injunctive relief available pursuant to 29 U.S.C. § 1132(a)(1)(B) is inadequate to remedy the violations alleged in Counts I and/or II.

103.    Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by Defendants' breaches of fiduciary duty and/or violations of ERISA described above.

104.    In order to prevent Defendants' ongoing violations of ERISA and the applicable plans, and the harm those violations cause, Plaintiffs and the Class are entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

## COUNT IV

### Claim for Other Appropriate Equitable Relief
### (against both Defendants)

105.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

106.    Plaintiff Collins brings this count on her own behalf and on behalf of the Class pursuant to 29 U.S.C. § 1132(a)(3)(B) only to the extent that the Court finds that the equitable relief available pursuant to 29 U.S.C. § 1132(a)(1)(B) is inadequate to remedy the violations alleged in Counts I and/or II. Plaintiff Burnett brings this count on his son's behalf as his son's agent and on behalf of the Class pursuant to 29 U.S.C. § 1132(a)(3)(B) only to the extent that the Court finds that the equitable relief available pursuant to 29 U.S.C. § 1132(a)(1)(B) is inadequate to remedy the violations alleged in Counts I and/or II.

107.    Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by Defendants' breaches of fiduciary duty and/or violations of ERISA described above.

108.    In order to completely and adequately remedy these harms, Plaintiffs and the Class are entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

### REQUESTED RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants as follows:

A.    Certifying the Class and their claims, as set forth in this Complaint, for class treatment;

B.    Appointing the Plaintiffs as Class Representative for the Class;

C.    Designating Zuckerman Spaeder LLP and Psych-Appeal, Inc. as Class Counsel;

D.    Declaring that Clinical UM Guideline CG-BEH-03 and the MCG RTC Guidelines used by Defendants were inconsistent with generally accepted standards of medical practice;

E.      Declaring that Defendants' use of the MCG RTC Guidelines to make coverage determinations with respect to behavioral health conditions violates MHPAEA;

F.      Issuing a permanent injunction ordering Defendants to stop using Clinical UM Guideline CG-BEH-03 and the MCG RTC Guidelines complained of herein, and instead to adopt or develop and use clinical coverage guidelines that are consistent with generally accepted standards of medical practice;

G.      Ordering Anthem UM to reprocess the claims for residential behavioral health treatment that it previously denied (in whole or in part) under Clinical UM Guideline CG-BEH-03 and the MCG RTC Guidelines or any other MCG Guidelines containing the same restrictive criteria, pursuant to new guidelines that are consistent with generally accepted standards of medical practice;

H.      Awarding other appropriate equitable relief, including but not necessarily limited to additional declaratory and injunctive relief;

I.      Awarding Plaintiffs' disbursements and expenses for this action, including reasonable counsel and expert fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. § 1132(g); and

J.      Granting such other and further relief as is just and proper.

Dated:  April 29, 2020                                   Respectfully submitted,

                                                         /s/ D. Brian Hufford
                                                         ZUCKERMAN SPAEDER LLP
                                                         D. Brian Hufford
                                                         Jason S. Cowart
                                                         485 Madison Avenue, 10th Floor
                                                         New York, NY 10022
                                                         Tel: (212) 704-9600
                                                         Fax: (212) 704-4256
                                                         dbhufford@zuckerman.com

jcowart@zuckerman.com

ZUCKERMAN SPAEDER LLP
Caroline E. Reynolds (*pro hac vice*
forthcoming)
Marcus P. Smith (*pro hac vice* forthcoming)
1800 M St., NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
creynolds@zuckerman.com
mpsmith@zuckerman.com

PSYCH-APPEAL, INC.
Meiram Bendat (*pro hac vice* forthcoming)
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (888) 975-1957
mbendat@psych-appeal.com

*Attorneys for Plaintiffs*