# EXHIBIT 27

Page 1

```
1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF NEW YORK

3    MARISSA COLLINS, on her own      )

4    behalf, and on behalf of         )

5    all others similarly situated,   )

6    and JAMES BURNETT, on behalf     )

7    of his son, and on behalf of     )

8    all others similarly situated,   )

9    and KARYN SANCHEZ, on behalf     )

10   of her minor son and all         ) Case No:

11   others similarly situated,       ) 2:20-CV-1969

12          Plaintiffs,               ) (FB)(SIL)

13   vs                               )

14   ANTHEM, INC., and ANTHEM UM      )

15   SERVICES, INC.,                  )

16   Defendant.                       )

17   _____  )

18   A.I., on behalf of his minor     )

19   daughter and all others          )

20   similarly situated,              )

21   Intervenor Plaintiff,            )

22   vs                               )

23   ANTHEM, INC., and ANTHEM         )

24   UM SERVICES, INC.,               )

25          Defendants.               )
```

Page 2

```
 1   APPEARANCES:
 2       On behalf of the Plaintiffs:
 3           Ms. Caroline E. Reynolds
 4           Ms. Sasmantha Gerencir
 5           Zuckerman Spaeder LLP
 6           1800 M Street N.W. Suite 1000
 7           Washington, D.C. 20036
 8           (202)778-1800
 9           Fax: (202)822-8106
10           creynolds@zuckerman.com
11
12       On behalf of the Defendants:
13           Mr. Robert C. Deegan
14           Ms. Jennifer Cook
15           Reed Smith LLP
16           10 South Wacker Drive, 40th Floor
17           Chicago, Illinois 60606
18           (312)207-1000
19           Fax: (312)207-6400
20           rdeegan@reedsmith.com
21
22       VIDEOGRAPHER:
23           Mr. Justin Dloski
24
25
```

Page 55

1    probably they had more occasions to use the numbers

2    but I think they used the number which I described

3    the use of the EKG in general would be the more

4    impressionistic and then in certain cases they

5    would look at the numbers.  I don't have

6    documentation of that but that's my sense.

7            Q.   You view it as an impressionistic or it

8    gives you an impressionistic image of the person

9    and the appropriate level of care.  Is that how you

10   view the role of -- in your role as a physician, of

11   a level of care guideline?

12           A.   I mean, I certainly see level of care

13   guidelines as part of a very large array of

14   clinical tools that we use to make very complex

15   decisions and to me, level of care guidelines are

16   now part of that set of tools, particularly in

17   cases where there's any complexity around that

18   decision.

19           Q.   In your impression, in your opinion as

20   a practitioner, a psychiatrist, need to use a level

21   of care guidelines in order to make a decision on

22   level of care decision whether it's the generally

23   accepted standard of care?

24               MS. REYNOLDS: Object to form.

25           A.   I think unfortunately that your

```
 1   question is now starting to conflate two separate
 2   things.  I believe that the LOCUS, CALOCUS, the
 3   AACAP Guidelines are a, not b, but a way of
 4   understanding level of care in a systematic way.
 5   They follow the generally accepted standards.  I
 6   would not say that the generally accepted standard
 7   is dependent on the LOCUS, but it's a very good
 8   illustration of generally accepted standards.  Our
 9   decisions as physicians, as professionals, need to
10   be based on those generally accepted standards.
11   I'm not saying that they need to be based on the
12   LOCUS in every case.  I'm saying they need to be
13   based on generally accepted standards.  I'm here
14   today, my report, the scope of what I was asked to
15   do is not to comment on the LOCUS's role in
16   generally accepted standards.  My report, what I
17   see as my expertise, is to comment on the MCG and
18   the Anthem Guidelines, which to me are out of
19   keeping with generally accepted standards.  I use
20   the LOCUS as a way of illustrating that, not
21   because the be all and end all of generally
22   accepted standards is that they depend on the
23   LOCUS, but I think it's a good illustration of how
24   out of keeping with generally accepted standards
25   the Anthem and the MCG Guidelines are.
```

