# EXHIBIT 29

Page 1

1            UNITED STATES DISTRICT COURT
2            EASTERN DISTRICT OF NEW YORK
3

   MARISSA COLLINS, on her              )
4  own behalf, and on behalf of         )
   all others similarly situated,       )
5  and JAMES BURNETT, on behalf of      )
   his son, and on behalf of all        )
6  others similarly situated,           )
   and KARYN SANCHEZ, on behalf of      )
7  her minor son and all others         )
   similarly situated,                  )
8                                        )
            Plaintiffs,                  )
9                                        ) Case No.
    Vs.                                  ) 2:20-cv-1969
10                                       )
   ANTHEM, INC. And ANTHEM UM           )
11 SERVICES, INC.,                       )
                                         )
12            Defendants.                )
13
14
15
16            VIDEOTAPED DEPOSITION OF
17                 MARC FISHMAN, M.D.
18
19
20
21
22  JOB NO: 5361537
23  TAKEN:  August 25, 2022
24  TIME:  9:30 a.m.
25  STENOGRAPHICALLY REPORTED BY:
    Brandi Bigalke, RPR, RSA, CSR NO. 084-4870

Page 2

```
 1                REMOTE APPEARANCES:
 2    On Behalf of the Plaintiffs:
 3    ZUCKERMAN SPAEDER LLP
      BY: CAROLINE REYNOLDS, ESQ.
 4        SAMANTHA M. GERENCIR, ESQ.
          101 East Kennedy Boulevard, Suite 1200
 5        Tampa, Florida 33602-5838
          EMAIL:  Creynolds@zuckerman.com
 6
 7
 8    On Behalf of the Defendants:
 9    REED SMITH LLP
      BY: ROBERT DEEGAN, ESQ.
10        JENNIFER B. COOK, ESQ.
          10 South Wacker Drive, 40th Floor
11        Chicago, Illinois 60606
          EMAIL:  Rdeegan@reedsmith.com
12
13
14
15
16
17
      ALSO PRESENT:
18
      John Worobij, Gravitystack
19
      Kevin Duncan, Video Operator
20
21
22
23
24
25
```

Page 26

1    would say that there are documents that reflect a
2    predominant consensus, yes.
3              Q.    By predominant, can you elaborate on
4    that?
5              A.    That most people with knowledge of
6    the field would concur that they articulate the
7    current consensus for what constitutes the
8    generally accepted standard of care.
9              Q.    Okay.  And is it in your
10   experience -- can you identify the documents or
11   the items that you believe fall within that
12   category of predominant?
13             MS. REYNOLDS:  Object to form.
14             THE WITNESS:  Yeah.  They might
15   include clinical guidelines.  For example, a
16   professional association through a process of
17   expert consensus might publish a clinical
18   guideline.
19             So, for example, the American
20   Society of Addiction Medicine published a clinical
21   guideline for the treatment of opioid use
22   disorder.  I know about that one because I was on
23   the advisory committee, and so that -- of how a
24   predominant consensus is articulated.  And I would
25   say that that represents elements of the generally

Page 27

```
 1    accepted standard of care.
 2                   And as I said in my report, I think
 3    the American Society of Addiction Medicine, ASAM
 4    Criteria is another such document that articulates
 5    and reflects the generally accepted standard of
 6    care.
 7    BY MR. DEEGAN:
 8            Q.      And aside --
 9            A.      Those are two examples.
10            Q.      All right.  Two examples.
11                   Do you have other examples?
12            A.      Well, those are two starting places.
13                   Do you want me to try to find other
14    ones?
15            Q.      Just asking for examples.
16                   I'm trying to define, you know,
17    figure out where the boundaries of -- you know,
18    you opine a lot about generally accepted standard
19    of care, and that topic has come up couple of
20    times this morning, and I'm trying to define the
21    boundaries of that.
22            A.      Yeah.  I think another place that
23    one would look for articulation of the generally
24    accepted standard of care is in local regulatory
25    guidelines which help define the standard of care.
```

Page 81

1    BY MR. DEEGAN:

2         Q.     Okay.  And would you agree that

3    that's what your report says, correct?