Page 66

```
 1    standards.  Our physicians are trained in generally
 2    accepted standards.  They generally know the
 3    structure of the LOCUS and the CALOCUS because
 4    these are just generally accepted standards and
 5    that is what they are following, but they are doing
 6    it from a clinical perspective, which means they
 7    are not going through and rating things 2'sand 3's.
 8    The UR office has the same set of standards but
 9    they are a bit more focused on the 2's and 3's but
10    they are all speaking the same language.  They are
11    all using the same generally accepted standards to
12    arrive at the best recommendation for that patient.
13         Q.   I guess my preliminary point was just
14    that those recommendations are based on
15    individual -- the way the individual is presenting
16    and that individual's particular history; right?
17    That's the data that goes in, that starts the
18    problem.
19         A.   I guess I'm just trying to have a sense
20    if you are somehow implying that that doesn't
21    involve a set of general guidelines.
22         Q.   I'm asking -- are the inputs
23    generalized inputs?
24         A.   Sure.  The inputs that the physicians
25    have is information about that patient seen through
```

Page 70

1    experience --

2                MS. REYNOLDS: Object to form.

3         A.    Yes.

4         Q.    (By Mr. Deegan) -- and arrive at some

5    result through that judgment?

6                MS. REYNOLDS: Object to form.

7         A.    I would say yes, they are responsible

8    for integrating all this.

9         Q.    (By Mr. Deegan) So again, do you have a

10   clinical practice as part of Silver Hill?

11        A.    Very small now.  I consult on cases

12   periodically.  I don't see any patients at Silver

13   Hill at the moment.  I have a few private patients

14   but it's smaller than it was.

15        Q.    Do you still use the LOCUS, CALOCUS or

16   ASAM in your clinical practice?

17        A.    Because my practice is small it's

18   relatively unusual now that I am referring patients

19   to different levels of care, but it is certainly

20   part of my internalized generally accepted

21   standards knowledge.

22        Q.    Could you elaborate on that?

23        A.    Meaning to me the instrument of the

24   LOCUS and CALOCUS is not -- I'm not trying to

25   portray and I don't think we're here -- I certainly

Page 71

1    don't think my expert testimony was supposed to say

2    that that is the be all and end all.  To me there's

3    a set of generally accepted standards that is very

4    well aligned with the LOCUS and CALOCUS but it's my

5    knowledge of generally accepted standards that I'm

6    here representing and that I use in my daily

7    practice as a physician, as a hospital

8    administrator and the LOCUS and CALOCUS and ASAM

9    are good illustrations of that.

10         Q.   But you don't need those to practice

11   within what you believe to be generally accepted

12   standards of care?

13         A.   That's like saying to me do I need a

14   potassium test in order to practice generally

15   accepted standards.  It is all my knowledge based

16   on a potassium test?  Of course not, but it is a

17   piece.  I don't want to give up the potassium

18   because at times it's very useful.  LOCUS is the

19   same way.  It's a very useful tool within my wider

20   frame.

21         Q.   I'm just having difficulty drawing a

22   distinction between the idea of what you seem to be

23   describing LOCUS representing versus utilization of

24   LOCUS in your practice.  So perhaps I'm missing

25   something, but sounds like at present you're not --

1    symptoms.  In fact, they state very clearly in a

2    number of places that the criteria for residential

3    treatment is that one has safety concerns.  They

4    supplement here and there in very minor ways but

5    the overall message is you decide whether they need

6    residential based on whether they are safe in a

7    lower level of care.  That's not the generally

8    accepted standard.  The generally accepted standard

9    is what is the most effective treatment and in

10   order to consider what the most effective treatment

11   is, you have got to evaluate the co-morbidities and

12   the underlying disorders and there is no reference

13   to that in these guidelines.

14        Q.   All right.  So we'll get to the MCG in

15   a few minutes.  I do want to qualify, though, are

16   you aware that all of the denials that you are

17   reviewing are conducted, finalized by physician

18   reviewers, psychiatrists?

19             MS. REYNOLDS: Object to form.

20        Q.   (By Mr. Deegan) Are you aware of that?

21        A.   I am aware.

22        Q.   So does that alter the baseline

23   analysis that you have when use something like the

24   reasonable person, but right, we're talking about

25   psychiatrists, not necessarily the reasonable

Page 116

1   two?