4         A.     Yes.

5         Q.     And did you look at any individual

6    files to determine whether -- to test that

7    conclusion?

8         A.     I did not.  I was not asked to opine

9    about individual cases.  My opinion was that as

10   written, guidelines will result in that

11   restrictiveness.

12        Q.     And how are you able to base that

13   with respect to Anthem's population, the

14   population that Anthem is making determinations

15   with in the absence of individual files?

16              MS. REYNOLDS:  Object to form.

17              THE WITNESS:  I can only form an

18   opinion about the guidelines themselves, which

19   make very explicit statements about what is to be

20   considered medically necessary and not.  And so my

21   opinion is about how the guidelines themselves

22   shape that determination about medical necessity.

23   And it's my opinion that that is overly

24   restrictive.

25              I don't know about any one

Page 108

```
 1   treatment need decisions treatment placement
 2   decisions.  So it's the first step.  And a set of
 3   alternate guidelines that did that would be moving
 4   towards a good first step.  I'm all for it.  It's
 5   not enough, but it's a good start.
 6   BY MR. DEEGAN:
 7          Q.     Okay.  So just to clarify.
 8                 So actual organization, the way
 9   information is presented in level of care
10   guidelines, is it your opinion that that
11   organization -- organization itself is a component
12   in the analysis of whether something is
13   a generally accepted -- satisfies the generally
14   accepted standards of care or not?
15          A.     Yes.  It should be multidimensional.
16   It should be holistic.  It should take into
17   account these core concepts.  If it's -- I don't
18   want to wordsmith about it.  If it's manned
19   differently, if it's ordered differently, if it's
20   delineated according to a different taxonomic
21   rubric, that's also okay.
22          Q.     I see.
23                 What about placing emphasis on one
24   factor versus another?
25                 So, for example, does the ASAM
```

Page 145

1          Q.      -- ASAM suggests that you should be

2     at a 3.1, there's no 3.1 in your area necessarily,

3     rather than going to a 3.5 -- sorry, there's no

4     dedicated 3.1 in your area, rather than being sent

5     to a 3.5, it's your opinion that you can

6     essentially, based on the individual circumstances

7     and the individual services available to that

8     individual, that person, you create your own 3.1?

9          A.      Yeah.  Or close enough.  And this

10     would be a risk-benefit analysis both for the

11     individual patient and for the potential downside

12     of 3.5 which is somewhat more restrictive and, you

13     know, does that have some downside, it might

14     depending on the upside.

15                 And it's a balance.  Would the

16     supportive residential structure of that

17     particular recovery house be structured and

18     supportive enough for this patient to substitute

19     for the equivalent residential component of the

20     hoped-for available 3.1.  Would the clinical staff

21     of the 2.1 or 2.5 intensive outpatient that you're

22     utilizing have enough integration with the staff

23     of the recovery house to create a -- I don't want

24     to go as far as to say seamless, but approaching

25     in the integration of the two components, the

Page 146

1    clinical component and the residential component

2    that we would have hoped for in 3.1, could you

3    make good enough with the shoestring and beeswax

4    approach of putting together 2.1 or 2.5 and the

5    recovery residence because those particular

6    instances of that 2.1 and that recovery residence

7    play well enough or integrate well enough

8    together.

9              And so the burden is to demonstrate

10   that it is equivalent enough to be sufficiently

11   effective for that patient.  If it works, that's

12   great.  The idea is, okay, you got to demonstrate

13   that the default of rounding up is not necessary.

14   But it's an alternative approach which works

15   sometimes.  I'm okay with that.

16             Q.    All right.

17             A.    But it does require -- it isn't

18   automatic.  It requires, you know, a thoughtful

19   exercise of let's go through our paces and see if

20   it's going to work, or let's round up.

21             Q.    Okay.  And just to be clear, but in

22   terms of going through the paces, that means

23   looking at the individual circumstances, the

24   individual available services?