2         A.    Underlying conditions implies a

3   hierarchy; that there's essentially a superficial

4   set of symptoms on top and that underneath those

5   are the conditions.  I think that's an important

6   perspective.  Co-occurring disorders basically says

7   let's put that notion of a hierarchy aside for the

8   moment and just let's consider all the things that

9   are going on.  Now, in an ideal situation those two

10  get tied together but they can't always be tied

11  together.  In fact, sometimes there are

12  co-occurring disorders that really seem quite

13  distinct and they are not just underlying or

14  superficial manifestations of something else.  So

15  that's why it makes sense to have both these things

16  even though they are often not.

17        Q.    Item 3, Least Intensive and Restrictive

18  that is Safe and Effective, what is your

19  understanding of that?

20        A.    So that's a core principle and

21  certainly a part of generally accepted standards.

22  I think that the part that often gets neglected and

23  was neglected in the guidelines that I reviewed is

24  the effective piece.  Least intensive and

25  restricted, safe, that was well represented but the

Page 117

1  effective piece can sometimes be left off and it

2  was.

3          Q.    What falls in the scope of effective?

4          A.    So the notion that it's not sufficient

5  to just say let's find the level of care that's

6  least intensive and restrictive and safe.  You need

7  to find the level that is both safe and adequately

8  treating the totality of the person's illness.

9  That's where the effective piece has to be

10  included.

11          Q.    Again, what qualifies as adequately

12  treating the totality of the illness?

13          A.    That's a principle and the principle

14  that needs to be applied to the individual

15  depending on the individual's set of symptoms, set

16  of underlying conditions, diagnoses, co-occuring,

17  everything else, the treating physician then makes

18  a judgment based on the literature, based on the

19  treatment history, based on their experience of

20  what is the most effective treatment for them.  In

21  this case we're talking what level of care

22  provision, that option, not just what is the safe

23  level of care but what is the level of care that is

24  effective for them.

25          Q.    Item 4, Err on the Side of Caution.

1        Q.   (By Mr. Deegan) But do you think, is it

2   your opinion that the LOCUS and CALOCUS and the

3   dimensions that they do measure meet the generally

4   accepted standards of care for a level of care

5   determination?

6        A.   I think we're mixing apples and oranges

7   here.  The LOCUS and CALOCUS do not claim to be

8   patient assessment tools in general.  They are not

9   instruments that we use to say what is wrong with a

10   patient.

11        Q.   All right.

12        A.   They are instruments we use much more

13   narrowly to help us say what level of care is

14   appropriate for that patient.  As part of the

15   assessment of level of care we need to do a

16   multidimensional assessment.  That's not the LOCUS

17   and CALOCUS, but to do the LOCUS and CALOCUS

18   properly we need to be doing multidimensional

19   assessments with our patients.

20        Q.   So -- but again, I think that answers a

21   different question than I asked about whether the

22   LOCUS and CALOCUS and the dimensions that they

23   measure satisfy generally accepted standards of

24   care in your mind, your opinion, for tools that

25   assist with level of care determination?

Page 162

1    as written that's a criteria for inpatient

2    admission, not RTC, meaning if someone is at huge

3    risk of harming themselves or let's take behaviors,

4    they belong on an inpatient unit, not an RTC.

5         Q.   I'm sorry.  Where does the word

6    acute appear in subsection A?

7         A.   It's implied.  The word acute is not

8    there, although deterioration implies acute.  Acute

9    means it's quick and deterioration implies quick.

10        Q.   Deterioration implies change.  Wouldn't

11   you agree with that?

12        A.   It does.  Not a sizeable change,

13   though.  Usually status implies that's what they

14   usually are and now they have deteriorated from it.

15        Q.   On the face of subpart (A) that says

16   deterioration within the last 24 hours; right?