25             A.    Yeah.  That's right.

Page 180

1   and of itself is indicative of an overemphasis on

2   acuity?

3                   MS. REYNOLDS:  Object to form.

4                   THE WITNESS:  It to me is part of an

5   overall impression given by these criteria that is

6   cumulative.  It includes the use of those words,

7   but it also includes, as I mentioned before, a

8   question {ph} that there's a certain requirement

9   for direct medical service intensity.

10                  That there needs to be -- this is

11  described later on in another one of the

12  alphabetical sections -- that there needs to be a

13  certain amount of psychiatric severity.

14                  What I'm describing or trying to

15  describe or trying to articulate is to me a shift

16  to higher severity and higher crisis status than I

17  think is warranted as the pathway for admission to

18  this level of care.

19                  Not that there aren't other

20  pathways.  And so if a person needs certain

21  pathways in these guidelines, then that's

22  appropriate.

23                  But again, my point is too much

24  emphasis on the acute without enough consideration

25  of what might be contributed by the chronic and

                                            Page 181

1      cumulative, that also puts people at risk of

2      eminent harm.

3      BY MR. DEEGAN:

4              Q.     Okay.  And I think earlier -- well,

5      actually, let's do this in two phases.

6                     First, would you agree that under

7      Subsection F1, right, there is actually two

8      conditions that would allow an individual to

9      satisfy F1; is that right?

10                    MS. REYNOLDS:  Object to form.

11                    THE WITNESS:  In F1 that there are

12     two -- say that again, please.

13     BY MR. DEEGAN:

14             Q.     Sure.

15                    That F1 -- you can satisfy F1 by

16     either the clause before the 'or' in F1 or the

17     clause after the 'or' in F1.

18             A.     Do you mean the distinction between

19     substance use or mental health symptoms?

20             Q.     Yes.  Experiencing an acute crisis

21     marked by intensification of substance use, or

22     mental health symptoms that pose a serious risk of

23     harm to self or others without 24-hour monitoring

24     and support.

25                    MS. REYNOLDS:  Object to form.

1    different is that, or how do you see the

2    difference between that and acute stress disorder?

3         A.    Well, I think it's a nice

4    illustration of a nonmedical intervention, but I

5    don't think that it's that different.

6         Q.    Okay.  And then we see "safely and

7    effectively initiate antagonist or agonist

8    therapy."

9              Do you see that?

10        A.    Yes.  Not --

11        Q.    Then there's the parentheticals,

12   right, naltrexone and methadone?

13        A.    But non-materially different, I

14   agree.

15        Q.    Okay.  So again, I'm trying to

16   draw -- the Sub Criteria 3 in F is essentially the

17   same as Sub Criteria 3 in 5, Dimension 5 here for

18   the 3.7, same level of care?

19        A.    Yes.  Not materially different.  But

20   for me the context is again the point of the

21   context of the inappropriate characterization of

22   the level of care as emphasizing direct medical

23   service delivery, and that adds, in my view, to

24   the cumulative impression of an over-restrictive

25   emphasis on acuity and severity.

Page 216

1   population, I don't think that by doing that that
2   is providing more care than is necessary.  I don't
3   think that violates the standard of care.
4              It might be more expensive.  I don't
5   know it violates -- say necessarily does people
6   harm.
7        Q.     I see.
8        A.     But I think that to set it as an
9   inclusion criteria conveys the message of a
10  requirement for severity asking the experienced
11  clinician to say, well, that's a person that needs
12  to be provided direct medical staff service at
13  least weekly, and that conveys a picture of a
14  certain level of severity that I don't think --
15  that I think is overly restrictive and overly
16  acute for this level of care because I think that
17  there are many, many patients appropriately
18  treated in this level of care who would be
19  monitored by the physician but whose direct
20  service provision would be by nurses and
21  nonmedical clinicians that the doctor or other
22  member of the medical staff would be tracking
23  their progress, but not necessarily directly
24  hands-on at the level of week by week.
25              Might be, but wouldn't have to be

Page 217

1      for all patients.  And so that for me is -- sets a

2      threshold that is inappropriate.