17        A.   No, it doesn't say that.

18        Q.   So --

19        A.   I think the point is getting lost that

20   I'm trying to make.  My point is that this is such

21   a severe requirement that it doesn't even apply to

22   residential treatment.  So you certainly don't have

23   any objection from me with the idea that it's

24   important to assess self-injurious behavior or risk

25   taking behavior when assessing higher levels of

Page 163

```
1    care.  Nobody would disagree with that.  The
2    problem is that that's a requirement of entering
3    residential treatment.  This line essentially
4    eliminates residential treatment from consideration
5    because now you have got people that either make
6    inpatient criteria and if they don't, now they
7    don't make RTC either and that sort of violates the
8    whole principles that RTC is one of the levels
9    lost.
10        Q.   So with respect to Criteria A, what
11   limiting factors are here for a reviewer, a
12   psychiatrist, medical reviewer, that are going to
13   limit their ability to determine whether an
14   individual is appropriate or at risk outside of a
15   24-hour structured setting?
16            MS. REYNOLDS: Object to form.
17        A.   So to me what limits it is the sentence
18   that came before, "Residential treatment center is
19   considered medically necessary when the member has
20   all of the following: The contra positive of that
21   statement which is logically equivalent is if they
22   don't have at least one of the following
23   residential treatment is not medically necessary.
24   That's what to me this statement is saying and that
25   is out of keeping with generally accepted
```

Page 164

1    standards.

2         Q.   So it's your conclusion -- so then they

3    are strung together by "and" I guess making them

4    conjunctive in nature?

5         A.   Correct.

6         Q.   Is it your -- so if we look at C and

7    D -- well, actually let's look at B.  So B, if we

8    look B, "The social environment is characterized by

9    temporary stressors or limitations that would

10   undermine treatment that could potentially be

11   improved with treatment while the member is in the

12   residential facility."  Would you say that that's

13   a general standard of care in determining whether a

14   residential care is an appropriate term of setting?

15        A.   It's better than A but it's still

16   problematic and the problematic word in this one is

17   temporary, because it says that again because it's

18   strung together; they are all required by "and"

19   that it has to be characterized by its temporary

20   stressor.  What that means is if it's not a

21   temporary stressor, it's a chronic stressor, they

22   don't qualify and I would dispute that.  I would

23   say that the chronicity of the stressor is

24   irrelevant to the determination in this context,

25   meaning that chronic stress could be a very good

Page 181

1    instruments like the LOCUS and the CALOCUS.

2          Q.    Okay. Why don't we break this into two

3    parts.  We'll take the first part.  Your opinion is

4    that the MCG placed too much emphasis on, for

5    example, danger to self.  Is that one component?

6          A.    Correct.

7          Q.    And danger to others?

8          A.    Uh-huh.

9          Q.    And behavioral health disorder, that

10   includes moderately severe psychiatric behavior or

11   other co-morbid conditions?

12         A.    So that on its own, the moderately

13   severe psychiatric behavior and other co-morbid

14   conditions is better.  I don't object to that

15   phrase on its own.  I do object to the way -- I

16   think we have to make it bigger for me to point

17   this out, but I do object to the way that requires

18   both, the phrase you just read, and serious

19   dysfunction in daily living.  Let's see if we can

20   find that.  If you look at the 3rd point down and

21   the fact that it says all of the following was

22   joined by an "and."

23         Q.    Let me ask you this.  So serious

24   dysfunction, daily living, is that in your mind

25   addressing functional status, that by itself?

Page 182

1      A.   It is.  So that it's good that they

2   mentioned functional status.  I'm happy with that.

3   I'm not happy, though, that they require both.  A

4   point of multi-axial assessment and the generally

5   accepted standards, when you look at all these

6   different things, it's not everything.  It's how do

7   you assess the individual elements and then see

8   them as part of a larger picture.  This makes it

9   clear I think that you have to have both, which I

10  think is too strong.

11      Q.   Well, moderately severe -- we'll move

12  up one line; "Moderately severe psychiatric,

13  behavioral, or other co-morbid conditions for

14  adult."  Do you see that?  Is that addressing

15  underlying conditions?

16      A.   It doesn't do it as well as I would

17  like.  I'm happy that they put in "or other

18  co-morbid conditions."  That's hinting in that

19  information, but it still falls short of what I

20  think it should do which is explicitly reference

21  underlying conditions which it does not do.

22      Q.   Again, a reviewer, a qualified

23  reviewer, physician, a psychiatrist or a

24  psychiatrist or board certified psychiatrist would

25  have that operating background, wouldn't they?

Page 197

1    the MCG is written.