3              Q.     I see.

4              So does this go to your

5      impressionistic -- cumulative impression opinion

6      that has come up a couple of times this afternoon?

7              A.     It adds to it, yes.

8              MS. REYNOLDS:  Form.

9              THE WITNESS:  And by the way, it's

10     also in residential treatment center without

11     24-hour nursing.

12     BY MR. DEEGAN:

13             Q.     Okay.  So I think we'll get to that

14     example next.

15             So you have experience in managing

16     3.7 facilities, right?

17             A.     Yes.

18             Q.     Are there requirements with respect

19     to how often a physician evaluates an individual?

20             A.     No.

21             Q.     So you're not even -- in your

22     facilities you don't even -- it's not even a

23     requirement to evaluate them at admission?

24             MS. REYNOLDS:  Object to form.

25             THE WITNESS:  Yes, at admission.

Page 223

1    and we're just discussing the CG-BEH-04.  And I

2    think what we can do now, why don't we move on

3    to --

4                    MR. DEEGAN:  John, if you could pull

5    up page 26 of the report.

6    BY MR. DEEGAN:

7            Q.    Okay.  So we've pulled up page 26 of

8    your report, the MCG Guidelines - deviations from

9    generally accepted standards of care.  And this

10   section runs through the -- halfway through page

11   29.  And then you have Subpart A, MCG Guidelines,

12   and you list a number of bullet points.

13                    Can you confirm that those are the

14   four areas in which you believe the MCG deviate

15   from generally accepted standards of care?

16                    MS. REYNOLDS:  Object to form.

17   BY MR. DEEGAN:

18           Q.    Are you able to answer?

19           A.    Oh, yes.  My apologies.  I thought

20   you heard me.

21           Q.    Okay.  If you scroll to the next

22   page, please.

23                    All right.  Here we have Subpart B,

24   Inadequate attention to multidimensional

25   assessment.

Page 224

1                   So I think we've talked variously

2      today around different dimensions in or associated

3      with ASAM, right?

4            A.     Correct.

5            Q.     And at -- level those dimensions --

6      include acute intoxication and/or withdrawal

7      potential, biomedical conditions and

8      complications, emotional, behavioral, or cognitive

9      conditions and complications, readiness to change,

10     relapsed continued use or continued problem

11     potential, and recovery of living environment.

12                  Does that accurately state the six

13     dimensions in the ASAM?

14           A.     Yes.

15           Q.     And within those the ASAM also

16     grades severity?

17           A.     Yes.

18           Q.     Okay.  And is it your opinion that

19     the MCG do not address the dimensions described by

20     the ASAM Criteria?

21           A.     Well, I think they address them in

22     insufficient detail, and I think they -- by not

23     providing some granularity and some illustrated

24     examples, they don't provide what I think is

25     sufficiently rich guidance to the user to fill out

Page 225

1    that multidimensional assessment, which I think is

2    necessary.

3              Another issue is I think that of the

4    six dimensions, there is particularly insufficient

5    attention paid to Dimension 3, or psychiatric

6    psychological comorbidity as a pathway for the

7    inclusion criteria for admission.

8         Q.    Okay.  So there are a number of

9    points there.

10              So when you say a lack of richness

11   for a user, I just want to be clear, is that true

12   regardless of whether the user is a psychiatrist,

13   an addiction medicine physician who is certified

14   in addiction medicine, a physician who is board

15   certified psychiatrist?

16              Does that change your opinion?

17        A.    No.  The issue is since we, as you

18   and I have discussed, do want to allow for

19   individualization and clinical judgment, and that

20   so much interpretation is appropriately needed,

21   illustrations and examples are very helpful to

22   convey the details and the intention and the

23   meaning.