2         Q.   I think maybe I'm being unclear.   I

3    think that what this discussion originated as is

4    your criticism of the MCG placing in order danger

5    to self, danger to others and then the

6    co-morbidity, co-morbidity, functional status

7    elements and that somehow the ordering one makes a

8    difference and two, that you get a short shift to

9    co-morbidities and underlying conditions.  Now, you

10   did say Items -- if we move on to Recovery

11   Environment --

12        A.   Before we move on, though, can I

13   comment on something because you actually pointed

14   out something to me that's really interesting.  I

15   think you are actually mentioning a really

16   important thing here.  So -- I had not seen this

17   before.  If you read the LOCUS, the definition of

18   risk of harm is much more expansive in a clinically

19   appropriate way than the way it is written in the

20   MCG Guideline.  So I would not equate those two.

21   Risk of harm, as you pointed out in the LOCUS, is

22   really a more general concept and as a psychiatrist

23   reading risk of harm, I see the total risk of harm

24   but that's not what it says in MCG.  What it says

25   in MCG -- I've got to pull it back up to make sure

Page 198

1    I read it correctly -- is danger to self.  Risk of

2    harm and danger to self have very different

3    meanings for psychiatrists.  Danger to self means

4    suicidality; that's what MCG says, narrow; danger

5    to others, narrow; homicidality, narrow; risk of

6    harm in the LOCUS, much more expansive as

7    illustrated with the later point.  So I really see

8    those as quite different.

9            Q.   So if we look then at the -- let's go

10   to Serious Risk of Harm, Criteria 4 under Risk of

11   Harm.  I hear what you're saying.  So would you

12   agree that a rating of 4 on Serious Risk of Harm

13   constitutes the trump factor under the LOCUS for

14   RTC?

15           A.   I'm sorry.  Let me pull it up.  So I do

16   agree it's a trump factor and very nicely it lists

17   four different ways of getting there, which are not

18   included in the MCG items.

19           Q.   Hold on.  So current suicidal or

20   homicidal ideation, that would be danger to self or

21   others?

22           A.   That would be one.

23           Q.   And is there a time component to the

24   MCG?

25           A.   Let me look and I can tell you.  I

1   levels as well.  This is more instructional to you.

2   The general way in the field we talk about it is

3   being three gross areas, large areas of level.

4   There's high, which is inpatient.  There's low,

5   which is regular once a week outpatient, and then

6   there's intermediate and the intermediate level is

7   where RTCs, IOPs PHPs would be set.  That's the

8   contention so that's why I don't quite agree with

9   the word high.  I would call it intermediate

10  levels.

11       Q.   I see, but what about intensity of

12  service?  I guess to be more precise with my

13  question, in your experience are there IOPs or HPHs

14  that provide intensive services than RTCs?

15       A.   Certainly no good RTC.  Certainly no

16  RTC that I would recommend.

17       Q.   All right, and then if we return to the

18  idea of -- I'm sorry, there's jets going past my

19  office.  The Air and Water show is this weekend.

20  Going back to the idea of least restrictive, safe

21  and effective, that principle, can you give me a

22  short explanation of how you view that or what it

23  is?

24       A.   The way I see it is that the goal of

25  treatment is to get these patients back to the

Page 220

1    level of functioning and to the environment where
2    they would want to be.  Almost entirely patients
3    want to be in their families in their homes.  They
4    want to be back at school and back at work and to
5    do that most effectively one eventually wants to
6    live back as an outpatient.  So to me, the goal of
7    treatment is to put them in a more intensive
8    environment only when they need that to have safe
9    and effective treatment, and the goal then is to
10   move them back towards their quote-unquote normal
11   life where they can go back to school.  So that's
12   the way I would describe to somebody.
13   Interestingly, it's funny in these conversations
14   that it often sounds like it's the institutions or
15   the physicians that are arguing for higher levels
16   of care.  That's actually almost never the case.
17   The cases that take patients from their families,
18   come to us asking for more intensive, higher levels
19   of care because they know they need that level of
20   service to get better and we're in the position of
21   assessing whether they can benefit from those
22   levels of care, but it's virtually never the case
23   that we're arguing you need to stay at an RTC when
24   the family and the patient don't think so.  They
25   know the level of care they need.  So our goal is

Page 221

1    to get them back home, so as soon as they are able

2    to do that and they are ready, believe me, that's

3    what we want to do.  So to me this concept that you

4    were citing the principle of least restrictive is

5    actually a very easy and organic one.  It's really

6    following patients and the families lead on getting

7    them back home as soon as they are ready to benefit

8    from that level.