24              So one of the things in the

25   guidelines that we were previously reviewing today

Page 226

1    is that they did have a variety of examples that

2    were I thought very useful illustrations to the

3    user.  So that's a plus to them.  It makes the --

4    longer to read, but it makes it richer, in my

5    view.  And the lack of richness takes away from

6    what I think is a necessary emphasis on

7    multidimensional assessment.

8         Q.    But isn't multidimensional

9    assessment going to be the background approach

10   that a psychiatrist is going to take when making a

11   level of care determination?

12              MS. REYNOLDS:  Object to form.

13              THE WITNESS:  Yes.  I agree that

14   psychiatrists will be trained in that approach.

15   And for that reason, it would be useful to give

16   them illustrations that give examples of what is

17   meaned by this level of severity, that level of

18   severity, what is a crisis, what is not a crisis.

19              We've talked a little bit about this

20   today in the use of parentheticals to convey the

21   nuance of what is meant by certain words that's

22   helpful to understand their intent.

23   BY MR. DEEGAN:

24        Q.    So is it your opinion that the

25   physician reviewer is coming into the RTC level of

Page 256

1          A.     Yes.  Yes.  And this is better.

2          Q.     Okay.

3                 MR. DEEGAN:  So let's go to on the

4     left-hand side, John, would you go to the second

5     page again.

6    BY MR. DEEGAN:

7          Q.     I do want to talk about this bullet

8     point very short-term crisis intervention and

9     resource planning for further care at

10    nonresidential level is unavailable or

11    inappropriate.

12                And I think you have -- you take

13    specific umbrage to this criteria?

14         A.     Umbrage, yes.

15         Q.     Is that fair to say?

16         A.     Yes.

17         Q.     On page 28 of your report?

18         A.     Yes.

19         Q.     But in the context of the described

20    anecdotally as the Goldilocks factor, isn't this

21    supportive of the idea that you're keeping a

22    person in the least restrictive environment to be

23    treated safely and effectively?

24                MS. REYNOLDS:  Object to form.

25                THE WITNESS:  I think it doesn't do

Page 257

1    that.  I think it reads like a let's do the least

2    possible and let's find a short-term crisis

3    intervention Band-Aid, Band-Aid is my words, it

4    may be unfair coloration, but it expresses the

5    impression given here as if that was equivalent to

6    residential treatment.

7                    And crisis intervention care tends

8    to be, as I'm familiar with it, not that I know

9    every instance of it, but to be three days for

10   patients that you're trying to -- that might be

11   temporarily suicidal, you're trying to keep out of

12   the hospital to use a phychiatric analogy rather

13   than an SUD analogy, but it's not equivalent to

14   the effectiveness of residential care that

15   attempts to provide a habilitative or

16   rehabilitative treatment service.  It's a keep

17   them safe for the moment while we figure something

18   out.

19   BY MR. DEEGAN:

20           Q.    Well, so I hear what you're saying.

21                    But in the context of the other

22   bullet points, isn't it indicative of keeping a

23   person in their home environment if possible until

24   they're stable enough for a short-term crisis

25   intervention?

Page 258

```
1              MS. REYNOLDS:  Objection.  Sorry.
2    BY MR. DEEGAN:
3         Q.     In order to keep -- in order to --
4    it means that they're not appropriate for
5    residential level of care, a restrictive --
6         A.     Sure.  That's right.  And you can
7    make the argument that it all pivots around the
8    word "inappropriate," and that by saying --
9    declare it inappropriate or unsuitable alternative
10   to nonresidential care, you know, I reject that
11   bullet point.  But I think that it's out of left
12   field as creating the impression of equivalence.
13   Again, would that alone be enough to say that
14   these don't comport with generally accepted
15   standards of care, no, but it's awfully worrisome
16   to me when we're looking for clinically
17   appropriate matching for the habilitative or
18   rehabilitative treatment and the reviewer is
19   directed to consider whether just keeping them
20   temporarily safe would be equivalent.  I think
21   that's rarely the case.
22              MS. REYNOLDS:  And can I just lodge
23   an objection to the last question.  I just didn't
24   get a chance.  We're starting to talk over each
25   other.
```