9         Q.   Right.  So now if we return to the

10   bullet point that you specifically criticized,

11   "Very short term crisis intervention and

12   resource planning for further care at

13   nonresidential level is unavailable or

14   inappropriate."  First of all, what is short term

15   crisis intervention in your experience?

16        A.   Actually, this item jumps out at me and

17   jumped out at me when I read it because it's an odd

18   contrast.  A very short term crisis intervention, I

19   suppose, and I don't think it's defined here, is

20   some kind of mental health professionals coaching

21   them on whatever the acute problem is and quickly

22   getting them back to a higher functional level.

23   It's not something that I have been in an

24   environment that offers particularly and it

25   actually feels like quite an odd item to have

Page 231

```
 1    MCG Guidelines Discharge Criteria.  "A patient can
 2    and should be discharged from a residential level
 3    of care to a lower level of care because some of
 4    the acute symptoms; for example, suicidality,
 5    homicidality, functional impairments, medical
 6    co-morbidities are manageable at a lower level of
 7    care.  Notably, the discharge criteria do not
 8    mention chronic conditions."  I just got a notice
 9    from my headset that my battery is low so at some
10    point I may have to switch back to the regular
11    microphone or maybe try an alternative.  Jonathan,
12    if you pull up the MCG again.  We'll scroll down,
13    Discharge Guidelines, if we could have those sort
14    of rolling over from one page to the next.  Thank
15    you.  So I'm curious, when you have manageable at a
16    lower level of care in your criticism, how are you
17    interpreting manageable?
18         A.    Right.  So that really is the focus of
19    what I'm getting at there which is that to me the
20    word manageable stands in contrast with safe and
21    effective treatment, and to me the standard of what
22    we do when we recommend levels of care, in
23    particular we're talking here about residential
24    levels versus outpatient levels, our focus is not
25    on management.  Management to me means essentially
```

Page 232

1  keeping them safe, keeping something bad from

2  happening.  That's managing.  Treatment is

3  focussing the treatment on improving or preventing

4  deteriorations in an active therapeutic way.

5  Management to me connotes essentially kind of

6  keeping things okay but not actively treating and

7  to me the standard of care in generally accepted

8  standards and really the reason for most cases for

9  residential treatment is that it's the appropriate

10 level for active treatment.  So that's the

11 distinction I'm making there.

12       Q.   Well, I'm having a little difficulty

13 understanding.  So managing of behavioral health,

14 doesn't that necessarily involve treatment?

15       A.   This may be a case where it's an English

16 word and I could understand your feeling but that's

17 not what it means to a psychiatrist.  To a

18 psychiatrist managing a condition implies a much

19 more passive, almost defensive stance of let's keep

20 something bad from happening, where treatment

21 implies an active let's identify and address the

22 underlying disorders.  That's what the word

23 management means in the context of psychiatric

24 treatment.

25       Q.   Well, so I'm trying to figure out what

Page 237

1    5:00 o'clock.  It's getting a little fuzzy.  Can

2    you remind me what page in my report you are

3    citing?

4            Q.    It is on page 8, the bottom paragraph.

5            A.    I got it.  Thank you.

6            Q.    Do you need help finding it?

7            A.    I've got my report here but I'm just

8    reading the discharge of what I was getting at

9    there, but I just wanted to double-check.  So what

10   I was getting at here is the idea that when one is

11   considering discharge of a patient from residential

12   levels of care, chronic conditions are really an

13   important thing to be considering.  In other words,

14   most of the conditions we care for at intermediate

15   or high level psychiatry have at least a chronic

16   component.  In other words, we rarely cure people.

17   We help people, we treat people.  We make them

18   better, but there is almost always a level of

19   vulnerability, a level of difficulty that remains.

20   So clearly our goal is not to keep people at a

21   residential level of care until their disorder is

22   completely gone.  We have to be able to figure out

23   what elements of their chronic condition can

24   continue to be treated or managed, for that matter,

25   sometimes at other levels of care.  So from the

Page 238

1    perspective of a psychiatrist considering chronic

2    conditions are an almost constant component of

3    thinking about discharge.  So when I read these

4    guidelines it surprises me that they are not

5    mentioned given how important it is as a

6    consideration.

7          Q.   Let me ask you this.  When you look at

8    these guidelines, and correct me if I'm wrong

9    maybe, as we look at a potential discharge for

10   someone, say for example, schizophrenia, can we

11   agree that that's a chronic condition?

12         A.   Like most, it certainly has a chronic

13   component to it and it has acute components as

14   well.

15         Q.   Let's say the acute components are

16   resolved.  Is it your position that in the absence

17   of the acute components the individual should

18   remain in the RTC setting?

19         A.   See, this is where we need guidelines

20   to help us with because it's not a black or white.

21   Since some component always remains, clearly a

22   guideline that said any chronic component means

23   they have to stay would be wrong.  On the other

24   hand, one similarly could not say don't disregard

25   chronic components because they are never going to

Page 239

1   fully go away anyway; you have to discharge them

2   anyway.   The issue comes down the details, the

3   subtleties of how do we think about the chronic

4   component.  What aspects of the chronic component

5   has to be treated, managed, considered in making

6   that determination.  That's a really crucial

7   decision that, to me, the value of guidelines is to

8   help bring some standardization to the way

9   physicians and reviewers are operating and in the

10  absence of those at minimum we have a lack of

11  standardization but at worse, somebody could

12  actually mistake the absence to say, for example,

13  what you just said.  Somebody could read that well,

14  they don't mention the chronic component so maybe

15  chronic components should be irrelevant to me and I

16  shouldn't consider them in discharge criteria.

17          Q.   Can I interject here?

18          A.   Sure, please.

19          Q.   All right.  I think -- I want to make

20  sure that we're on the same page because if you

21  look at the discharge guidelines that we had open

22  on the screen here, it's not clear to me that

23  chronic is something that is or is not inherently

24  part of this analysis; right?  If you give me a

25  moment we have risk status.  This is a factor that

1    guidelines.  They come in and out because the

2    practice that's really been generated by the

3    failure of reimbursement is -- and you could ask

4    any psychiatrist, I know that they have had this

5    experience with doc to doc and peer reviews.  They

6    get told well, the acute symptom is over and our

7    plan now tells us that that means they need to be

8    discharged.  You say well, what about residential?

9    Well, they are not acute.  There's no acute safety

10   issue.  We have a chronic condition we need to work

11   on.  Well, that's not listed in the criteria.

12       Q.    Can I pause you there for a second?

13       A.    Sure.

14       Q.    I like your example.  I think your

15   example is an interesting example.  My question to

16   you, though, is what proportion of chronically ill

17   schizophrenics are coming in on private pay

18   programs that are not adolescents or under the age

19   of 26?  Aren't the majority in your experience,

20   maybe not at Silver Hill but in the field going to

21   be a Medicaid population, a public aid population

22   that's irrelevant to our current discussion?

23       A.    Well, it's an interesting point.  So it

24   isn't my direct experience at least in the last

25   part of my career because at Silver Hill we don't

Page 269

1  not trying to misstate it.

2      A.   What I think I said is I don't have

3  those numbers so -- but what I think is a logical

4  conclusion of my opinion about these guidelines is

5  that it narrows significantly the window of who

6  would be considered appropriate for this kind of

7  reimbursed care as compared to the generally

8  accepted standard which would have a wider window.

9  So what is logical from that is that there are

10  individuals who don't fit in the narrow window,

11  meaning they are being denied residential now.  I

12  would imagine that might include the named

13  individuals in this case, but again I'm not opining

14  specifically on their cases; and a wider window

15  which I believe is indicated by generally accepted

16  standards would include those and they would not be

17  denied in that case.  So yes, my conclusion is that

18  it is likely that there are people being denied who

19  should not be denied because of the way these

20  standards are written.

21      Q.   The specific thing I wanted to ask

22  about that was people who are being denied who

23  should not be denied, that could occur right at

24  admission; right?

25      A.   Yes.