**FILED**
**CLERK**

5/31/2023 8:53 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARISSA COLLINS, et al.,      *    Case No. 20-CV-01969(SIL)
                       *
         Plaintiffs,   *    Long Island Federal
                       *     Courthouse
    v.               *    100 Federal Plaza
                       *    Central Islip, NY  11222
ANTHEM, INC., et al.,      *
                       *    April 28, 2023
         Defendants.   *
                       *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE STEVEN I. LOCKE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:         CAROLINE E. REYNOLDS, ESQ.
                          Zuckerman Spaeder, LLP
                          1800 M Street, NW, Suite 1000
                          Washington, DC  20036

For the Defendants:         REBECCA R. HANSON, ESQ.
                          Reed Smith, LLP
                          10 S. Wacker Drive, Suite 4000
                          Chicago, IL  60606

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, CT 06484 (203)929-9992**

1       (Proceedings commenced)

2            THE CLERK:  Calling Case 20-CV-1969, Collins, et

3    al, versus Anthem, Inc., et al.

4            Counsel, please state your appearance for the

5    record.

6            MS. REYNOLDS:  Good morning, Your Honor.  This is

7    Caroline Reynolds, from Zuckerman Spaeder, on behalf of the

8    plaintiffs.

9            THE COURT:  Good morning.

10           MS. HANSON:  Good morning, Your Honor.  Rebecca

11   Hanson on behalf of the Anthem defendants.  I have with me

12   Dionne McCoy.  She's with Elevance Health, in-house counsel.

13   I do not have an appearance on record.

14           THE COURT:  Okay.  No objection?

15           MS. REYNOLDS:  No objection.

16           THE COURT:  Welcome aboard.

17           All right.  We're here for oral argument on the

18   motion for class certification.

19           It is not a secret that I just told my employment

20   law class who's with us today that I expect this to be the

21   highlight of my week.  And that includes the fact that

22   yesterday I attended a presentation by the Chief Justice of

23   the Ukraine Supreme Court.  So no pressure on you.

24           What's going to happen is I have obviously some

25   questions I want to ask you.  Do not be concerned that I will

1    cut you off such that you can't make whatever record you

2    want.  You will get a chance to say everything you need to

3    say, highlight whatever you need to highlight, but there are

4    some questions I do have.

5           Starting with Ms. Reynolds.

6           I understand that to your mind, *Wit*, and I don't

7    know how to -- *Bersanell* (ph), whatever it is, were wrongly

8    decided.  So let's just assume that.

9           But my question to begin with is on the facts, and

10   with respect to *Wit*, I'm talking about just the first *Wit*

11   class, I know there were three classes in the case, at least

12   according to the circuit, I mean, how is that case factually

13   materially different than this case?

14          MS. REYNOLDS:  And when you say the first *Wit*

15   class, are you talking about the state mandate class that --

16          THE COURT:  Not the one with state law.

17          You can stay seated by the way, or if you want to

18   stand, that's fine, but use the lectern because the mic won't

19   pick you up.

20          MS. REYNOLDS:  Okay.

21          THE COURT:  I think when they're listed in the

22   opinion there are three classes.  One has to do with state

23   law, which isn't about this.  The other was a class that

24   began with an A whose name eludes me at the moment, but that

25   also seemed different.

1          MS. REYNOLDS:  Sure.  The *Wit* case is actually two

2     cases consolidated.

3          THE COURT:  Okay.

4          MS. REYNOLDS:  So the case that's captioned, *Wit*

5     *vs. United Behavioral Health* concerned residential treatment

6     for mental health and substance use disorders.

7          THE COURT:  Okay.  Pull the mic a little closer.

8          MS. REYNOLDS:  Yes.  And the -- and the class in

9     that case was asserting -- sorry, there were two classes in

10    that case.  There was a guidelines class that was challenging

11    the guidelines as being inconsistent with the class members'

12    plans and there was a state mandate class in which the class

13    members were alleging that state law required UBH to use

14    particular standards to decide medical necessity.

15         THE COURT:  Okay.  The state law thing is not an

16    issue here though.  Right?

17         MS. REYNOLDS:  No.

18         THE COURT:  So how -- with respect to the former --

19         MS. REYNOLDS:  Yes.

20         THE COURT:  -- how is it materially different than

21    what we're dealing with here, if it is?

22         MS. REYNOLDS:  Well, I mean, it's the -- a very

23    similar.  It's pretty much the same legal theory, except in

24    that case we did not assert a Parity Act claim so that claim

25    is --

1          THE COURT:  The Parity Act, okay.

2          MS. REYNOLDS:  Yes.  Sorry.  The Mental Health

3   Parity and Addiction Equity Act claim that we assert in this

4   case was not asserted in the *Wit* case.

5          And, you know, it is a different company and a

6   different set of guidelines, but the legal theory and sort of

7   the way that we went about proving it are very similar to

8   this case.

9          THE COURT:  Okay.  With respect to the Parity

10   Act claim, what facet does it add to this motion that I

11   should be paying attention to?  Or is it all the one motion

12   really applies to both sets?

13          MS. REYNOLDS:  I think it's -- yeah.  It is one

14   motion that applies to --

15          THE COURT:  Right.

16          MS. REYNOLDS:  -- all of the plaintiffs' claims and

17   we don't see a distinction.  There's been -- really the

18   arguments that Anthem asserted against certification of the

19   Parity Act claim are exactly the same as what they asserted

20   against us.

21          THE COURT:  Okay.  The motion will succeed or fail

22   as one uber motion.  Okay.

23          MS. REYNOLDS:  That's our position.  Yes.

24          THE COURT:  Okay.  And then the answer is the same

25   for the Wisconsin case?

1          MS. REYNOLDS:  *Bertino*.

2          THE COURT:  *Bertino*, thank you.  Okay.  In terms of

3    it being --

4          MS. REYNOLDS:  The key decision between *Bertino* and

5    this case --

6          THE COURT:  Yeah.

7          MS. REYNOLDS:  -- is that in *Bertino* there was no

8    request for forward-looking relief because the guidelines --

9          THE COURT:  Right.

10          MS. REYNOLDS:  -- in question had already been

11    abandoned before the case was final.

12          THE COURT:  What about in *Wit?*

13          MS. REYNOLDS:  In *Wit* there was forward-looking

14    relief that was requested and awarded.

15          THE COURT:  Okay.  And so to the degree that the

16    argument lost in *Wit,* if this court were to follow *Wit*, it

17    would result in the same outcome?

18          MS. REYNOLDS:  If the Court followed *Wit*, then the

19    breach of fiduciary duty class would remain certified and

20    then --

21          THE COURT:  We're going to talk about that in a

22    minute.  But, okay.

23          MS. REYNOLDS:  Right.  And the benefit claim would

24    not.

25          THE COURT:  Okay.  I'm sorry. Go ahead.

1          MS. REYNOLDS:  I of course do not believe the Court

2     should follow it.

3          THE COURT:  No, no, no, no.  And you're going to

4     tell me all about why, but I want to understand and get some

5     questions answered first.

6          MS. REYNOLDS:  Sure.

7          THE COURT:  Now, if we look at *Bertino*, and then I

8     handed you a case called *LD*, did you have a chance to read

9     it?  And if you want more time, you can have it so don't feel

10    pressured.

11         MS. REYNOLDS:  I have read it, Your Honor.

12         THE COURT:  Okay.  If we read those three cases

13    together, Wit, Bertino, and now *LD*, does that create the same

14    result?

15         Well, let's start with *Wit.*

16         In *Wit*, the breach of fiduciary duty class remains.

17    But what I can't tell from the opinion is was an argument

18    made with respect to the fiduciary duty thing?  Was it left

19    out?  In other words, was the Court just silent or did the

20    Court actually rule?  Because I didn't see a ruling specific

21    to the fiduciary duty claims.

22         Do you understand my question?

23         Right?  They're only going to address what's on

24    appeal.  And I don't know -- I couldn't tell whether that was

25    appealed.

1                    MS. REYNOLDS:  Right.  Yeah.  It's a little

2        confusing.  In my opinion --

3                    THE COURT:  Right.

4                    MS. REYNOLDS:  -- the ruling doesn't relate that

5        much to what the parties argued, but.

6                    THE COURT:  Okay.

7                    MS. REYNOLDS:  But no.  UBH did not challenge the

8        certification of the breach of fiduciary duty class.

9                    THE COURT:  Okay.  Okay.

10                   MS. REYNOLDS:  And so the Court noted that that

11       remained intact --

12                   THE COURT:  Okay.

13                   MS. REYNOLDS:  -- because that argument had been

14       forfeited by not being raised.  So that's, I think, the

15       answer.

16                   THE COURT:  Okay.  No.  That's exactly what I'm

17       asking because I couldn't tell.

18                   MS. REYNOLDS:  Yeah.

19                   THE COURT:  And I know you were there.

20                   MS. REYNOLDS:  Yes.

21                   THE COURT:  And so then with respect to *Bertino* and

22       *LD*, and I understand the distinction you've already pointed

23       out to your mind, did those cases apply the same logic to

24       defeat certification with respect to the breach of fiduciary

25       duty claims?

1          I'm going to ask you all the same questions about

2    that.

3          MS. REYNOLDS:  So in *Bertino*, the Court, if I'm

4    remembering it correctly, I'm sorry --

5          THE COURT:  That's all right.

6          MS. REYNOLDS:  -- the distinction between the

7    benefit claim and the breach of fiduciary duty claim I don't

8    exactly remember, but I think it was that in *Bertino* the

9    Court really was hung up on the fact that there was no

10   request for prospective relief.

11         And to the extent retrospective relief would be --

12   would be a remedy for the breach of fiduciary duty claim, the

13   Court thought that the named plaintiffs hadn't -- didn't show

14   that they were entitled to this retrospective remedy.

15         THE COURT:  Okay.  With respect to *Bertino*, it

16   seemed to me that if you read just for the moment Wit and

17   *Bertino*, the Ninth Circuit found standing but didn't address

18   redressability --

19         MS. REYNOLDS:  Correct.

20         THE COURT:  -- the third part of the standing

21   standard.  And in *Bertino* the Court went, pardon me,

22   addressed it at some length --

23         MS. REYNOLDS:  Right.

24         THE COURT:  -- and said there was no redressability

25   here.

1          Does that argument, and you can tell me why it's

2     wrong, but does that issue obtain here?

3          And how do we do a --

4          MS. REYNOLDS:  I do not believe that it obtains in

5     this circuit.

6          THE COURT:  Okay.

7          MS. REYNOLDS:  So a couple of things.

8          So if we -- if we step back for a minute and we're

9     just talking about Article 3 standing and redressability --

10          THE COURT:  Right.

11          MS. REYNOLDS:  -- it's not a standard that requires

12     that, you know, the Court be able to provide complete relief

13     or the most satisfactory relief.

14          THE COURT:  Right.

15          MS. REYNOLDS:  It just has to be able to provide

16     relief for the claims asserted.

17          And, you know, the *Wit* court agreed that there was

18     standing, that there were injuries that the class members

19     suffered, and that it was redressable.

20          THE COURT:  But it didn't talk about

21     redressability.

22          MS. REYNOLDS:  No.  But it --

23          THE COURT:  I mean --

24          MS. REYNOLDS:  -- there was no challenge to it

25     because of course injunctive relief, forward-looking relief,

1    declaratory relief, those are all ways of redressing

2    injuries.

3             THE COURT:  In *LD,* I think the judge said that for

4    there to be forward -- for there to be a valid declaratory

5    judgment claim there has to be some kind of prospective

6    relief available that would redress the plaintiffs' claims.

7             I admit that's a very short opinion and it was not

8    super-flushed out, but would that defeat your argument here

9    if this court were to agree with that?

10            MS. REYNOLDS:  No.

11            THE COURT:  Okay.

12            MS. REYNOLDS:  Well, if you agreed with that, what

13   I believe is an erroneous view of declaratory relief --

14            THE COURT:  Is a what view?

15            MS. REYNOLDS:  I believe it's erroneous.

16            THE COURT:  Erroneous.  Okay.

17            MS. REYNOLDS:  An erroneous understanding of ERISA

18   and what is available under ERISA, which specifically

19   provides for clarification of peoples' rights under their

20   plan, which is generally considered to be a declaratory

21   relief remedy, so I don't -- I don't think that's correct.

22            But also, we are seeking on behalf of current

23   members of Anthem plans prospective relief that would address

24   the fiduciary duty breaches here.

25            THE COURT:  Two questions.

1        One, does the *Spokeo* standing decision, which talks

2    about statutory injury not being enough, impact what you said

3    at all?  And why not?

4        MS. REYNOLDS:  No.  Because we're not alleging, you

5    know, some unimportant, you know, statutory injury that

6    doesn't have a real world effect.  Every single person in

7    this class was denied healthcare coverage.  That is a real

8    world injury --

9        THE COURT:  Right.

10        MS. REYNOLDS:  -- that impacts them and that's all

11    that's required.

12        THE COURT:  But in -- that's funny.  This actually

13    kind of goes a bit in a circle. What you said is there are

14    some people who are still members of the plans and presumably

15    some who are not, right?

16        MS. REYNOLDS:  Presumably.

17        THE COURT:  But does that impact your class

18    definition at all?

19        Because I think your class definition encompasses

20    both.  And to the degree that either the plan ceased to

21    operate or has ceased to operate, or people just left for

22    other jobs, would those individuals necessarily be

23    inappropriate class members?

24        MS. REYNOLDS:  I could see the Court subclassing to

25    address the fact that some people are no longer members of

1    plans administered by Anthem, and that's effectively what the

2    Court did *Wit*.

3         There was a ruling on a motion for decertification

4    at the same time as the remedies order and the Court tailored

5    the class basically and said for the B-2 class, for the

6    forward-looking relief, it's only people who are still

7    members of plans being administered by United.

8         So I could see that happening either at the

9    remedies phase or now, but I don't think it makes a lot of

10   sense to do it now just because that's -- it's really a

11   question for later.  Everybody has the same core claims and

12   all the proof's going to be the same, but honestly it's a

13   timing question.

14        THE COURT:  Well, there's one thing I think in your

15   last letter that I want to clear up my understanding of.

16   It's the remedy you seek is a reprocessing of the claims,

17   right?

18        MS. REYNOLDS:  We are seeking a combination of

19   reprocessing that would apply the appropriate standard to the

20   claims that have already been denied and injunctive and

21   declaratory relief going forward to ensure that Anthem

22   follows the plans for future claims.

23        THE COURT:  Okay.  Now, I think in one of these

24   decisions, with respect to retroactive relief, obviously

25   admission to an in-patient plan, it won't be appropriate


today or necessarily be appropriate today the way it might have been at the time these claims were filed, so how do we deal with -- assuming you're right and a reprocessing remedy were granted --

MS. REYNOLDS: Reprocessing.

THE COURT: -- what do you do with those people?

MS. REYNOLDS: So our position is that reprocessing is a meaningful remedy for everyone because this is a determination that was made under the wrong standards under their plan. And it's important for all of their records, including about insurance, to be correct.

Because in the future when Anthem or some other administrator is looking at this history, it's important for it to reflect, oh, they didn't get the residential treatment that they really needed and so, you know, when we're evaluating questions like response to treatment or course of their illness, things like that, you know, it's important to know that their doctor thought they needed this and Anthem didn't provide it or provide coverage for it, excuse me.

So that is our position.

THE COURT: Okay.

MS. REYNOLDS: If the Court were to determine that it is significant whether someone actually paid out of pocket, all of our named plaintiffs did pay out of pocket, and it could be --

1          THE COURT:  And then --

2          MS. REYNOLDS:  -- a way of subclassing.

3          THE COURT:  Subclassing meaning creating a more

4     narrow class for people with financial injury, calculable

5     financial injury?

6          MS. REYNOLDS:  Meaning that the retrospective

7     relief could be limited to people with monetary injury, yes.

8          THE COURT:  That's not a complaint or anywhere else

9     until now, until your bringing it up here?  Or am I wrong?

10          MS. REYNOLDS:  Well, we did mention it in our

11     papers, but our position is that everyone should get

12     reprocessing.

13          But if the Court thinks it is significant whether

14     someone paid out of pocket, the way to address it would be to

15     certify the class only -- certify that portion of the relief

16     only for people who suffered that injury.

17          THE COURT:  Okay.  One last question.

18          MS. REYNOLDS:  Yes.

19          THE COURT:  As a factual matter, the defendants

20     argue I guess is the right word that their claim review

21     process is a little different in that each plan, assume for

22     the purpose of this question, for each plan there's a set of

23     guidelines, and there's an initial level review, UM review,

24     where this first level reviewer can grant the claim or grant

25     the in-patient stay, but if they were to say no because the

1    guidelines aren't met, it gets kicked up to a doctor who then

2    exercises, among other things, clinical judgment.

3           Is that a fair summary of what you said, Ms.

4    Hanson?  Okay.

5           That, to me, seems different than all the other

6    cases I've read that you've cited --

7           MS. REYNOLDS:  Yes.

8           THE COURT:  -- as a factual matter.  How do you --

9    the one thing you do do is you say, well, look at your

10   rejection notices, they just say guideline.  They don't say

11   the other stuff that was summarized.

12          Is that the sum and substance of your response or

13   do you want to add to that?

14          MS. REYNOLDS:  Well, yeah, I have a couple of

15   responses to that.

16          THE COURT:  Okay.

17          MS. REYNOLDS:  One is that I don't actually think

18   that's an accurate summary of what the facts are.

19          THE COURT:  Meaning that a two-tier review doesn't

20   exist?

21          MS. REYNOLDS:  There is a two tier of review, but

22   let me just describe it, and counsel can correct me if I've

23   gotten --

24          THE COURT:  I'm sure.

25          MS. REYNOLDS:  -- something actually wrong.

1          But firstly, I'm sure Your Honor didn't mean to say

2     this, but you said at the beginning that there was a

3     different set of guidelines for each plan.  That is not the

4     case.  There is one set of guidelines.  And Anthem applies it

5     to all plans.

6          THE COURT:  Okay.

7          MS. REYNOLDS:  So, you know, they might have a

8     different edition from one year to another.  There are a

9     couple of different editions or versions.

10          THE COURT:  Editions, E-D?

11          MS. REYNOLDS:  Yeah.  E-D.

12          THE COURT:  Okay.

13          MS. REYNOLDS:  But they apply them across the board

14     to all plans, so it's one set of guidelines.

15          THE COURT:  Okay.

16          MS. REYNOLDS:  And the way that the processor -- so

17     this is actually the way it always works, and, it's, you

18     know, a lot of it's prescribed by statute and a lot of it is

19     required by accreditation requirements, but the way it works

20     is there's an initial level of review.  There might even be

21     more than one initial level of review.

22          And what these folks, the initial folks, are trying

23     to figure out is if the person enrolled in the plan, are they

24     eligible for coverage, is this condition covered under the

25     plan, is this treatment covered under the plan, like all

1        those sort of basic things.

2                Is there some exclusion that just says no coverage

3        for this treatment, right?  And if there is, then they just

4        deny it.  And they are allowed to deny it at that level.

5                Only after all that stuff is figured out, because

6        they do that for every single, I mean, you know, millions of

7        claims, so only after all that is figured out, then they say,

8        okay, there should be coverage.  There's coverage except for

9        this last thing.  Is it medically necessary for this person

10       under the plan?  And that's where they apply guidelines.

11               And so the first level --

12               THE COURT:  Which are uniformly the -- let's just

13       make sure I understand --

14               MS. REYNOLDS:  Yeah.

15               THE COURT:  -- are uniformly the same regardless of

16       the plan.

17               MS. REYNOLDS:  Correct.

18               THE COURT:  There's medical necessity, and then

19       there's guidelines A through E or whatever it is that speak

20       to medical necessity and --

21               MS. REYNOLDS:  Right.  I mean there are --

22               THE COURT:  -- A through E are always the same.

23               MS. REYNOLDS:  To be clear, Your Honor, there are

24       guidelines.  There are different guidelines depending on, for

25       example, mental health versus medical and surgical.

1      So in this case we're talking about guidelines for

2  residential treatment of mental health and substance use

3  disorders.

4           THE COURT:  Right.  And those are all the same.

5           MS. REYNOLDS:  Those are the same, yeah.

6           THE COURT:  Okay.

7           MS. REYNOLDS:  They have one at a time.

8           THE COURT:  I cut you off.  Please continue.

9           MS. REYNOLDS:  And counsel I'm sure is going to

10  jump in and say, well, there's -- actually there's one for

11  mental health and there's one for substance use disorder --

12           THE COURT:  She'll get to it.

13           MS. REYNOLDS:  -- but only one of each at a time.

14           THE COURT:  Okay.

15           MS. REYNOLDS:  But this is all still at that first

16  level of review.  But the care manager does apply the

17  guidelines, but they are not allowed to deny because they

18  don't have the same level of licensure as the prescribing

19  doctor.

20           THE COURT:  Okay.

21           MS. REYNOLDS:  So you have to have it be denied by

22  -- this is an accreditation regulatory requirement -- you

23  have it be denied by a psychiatrist.

24           THE COURT:  Okay.

25           MS. REYNOLDS:  So if the -- if the care manager

1   cannot approve because they can't match up, you know, they

2   see the guideline criteria and the person doesn't match, if

3   they can't approve it, they kick it up to the --

4           THE COURT:  Psychiatrist?

5           MS. REYNOLDS:  -- to the peer reviewer.  That's why

6   it's called a peer review --

7           THE COURT:  I see.

8           MS. REYNOLDS:  -- because they're a peer to the

9   person who has prescribed it.

10          At that point, the peer reviewer, you know,

11  actually has the authority under Anthem's policies and under

12  the law to then issue a clinical denial for medical

13  necessity.  So this is really the last step in the whole

14  process.

15          So that's why, you know, we're very confident that

16  that's the only issue that stood between the class members

17  and coverage because this was the very last step in the whole

18  process.

19          THE COURT:  Okay.  Clarify the -- you had me right

20  up until the very last sentence and then I got all confused.

21          MS. REYNOLDS:  Right.  Because none of the

22  necessity -- they don't do a medical necessity review on

23  every single, solitary claim, right?  If your claim is

24  excluded --

25          THE COURT:  Right.  Okay.

1          MS. REYNOLDS:  -- they're not going to do a medical

2     necessity review on it because they just don't have enough

3     people to do that on every possible claim.  So they really

4     only do it if there's some possibility they would, you know,

5     if they would otherwise have to pay --

6          THE COURT:  Right.

7          MS. REYNOLDS:  -- then they check medical

8     necessity.  It's like the last step.

9          THE COURT:  Okay.  All right.  You've answered all

10    my questions at least so far.

11         MS. REYNOLDS:  Okay.

12         THE COURT:  Tell me anything or everything else you

13    want to tell me or highlight or whatever it is.

14         MS. REYNOLDS:  Okay.  A couple of things.

15         First, you know, I was -- in preparing for the

16    hearing, I was thinking back on all of our discussions about

17    *Wit* and sort of its impact on this case, it dawned on me that

18    sort of lost in our two-page response is the fact that *Wit*'s

19    not the binding law in this circuit.

20         THE COURT:  Right.

21         MS. REYNOLDS:  We think it's wrongly decided.  We

22    have fought *en banc* review.  We're really hoping that things

23    turn around in the Ninth Circuit.  But we're not in the Ninth

24    Circuit here.

25         And in the Second Circuit the rule, the very well

1    and long-established rule, just like everywhere else in the

2    country until *Wit*, is that if a plan administrator

3    arbitrarily and capriciously denies a claim the district

4    court in most cases the right thing to do is to remand to the

5    administrator to make a new decision under the right

6    interpretation of the plan.  Right?  That's the rule the --

7    the Second Circuit stated it in *Miller*, stated it in *Miles*.

8    It's been, you know, applied by district courts right up

9    until very recently.

10         And, you know, that is the rule in this court

11   unless the district court -- unless it's completely obvious

12   to the district court that it must award the benefit, then it

13   must remand.  Those are -- it's like the opposite of *Wit*,

14   right, where you -- where you would never remand unless it's

15   obvious that you get the benefit.  Like, that's the rule that

16   the *Wit* panel stated.

17         THE COURT:  Well, I understand what you're saying.

18   But in that context, the question here is whether that

19   resolution is ripe for class resolution, right?

20         MS. REYNOLDS:  Right.  Well, if -- if a remedy is

21   available to an individual, then it is also available to a

22   class.

23         THE COURT:  Okay.

24         MS. REYNOLDS:  That's how the rule's enabling act

25   applies here.

1          THE COURT:  Okay.

2          MS. REYNOLDS:  It can't abridge a right either.

3          And, you know, there are really two -- there are

4     sort of two steps in the analysis of whether or not the

5     ultimate decision of -- on benefits should be changed.

6          So one step is was the decision made arbitrarily

7     and capriciously?  That's what this case is about.  And

8     that's really -- it's based on the same argument for

9     everybody.  Was the --

10          THE COURT:  Because the guidelines are arbitrary

11     and capricious in their interpretation of medical necessity?

12          MS. REYNOLDS:  Right.  Did they use a medical

13     necessity standard that was inconsistent with what the plans

14     require?  That's the question in this case.

15          Then, you know, let's say the Court agrees with us

16     and finds that it was an arbitrary and capricious standard,

17     then, you know, the next step would be to say, well, can I,

18     as the Court, you know, is it -- is it obvious that I must

19     award benefits to all these people?  And, you know, it's

20     almost never true that it's obvious because it's --

21          THE COURT:  I can't imagine a world where I could

22     make that conclusion.

23          MS. REYNOLDS:  Yeah.  I mean, if it's --

24          THE COURT:  I'll be very candid with you.

25          MS. REYNOLDS:  If the plan administrator applied

1    the wrong standard, they're not collecting the right

2    information to answer the questions that the right standard

3    poses, right?

4         So, here, the Court would say, well, I can't award

5    the benefits so I need to remand.  And that would be true if

6    you had one claim in front of you.  And it's true if you have

7    a class of thousands, which you have here.

8         So just following the binding law in this court,

9    that is the appropriate remedy, that is what the Court should

10   do for this class.

11        And, you know, what's going on in the Ninth Circuit

12   is really unfortunate, but I don't think that it should sort

13   of intrude on this court's application of binding Second

14   Circuit law.

15        THE COURT:  Okay.  I understand what you're saying.

16        With respect to that peer review that occurs, is it

17   your position that it's -- that peer review is still an

18   application of the guidelines or is clinical judgment also

19   involved?

20        MS. REYNOLDS:  That was my next point that I --

21        THE COURT:  Okay.

22        MS. REYNOLDS:  -- did want to address, Your Honor.

23   You read my mind.

24        Yeah.  That's really -- this is the center piece of

25   Anthem's argument against class certification.  And it's a

1    really surprising argument actually that Anthem is saying,

2    well, its reviewers actually don't use its guidelines.

3            And there's a really important distinction between

4    exercising clinical judgment to determine whether the

5    guidelines are met, whether the clinical facts presented

6    satisfy the criteria in the guidelines.  That is the

7    discretion, the clinical discretion --

8            THE COURT:  Okay.

9            MS. REYNOLDS:  -- the professional judgment that

10   the peer reviewers are bringing.

11           THE COURT:  And the evidence you submitted reflects

12   that?

13           MS. REYNOLDS:  Yes.

14           THE COURT:  Okay.

15           MS. REYNOLDS:  And what Anthem is arguing or what

16   it seems to be arguing is that, no, there's some other --

17   there's this other discretion, which is they don't even have

18   to apply the guidelines.  They can ignore them.  They can

19   come up with their own.  They can take the pieces they like

20   and apply those and then apply some other standard.  They can

21   base it on, you know, whether they have a stomach ache that

22   day, like, whatever.

23           And I realize I'm being a little bit glib, but, you

24   know, the problem is that, one, Anthem told all of these

25   class members that it used the guidelines in making the

1          decision, so it really told everyone that's what it did.

2                    THE COURT:  In the letters you mean, the denial

3          letters?

4                    MS. REYNOLDS:  Right.

5                    THE COURT:  Okay.

6                    MS. REYNOLDS:  So I think it's fair to conclude

7          that at least in those cases the reviewers did use the

8          guidelines.  Anthem has standard operating procedures and

9          policies that mandate use of the guidelines and say that you

10         can't pick and choose, you have to apply all the -- you know,

11         you have to apply all policies in full without just selecting

12         the pieces you want.  They have training manuals that say

13         apply them.

14                   And if it really were the case that Anthem had this

15         no policy policy, right, we have no criteria, we're going to

16         pretend we have criteria, but, in fact, we have no criteria,

17         they can do what they want, that would also violate ERISA.

18                   So ERISA does require that an administrator have

19         policies in place to ensure that like claims are administered

20         in the same way.  Consistency is really important and it's

21         part of fairness and making a non-arbitrary decision.

22                   So what Anthem is sort of describing is a different

23         kind of arbitrary and capricious process.  And so that's why

24         I find it sort of a surprising argument --

25                   THE COURT:  Okay.

1          MS. REYNOLDS:  -- to say, you know, well, it's not

2     arbitrary and capricious because we use guidelines that

3     conflict with the plans because we didn't use any at all.

4     And so --

5          But ultimately it doesn't really -- you know,

6     that's not where we're going because the facts are so

7     overwhelmingly showing that, yes, Anthem absolutely used

8     these guidelines.  And Anthem hasn't put in any proof that it

9     has a secret policy that says, oh, I'm just kidding, don't

10    use them.

11         THE COURT:  Okay.  So to draw a straight line

12    through your theory, which is that these plans provide for

13    treatment according to medical necessity, all these plans

14    have guidelines that define medical necessity incorrectly

15    and, therefore, there's a class-wide claim when -- class-wide

16    cause of action for when medical claims are denied under the

17    guidelines because those guidelines are artificially narrow?

18         That's the claim?

19         MS. REYNOLDS:  That's pretty close.  But I just --

20         THE COURT:  Corrected.

21         MS. REYNOLDS:  I'm going to -- I'm going to jump on

22    the -- on whether or not the plans have their own guidelines.

23         So the plans, each of the plans, and in this

24    instance I'm using the word plan really to refer to a summary

25    plan description, right --

1          THE COURT:  Okay.  That's fine.

2          MS. REYNOLDS:  -- the terms that -- the document

3     that sets forth the terms of the plan.

4          So all of the class members' plans require medical

5     necessity.  You can't get coverage unless your services are

6     considered medically necessary under the plan.  Each of the

7     plan definitions incorporates either right there, most of the

8     time it's right there in the medical necessity definition, it

9     incorporates that care must be consistent with generally

10    accepted standards.

11         And then what Anthem does is it, for all of those

12    plans, it uses one set of guidelines --

13         THE COURT:  Okay.

14         MS. REYNOLDS:  -- and then -- but those are more

15    restrictive than the generally accepted standards for

16    evaluating --

17         THE COURT:  So if there were 50 plans, there would

18    be a footnote that refers under all of those plans to one set

19    of guidelines.

20         MS. REYNOLDS:  So it's not in the plan.  So the

21    plan -- the plan documents are sort of separate.

22         THE COURT:  Okay.

23         MS. REYNOLDS:  It's not in the plan.

24         THE COURT:  I'm referring to some --

25         MS. REYNOLDS:  It's in Anthem's procedures.

1          THE COURT:  Okay.

2          MS. REYNOLDS:  They say this is how we're going to

3    do it.  This is our process.  This is the medical -- they

4    have a committee.  They adopt their medical necessity

5    criteria and they've decided to use these.

6          THE COURT:  But it applies to all plans?

7          MS. REYNOLDS:  But it applies to all commercial

8    plans.

9          THE COURT:  Okay.

10         MS. REYNOLDS:  Yeah.  All ERISA plans that we're

11   talking about.

12         THE COURT:  Anything else you want to tell me?

13         MS. REYNOLDS:  I guess just I do want to just take

14   a moment, Your Honor, if I might, and clarify what our claims

15   actually are.  Because one of the things we seem to have run

16   into in the *Wit* case was that the Court kind of fell for the

17   mischaracterization of what our claims were and especially

18   when it comes to this plan interpretation question.

19         So when we're talking about unreasonable benefit

20   denials, denying benefits using a standard that is

21   inconsistent with plan terms, is -- that's arbitrary and

22   capricious under our ERISA.  It's an abuse of discretion.  It

23   is a basis for filing an (a)(1)(B) claim for a wrongful

24   denial.

25         And our claim is about the criteria that Anthem

1    used and whether they're consistent with plan terms.  It is

2    not about whether Anthem correctly applied any given

3    guideline.  That's not the question.  The question's whether

4    the guideline itself comported with the plan.

5              THE COURT:  Right.

6              MS. REYNOLDS:  And it's really important for the

7    Court to understand we do not claim that the plans require

8    coverage of every single solitary thing that is consistent

9    with generally accepted standards of care.  That's backwards,

10   right?

11             We claim that the plans here cover mental health

12   care and substance use disorder care.  They cover residential

13   treatment.  It's provided under the plan that you can get it

14   as long as it is medically necessary.  And so we're really

15   talking about those medical necessity decisions that Anthem

16   made and whether it used a standard that is inconsistent with

17   the plans.

18             And so sometimes, you know, it came into the

19   briefing as, well, that, you know, we're getting it

20   mischaracterized if we're saying the plans mandate that

21   generally accepted standards of care is the only criterion

22   for coverage, and that is not what we're saying.

23             We're just saying the way the process works we know

24   all the other requirements for coverage have already been

25   resolved in the plaintiff's favor and so we're left with this

1   one last decision and that's the one that has to be made

2   according to the standard set forth in the plan, which is the

3   same for everybody.

4           THE COURT:  Okay.  Does that cover it?

5           MS. REYNOLDS:  I think that's all I have right now.

6           THE COURT:  Okay.  That sounds good.

7           Ms. Hanson, you have nothing?

8           MS. HANSON:  You can just decide on the papers

9   there, Your Honor.

10          THE COURT:  Okay.  Well, why don't you respond to

11  your adversary, let's start with that.

12          MS. HANSON:  Certainly.

13          THE COURT:  Pull the mic a little closer.

14          MS. HANSON:  Absolutely.

15          So I want to start with the idea of the discretion

16  issue because the discretion that Anthem peer clinical

17  reviewers use in making their reviews, that destroys their --

18  the plaintiffs' possibility of getting a class certified

19  here.

20          THE COURT:  But what if the -- that discretion is

21  within the confines of the guidelines?

22          MS. HANSON:  So the guidelines, two things there.

23          One is the guidelines themselves are just a --

24  other courts have called them a scaffold of factors,

25  framework, they're not all encompassing.

1          The *Bersanell* court, that's how I say the name of

2     that case after having Googled it, the *Bersanell* court said

3     that in that case the guidelines -- and the guidelines in

4     that case, the guidelines in this case, they all do the same

5     thing.  And the *Bersanell* court said that they're not meant

6     to be a comprehensive view on behavioral health treatment,

7     they're just supposed to basically be a framework, a guide.

8          And we see that language come through in the

9     materials that Anthem has for its reviewers called -- the MCG

10    themselves call the MCG guidelines a tool.  The MCG guideline

11    documents say you can't apply these rigidly.  Even if, like,

12    the content guide -- I can get the, well, it's here, Exhibit

13    D-9, Exhibit D-10, these are the MCG master license

14    agreement, the training manual, the content guide, they all

15    indicate that the member may not meet all the criteria in the

16    guidelines, that only means that whether or not that

17    individual needs residential treatment becomes a question.

18    It literally says it's questionable.

19         And it says that you -- you can't rely just on the

20    guidelines.  That's why they require a peer clinical reviewer

21    who is a board certified, highly-trained, experienced

22    psychiatrist, board certified, clinical psychiatrist.  So

23    that person is brought in because these are --

24         Going back to the process, that care manager, they

25    literally are, you know, looking at the guidelines very

1      carefully.  Do they match up?  They make the decision that

2      they can't do that, that the member doesn't meet the

3      guidelines.

4             So by the time the peer clinical reviewer, the

5      board certified psychologist, gets it, a decision's already

6      been made that the guidelines are not met.  That's where the

7      discretion comes in.  That's where the clinical judgment

8      comes in.  That's where someone who has the experience and

9      the training and the knowledge about what to do with the kid

10     who is throwing rocks versus the kid who, you know, is just

11     the parents want a way for --

12            THE COURT:  I get your -- I get your argument in

13     that regard.

14            My question though is when I started drilling down

15     and looking at the letters, the denial letters --

16            MS. HANSON:  Mm-hmm.

17            THE COURT:  -- they say you're not getting

18     coverage, you don't meet the guidelines, and then it cites a

19     guideline number.  That's it.

20            MS. HANSON:  So I'll point to the Dennis F case.

21     The Dennis F case out of the Northern District of California

22     where the Court noted that every single denial letter

23     mentioned the guidelines, every single review was done with

24     the guidelines.

25            THE COURT:  No, no, no.  That's a -- there's a

1    little bit of a subtle distinction there.  It's one thing to

2    invoke the guideline.  It's another thing to have nothing

3    else in the letter that says this is why you were denied.

4              MS. HANSON:  So it doesn't -- it does say more.

5              THE COURT:  Okay.

6              MS. HANSON:  It says the care is not medically

7    necessary.  That's a reference to the plan term, which by the

8    way has more than just the generally accepted standard prong.

9    It has clinically appropriate, not for the convenience of the

10   member, all these other prongs that apply.  So when that --

11   that is mentioned in there that they're -- the care is not

12   medically necessary, that encompasses all of that.

13             THE COURT:  Yeah.  But that's all it says is

14   medically necessary, and it cites a guideline to I think --

15   we can pull out a letter.  I could be wrong.  I mean, I've

16   never not made a mistake.

17             MS. HANSON:  What it says is it says -- it may be

18   helpful to tell your provider that we relied on the

19   guidelines.  They are part of the process.  But the critical

20   judgment is the piece of it that is --

21             THE COURT:  No, no.  I understand that.  The letter

22   doesn't really reflect -- for example, my thinking is, and

23   then you can react, would be, okay, we -- you didn't meet

24   guideline ABC, there's no medical necessity here.  But it

25   doesn't say there's no medical necessity because.  There's no

1    actual explanation.  It's a form.

2            MS. HANSON:  That varies between letters actually,

3    Your Honor.

4            THE COURT:  Okay.

5            MS. HANSON:  There are some letters that definitely

6    spell out it's because of -- and they describe the member's

7    condition as to why.

8            THE COURT:  Okay.  And others don't?

9            MS. HANSON:  Others may not.  They may be more

10   general.  But there's a regulatory requirement that if the

11   guidelines are part of the process, that it has to be --

12           THE COURT:  I'm not disputing that.  I agree.  And

13   I agree that the guidelines are involved.

14           My question though is because what she's trying to

15   do is essentially prove pretext or language from another kind

16   of case that you're saying that now.

17           But these letters just say you didn't meet

18   guideline ABC and D, you don't have medical necessity, which

19   by the way the guidelines are just an interpretation of, and

20   that's it.

21           So that your explanation to the customer or the

22   patient undermines what you're saying now.

23           MS. HANSON:  I don't think so, Your Honor.

24           I think that if you --

25           THE COURT:  You don't think that's what you're

1    saying or you don't think that's right?

2              MS. HANSON:  I don't think that's right.

3              THE COURT:  Okay.

4              MS. HANSON:  So there are a lot of regulatory

5    requirements that go into what exactly the letter has to say

6    and there's regulatory requirements at what grade level that

7    has to be said at.

8              THE COURT:  Right.

9              MS. HANSON:  It has to be at the eighth grade

10   level.  So you're talking about you're limiting Anthem and

11   what they can say in their denial letters.

12             The reason for the denial is clearly there, no

13   medical necessity.  The plan term is not met.  Right?  So

14   that regulation is checked.  If you --

15             THE COURT:  Oh, I'm not suggesting you're not

16   complying with regulations at all.

17             What I'm suggesting is that the fact that there may

18   be -- we'll carve out a subset of letters that you say are

19   more fulsome -- that the letters don't say anything else.  It

20   has to meet an eighth grade reading level.  But all it says

21   is you didn't meet the guidelines and there's no medical

22   necessity.

23             What eighth grader is going to be able to interpret

24   that?

25             MS. HANSON:  I don't know that it comes down to

1      saying exactly that you don't meet the guidelines.  It says

2      you don't meet medical necessity and that's a broader --

3              THE COURT:  But there isn't a guideline invoked,

4      like a section something?

5              MS. HANSON:  It says -- well, we can pull one up.

6              Talks about -- I mean, these letters are -- some of

7      them look the same, others are different, so I'm just --

8              THE COURT:  Well, just pull up --

9              MS. HANSON:  -- the first one I have --

10             THE COURT:  I'll flip to whatever you tell me.

11     Tell me where to flip to.

12             MS. HANSON:  Exhibit A-1.

13             MS. REYNOLDS:  To?  Exhibit A-1 to what?

14             MS. HANSON:  Oh, to -- it must be to yours.  That's

15     your --

16             MS. REYNOLDS:  Oh, to the second -- I think --

17             THE COURT:  You've got to tell me what the exhibit

18     is to.

19             MS. REYNOLDS:  To the first declaration?

20             MS. HANSON:  To the plaintiffs' brief, opening

21     brief.

22             MS. REYNOLDS:  I'm sorry.  I think it's --

23             THE COURT:  Okay.

24             MS. REYNOLDS:  I think it -- are you talking about

25     the denial letter?

1          The denial letters are all -- they're Exhibits A

2     through -- A-1 through 383 to the first declaration of me.

3          THE COURT:  Okay.  And the first, A-1 is to Joshua

4     Burnett Green?

5          MS. HANSON:  Correct.

6          THE COURT:  Okay.  It's not the one I looked at

7     before, but go ahead.

8          MS. HANSON:  So it talks about -- it says a request

9     was made.  The plan clinical criteria considers residential

10    treatment medically necessary for, and then it lists a bunch

11    of things.  It says the information we have is not sure that

12    your behavior is putting you at risk for serious harm, et

13    cetera, et cetera.  For these reasons the request is denied

14    as not medically necessary.

15         THE COURT:  Okay.  And if you --

16         MS. HANSON:  And then it goes on --

17         THE COURT:  Oh, I'm sorry.

18         MS. HANSON:  Oh, I'm sorry, Your Honor.

19         THE COURT:  No.  Go ahead.  Continue.  I thought

20    you were done.

21         MS. HANSON:  Talks about other treatment options

22    that may be available.  You may want to discuss these with

23    your doctor.

24         And then it says it may be helpful for your --

25    sorry, I butchered that -- it says it may help your doctor to

1    know we reviewed the request using the plan clinical criteria

2    called psychiatric disorder treatment, residential treatment

3    center, et cetera, et cetera.

4          It doesn't say that the only reason that you're

5    denied is that guideline. It's just saying, you know, we

6    have an obligation to tell you if a guideline was part of the

7    process. Here we are telling you that.

8          And then, again, it says services that are not

9    medically necessary are an exclusion under your plan and are

10    not covered.

11          And later on it says please refer to the definition

12    and exclusion sections of your plan benefits for information

13    on not medically necessary services.

14          So while the guidelines are referenced, it's not

15    saying that the only thing that went into that decision was

16    the guidelines.

17          And, again, I'll stress that the guidelines

18    themselves don't get us to an answer in any particular case.

19    The peer clinical reviewer is brought in because the

20    guidelines are not outcome determinative. The guidelines

21    don't have a -- it's not a tick list of factors that the peer

22    clinical reviewer can go through, because the care manager

23    already did that and already made the decision that the

24    member doesn't meet the criteria. So the peer clinical

25    reviewer must be involved for that discretion, using their

1    judgment and their experience.  So the guidelines --

2          And, you know, Ms. Reynolds was surprised that we

3    were making this argument that Anthem doesn't use the

4    guidelines, but I find it surprising too because that's not

5    the argument we're making.

6          The argument we're making is that the guidelines,

7    they are part of the process.  They're a starting point for

8    the peer clinical reviewer, but they're certainly not the

9    end.

10          There's no other way to look at the situation

11    except that a board certified, experienced clinical

12    psychologist, psychiatrist, excuse me, has to get involved

13    because the guidelines are not enough.  They don't tell you

14    the answer.

15          And that's how the Dennis F court looked at the

16    guidelines in that case.  They said every letter mentioned

17    the guidelines.  Every decision highly correlated with the

18    scoring that was used with those guidelines.  It was obvious

19    the guidelines were part of that process too.

20          But the Court said I can't certify this class

21    because there's this other thing going on.  There's this

22    clinical judgment, this discretion that goes on.

23          And, you know, in their papers, the plaintiffs say

24    that there's no evidence of this discretion.  Well, there

25    certainly is.  It's replete throughout the record.

1    The peer reviewer training manual expressly says

2    that the peer clinical reviewers must use their discretion

3    and professional judgment when indicated by the individual's

4    clinical circumstances.  And it expressly says that the

5    guidelines are not meant to be exhaustive or to cover all

6    clinical situations.

7    So there you go.  The peer clinical reviewer

8    doesn't have enough information based on the guidelines

9    themselves.  They have to use their judgment, use their

10   experience.

11   And even if the guidelines are part of the process,

12   they're not the entire process.

13   THE COURT:  No.  I get the logic of everything

14   you're saying.  I'm still not sure I interpret what I'll call

15   rejections letters, for lack of a better word.

16   MS. HANSON:  Denial letters is what we call them.

17   THE COURT:  Thank you.  I've got it.  Denial

18   letters.  Yeah.  Yeah.  No, you're right.  You're right.

19   MS. HANSON:  We're not rejecting folks here.

20   THE COURT:  I guess maybe the disconnect in my mind

21   is that the exercise of clinical judgment by a peer review

22   you would think is unique, right?  Every patient gets a

23   unique analysis from a peer reviewer.

24   And these denial letters are not unique at all.

25   And I'm not saying they violate the regulatory requirements.

1    I'm saying that more as a factual matter in terms of

2    credibility what I can draw from these denial letters.

3            It says the service you seek is not medically

4    necessary.  And then --

5            And I'm looking at the Marissa one, which is A-2.

6    The service can also be medically necessary for those who

7    have mental health conditions that is causing serious

8    problems with functioning, and then parenthesis, (for

9    example), and there are some examples, and there may be other

10   treatment options for you.

11           Just by virtue of the fact that this letter only

12   refers to several examples, it doesn't say you do not suffer

13   from poor self care, or poor not sleeping, or whatever would

14   be applicable to Marissa, is not identified anywhere in here.

15           MS. HANSON:  So, Your Honor --

16           THE COURT:   Is it?  Or maybe -- I mean, if I'm

17   misreading it, point that out.

18           MS. HANSON:  Well, I'll say that the letters, some

19   of them do.  I looked at them this morning.

20           THE COURT:  Can you point me to one that does?

21           MS. HANSON:  Well, let me say this first --

22           THE COURT:  Sure.

23           MS. HANSON:  -- and then I will try to remember

24   which one I was looking at this morning.

25           THE COURT:  Okay.  That's fine.

1          MS. HANSON:  Actually, I know where to look to find

2     that.

3          But, Your Honor, the ERISA rules, the case law that

4     has developed around denial letters, says you have to state

5     the reason, right, the specific reason.

6          THE COURT:  Okay.

7          MS. HANSON:  And here certainly that has been

8     accomplished because the reason is lack of medical necessity.

9          What the case law goes on to say is is that you

10     don't have to provide the reason behind the reason, so you

11     don't have to go into a litany and cite medical records and

12     do all these things to say, you know, exactly why in detail.

13          All that needs to be done, all that the letters

14     require, all that the regulations require is the specific

15     reason and that's there.

16          THE COURT:  No.  Like I said, I'm not challenging

17     whether these letters comply with the regulatory

18     requirements.

19          MS. HANSON:  Well, so that's why you're not finding

20     in some of these letters what I think you're hoping to find,

21     which -- or you're not hoping to find maybe, but you

22     understand what I'm saying.

23          THE COURT:  I do.  I do.

24          MS. HANSON:  And so that is why it's not there.

25          THE COURT:  Okay.

1          MS. HANSON:  And the thing is is that information

2     exists in the administrative file.  You can see in the

3     clinical notes that are part of the record, that sort of --

4          THE COURT:  And that's part of the 54,000 pages on

5     the thumb drive?

6          MS. HANSON:  Exactly.

7          THE COURT:  Right.

8          MS. HANSON:  Exactly.

9          MS. REYNOLDS:  Only for some people actually.

10          MS. HANSON:  But it goes into great detail there.

11          THE COURT:  Okay.

12          MS. HANSON:  And that information is gathered.

13     Again, the peer clinical reviewer is gathering information

14     from a number of sources.  They can ask for more records.

15     They, in every instance that they can, they talk to the

16     provider themselves.  That's because they have already --

17     someone has already found that the guidelines are not met --

18          THE COURT:  Right.

19          MS. HANSON:  -- and they're trying to say, like,

20     well, wait a second.  Let's look a little deeper and use my

21     clinical judgment and my experience, which isn't --

22          None of the factors like for Sanchez, for example,

23     Plaintiff Sanchez's son, if you go through those notes, you

24     can see all the thinking that was done that, well, okay, this

25     kid is really anxious about going home because they don't

1    know if they can follow the rules at home.

2          And, you know, the peer clinical reviewer actually

3    approved care even though for some time, even though the

4    child was not meeting the guidelines, because they were

5    trying to, you know, give the benefit of the doubt, give more

6    time, and then it came to a point where the peer clinical

7    reviewer, using their experience, using their training, said,

8    you know, this kid is not going to move forward on this issue

9    until they go home and confront the issue.

10          So that's something that the guidelines didn't tell

11   the peer clinical reviewer to do.  That's something that

12   their judgment told them to do.

13          THE COURT:  What you're saying is I'm relying too

14   much on these letters.  These letters are were designed

15   purely to satisfy a regulatory requirement, but don't reflect

16   the process behind every decision?

17          MS. HANSON:  That is absolutely the case.

18          THE COURT:  Okay.  Okay.  What else you want to

19   tell me?

20          MS. HANSON:  And, again --

21          THE COURT:  I'm sorry.  Go ahead.

22          MS. HANSON:  Again, Anthem is caught in the -- you

23   know, we can't use jargon.  We can't -- we have to use a

24   certain level --

25          THE COURT:  No.  I got that part.  That I got.

1          What else do you want to tell me?

2          MS. HANSON:  Let me unpile myself here and find my

3     notes.

4          THE COURT:  Sure.

5          MS. HANSON:  So I do just want to put the nail in

6     the coffin on my statement on the discussion that what the

7     plaintiffs are saying is a strong man argument.  Anthem's not

8     saying that guidelines aren't part of it.  So, you know, all

9     this surprise and whatnot is to be set aside because that is

10    not the case.

11         I mean, the Dennis F case is 100 percent on point

12    here.

13         So the fact that discretion, clinical judgment,

14    they're all the same thing here is involved means that every

15    decision is going to be unique.  And the guidelines are not

16    the uniform static decision tree, static rules, or whatever

17    the plaintiffs characterize them as in their brief.

18         It doesn't ring true when you look at especially

19    the administrative record notes.  Right?  That all the things

20    that the peer clinical reviewer reviewed.

21         But then also we need to look -- what plaintiffs

22    argument here is is that Anthem has to use clinical

23    guidelines that are in accord with generally accepted

24    standards.

25         They're conflating the definition of medical

1    necessity in the plans with generally accepted standards

2    against all contract interpretation rules that I'm aware of.

3            The medical necessity definition in the plans has

4    several prongs, and in accordance with generally accepted

5    standards is one of them.

6            And I'll ask Your Honor when you're thinking about

7    this later to go back and read one of the medical necessity

8    definitions.  Because when you read the in accordance with

9    generally accepted standard prong, when it's in the plan,

10   it's not always in -- it's not in every single plan in this

11   case --

12           THE COURT:  Why wouldn't it always be the case

13   though that medical necessity is in compliance with generally

14   acceptable standards?

15           MS. HANSON:  So what I'm trying to say is that when

16   you read the definition --

17           THE COURT:  Right.

18           MS. HANSON:  -- that phrase really what it means is

19   is that you can't go to a yoga retreat and say I want that

20   covered because it's residential, and to me it's treatment,

21   you have to have service that is in accordance with generally

22   accepted standards like residential treatment.

23           THE COURT:  Right.  But doesn't that -- it seems to

24   imply that even if generally acceptable standards wasn't

25   specifically set forth in a guideline that it would always

1        have to be in compliance with generally acceptable standards

2        for the reason you've just explained?

3                MS. HANSON:  So it's all -- it is intertwined to an

4        extent, but the generally accepted language that they're

5        relying on to tie into the guidelines is a small piece of it.

6                The next one down usually, and not always --

7                THE COURT:  Right.

8                MS. HANSON:  -- is clinically appropriate.  That is

9        really what's going on in these cases.  The peer clinical

10       reviewers, the care managers, they're determining if for this

11       individual.

12               So we know residential treatment is a generally

13       accepted --

14               THE COURT:  I see.

15               MS. HANSON:  -- place to go for mental health care

16       that is going to be covered under the plan in these cases,

17       but the next thing down is is it clinically appropriate?  Is

18       it for this individual something that they need?

19               THE COURT:  I see.  Okay.

20               MS. HANSON:  So when they tie the guidelines to

21       generally accepted standards, they're conflating the entire

22       definition of medical necessity with generally accepted when

23       it really is referring to something else.  So their whole

24       theory falls apart.

25               THE COURT:  I've never seen two people so

1    vigorously call each other names so politely in an oral

2    argument.  But I get it.  I get it.

3            Did I cut you off, or is there more?

4            MS. HANSON:  So it's not just that, it's that --

5    that there are these prongs and that the case -- they hinge

6    the case on one prong --

7            THE COURT:  Right.

8            MS. HANSON:  -- and that there are these other

9    ones.

10           And most of the decisions in here are not on the

11   generally accepted prong because residential treatment is.

12           It's also that the plan terms themselves amongst

13   the putative class do have variation that would require Your

14   Honor to make decisions.

15           THE COURT:  Meaning where identify treatment must

16   be medically necessary, there are also other components

17   within that document that are different across various plans?

18           MS. HANSON:  They're different definitions.  Some

19   of them don't have some of the language that they're relying

20   on.  Some of them --

21           THE COURT:  Do all of them though refer to one set

22   of guidelines which is what Ms. Reynolds was saying?

23           MS. HANSON:  None of the --

24           THE COURT:  Do you see what I'm saying?  Judging my

25   question.

1          MS. HANSON:  So, no.  They don't refer to

2     guidelines.

3          THE COURT:  Does the -- does the policy or practice

4     manual of some kind that is applicable in this context refer

5     to a single set of guidelines?  She corrected me at the end.

6          MS. HANSON:  In the training manuals, the peer

7     clinical review training manual, refers to the peer clinical

8     reviewer using the process involving a set of guidelines in

9     addition to their peer finding.

10          THE COURT:  But there's only one set of guidelines?

11          MS. HANSON:  There is -- as she was -- said and

12     predicted that I would say --

13          THE COURT:  Right.

14          MS. HANSON:  -- there's one set for mental health,

15     one set for --

16          THE COURT:  Right.  Okay.

17          MS. HANSON:  Right.

18          THE COURT:  So there's one set.  But there's still

19     one set, but for each?

20          MS. HANSON:  And two different time periods where

21     one kind of Anthem's internal -- like they had a set of

22     guidelines that they developed internally.  They switched

23     over to the MCG --

24          THE COURT:  But let me ask you this way.  If I

25     picked a specific date in time for a mental health disorder,

1   regardless of the plan, ultimately a single set of guidelines

2   would be referred to on that date for that disorder, not

3   substance abuse?

4          MS. HANSON:  That is correct, Your Honor.

5          THE COURT:  Okay.

6          MS. HANSON:  That is correct.

7          THE COURT:  Okay.  Anything else you want to tell

8   me?

9          MS. HANSON:  I do have some responses to the

10  questions that you asked Ms. Reynolds --

11         THE COURT:  Okay.

12         MS. HANSON:  -- if I can pull those out.

13         So in terms of forward looking, really in this

14  case, there's no evidence at all of anyone needing additional

15  mental health care of any kind including residential

16  treatment.  That's an issue.

17         THE COURT:  So there may be still people enrolled

18  in the plans, but claims are pending for those people for

19  that treatment?

20         MS. HANSON:  Right.

21         THE COURT:  Okay.

22         MS. HANSON:  No evidence whatsoever in the record.

23         The fact that there's evidence in the record now

24  that there are individuals who did not submit a claim for

25  residential treatment after having been denied at the time,

1    so --

2              THE COURT:  I don't understand.

3              MS. HANSON:  So after -- what we did was we looked

4    to see did the member who was denied residential treatment on

5    X date, did they submit a claim for residential treatment at

6    any time in the future?

7              THE COURT:  I see.

8              MS. HANSON:  And the answer for 50 percent of the

9    sample is no.

10             THE COURT:  Okay.

11             MS. HANSON:  So they don't have any injury.

12   There's no injury here.  They've not incurred the cost of

13   residential treatment.

14             And this idea that there's, you know, some need to

15   have in their medical records that they were denied care and

16   didn't get treatment, that is in -- if they asked for their

17   -- the administrative records that we produced in the case

18   say that.  I'm sure their physician's records already say

19   that, because the residential treatment center would have

20   that documented.

21             THE COURT:  Okay.

22             MS. HANSON:  So there's no injury to redress there.

23   Or at least there would be a question as to whether or not

24   their records did or did not say those things.

25             THE COURT:  So you're applying the -- no, I can't

1   say it -- *Bertino* decision saying there's no redressability

2   and, therefore, no standing?

3            MS. HANSON:  There is no redressability here, Your

4   Honor.

5            THE COURT:  Okay.

6            MS. HANSON:  For those reasons.  Also because I'll

7   -- you know, the discretion issue, again, like they're not

8   going to --

9            THE COURT:  I got that.

10           MS. HANSON:  -- be redressed for that too.

11           THE COURT:  I got that.

12           MS. HANSON:  So just going through what you talked

13  about with her.

14           On remand being a -- yes, remand is a, you know,

15  happens in cases all the time where courts decide to remand a

16  case to the administrator.  But the reason why they remand it

17  is to see if there are benefits available under the plan.

18  And that's money, right?  That's not a -- it's not a proper

19  tool just to have a reprocessing for reprocessing sake

20  without the money at the end of it.

21           So that's the point of *Wit*, is that remand is an

22  appropriate remedy, but it is a means to deciding whether or

23  not you get benefits, i.e., money under the plan.

24           THE COURT:  Well, assuming that the Court agrees

25  with *Wit*, what about the breach of fiduciary duty claim?

1          MS. HANSON:  So because it's a means to get money,

2     the breach of fiduciary claim is duplicative of the claim for

3     benefits.

4          THE COURT:  So had the claim in your opinion been

5     raised with respect to the breach of fiduciary duty claim,

6     the same result would have occurred?

7          MS. HANSON:  That's right.

8          THE COURT:  Okay.

9          MS. HANSON:  And also the *Wit* court also said that

10    the breach of fiduciary duty claim, or at least from my

11    reading of it, insofar as it's wrapped up in the -- they made

12    the same, United made the same argument the plan and how it

13    works in terms of the conflation of the medical necessity

14    prong and the generally accepted standards.  And my reading

15    of *Wit* is that the breach of fiduciary duty claim, as far as

16    it's wrapped up in that, is eliminated.

17         THE COURT:  Meaning going forward?  It wasn't

18    eliminated in that case.  The circuit let it stand.

19         MS. HANSON:  I'm sorry.  I couldn't understand.

20         THE COURT:  The circuit -- would be eliminated in

21    other cases going forward.  In that case, the circuit let it

22    stand.

23         MS. HANSON:  They let it -- my reading of it is is

24    that they didn't let it stand to the extent that it's wrapped

25    up in the merits question essentially of --

1          THE COURT:  Okay.

2          MS. HANSON:  -- the reading of the --

3          THE COURT:  That wasn't my recollection.  But okay,

4     that's fine.

5          What else?

6          MS. HANSON:  On the arbitrary and capricious

7     standard as well, that, you know, as I was talking about the

8     variation in the plan terms in terms of medical necessity and

9     whatnot, there are a lot of the definitions that actually use

10    the word discretion in the definition, let alone the fact

11    that there's a separate provision in a lot of these plans

12    that grants Anthem discretion to interpret the plan

13    generally.

14          But in the medical necessity definition itself, it

15    uses the term discretion.  So that idea is baked right into

16    the terms of the plan, specifically with respect to medical

17    necessity.

18          So Your Honor is going to have to decide on that,

19    did Anthem do that correctly, not even correctly, but did

20    they do it -- were they arbitrary and capricious about it?

21          So there's an issue there in terms of the class.

22    You're going to have to make individual determinations in

23    each particular case, not just because of the discretion

24    issue.

25          So when she raised --

1          THE COURT:  I think that's a bit circular though in

2     the sense that I think she's saying the abuse of discretion

3     is the application of the guidelines themselves which are

4     inconsistent with what they suggest is a definition of

5     medical necessity.

6          Your issue of discretion I think is more additive

7     in the sense that, well, although there are guidelines here,

8     but that's not the sum and substance of our analysis.

9     There's a peer review that takes place after the application

10    of the guidelines if they're not met in which the doctor's

11    discretion is applied with respect to clinical judgment or

12    clinical necessity.

13          MS. HANSON:  It's a different discussion issue,

14    Your Honor.  The discussion is what is medically necessary?

15    What is generally accepted?  What are those factors?  What do

16    they mean?  It's separate than the actual --

17          THE COURT:  Okay.

18          MS. HANSON:  -- medical decision about it.

19          THE COURT:  And your client should have discretion

20    even in making those -- in creating the definitions then.  Is

21    that what you're saying?

22          MS. HANSON:  Interpreting those.

23          THE COURT:  Right.

24          MS. HANSON:  Interpreting the plan terms,

25    absolutely.

1          THE COURT:  Okay.  I don't know that your adversary

2     disagrees with you on that.

3          When you said it was an arbitrary and capricious

4     standard of review.  Right?

5          MS. HANSON:  Right.  Surprisingly we do agree that

6     -- yeah.  Under all of these plans --

7          THE COURT:  Right.

8          MS. HANSON:  -- Anthem is the claims administrator

9     and --

10          THE COURT:  Right.

11          MS. HANSON:  -- has the discretion to interpret the

12     plans.

13          THE COURT:  Okay.

14          MS. HANSON:  That's where the fiduciary duty comes

15     from.

16          THE COURT:  Right.  Okay.  And I get the argument.

17          But okay.  Is there anything else you wanted to

18     say, Ms. Hanson?

19          MS. HANSON:  I'm looking here.  Let's see.  We

20     talked about -- you and Ms. Reynolds talked about subclasses.

21          THE COURT:  Yes.

22          MS. HANSON:  And so -- and my understanding was

23     that she's suggesting there could be a subclass of

24     individuals who did pay for residential treatment.

25          THE COURT:  Did?  Oh, pay, yeah.

1          MS. HANSON:  There is no evidence beyond the named

2    plaintiffs that folks paid for the treatment.

3          THE COURT:  Okay.

4          MS. HANSON:  And there is reason to believe that it

5    would require individualized review.  We'd have to find out

6    did the residential treatment center actually bill them?

7          A lot of times these places make deals.  There are

8    grants available.  We know Ms. Collins got a grant for part

9    of her stay, so that's not a hypothetical.

10          And we would have to find out, you know, was it

11    covered under the -- you know, there's just a multitude of

12    factors there to determine.  And so the subclass just raises

13    more questions about individualized issues.

14          THE COURT:  Okay.  I'm not cutting you off.  Is

15    that it?

16          MS. HANSON:  I think that that's it.

17          THE COURT:  Okay.  I'm going to bet that Ms.

18    Reynolds has five minutes or less of reply.

19          MS. REYNOLDS:  I'll be as prompt as I can, Your

20    Honor.

21          Let me start with this idea of the breach of

22    fiduciary duty sort of collapsing into the benefit claim in

23    this case.

24          That the -- Your Honor is correct that there is a

25    freestanding, separate breach of fiduciary duty claim in *Wit*

1    that the district court found and that the Ninth Circuit

2    affirmed the findings for, meaning that there's a -- there

3    was proof of a breach of a duty of loyalty in that case, so

4    there is a breach of fiduciary duty class that is still alive

5    in *Wit*.  And we'll certainly be fighting about that with UBH.

6            For these purposes, you know, what's relevant is

7    are the claims that we've asserted in this case.

8            So I started to go through those, and I really only

9    touched on one, but our breach of fiduciary duty claim, so

10   under ERISA the fiduciary duties that an administrator owes

11   run to the participants and beneficiaries of the plan.  Its

12   job is to carry out all of its duties.  I know you know this,

13   Your Honor.  But it's job is to carry out its duties solely

14   in the interest of the participants and beneficiaries of the

15   plan and for the exclusive purpose of paying benefits under

16   the terms of the plans and defraying administrative expenses.

17           And there's an independent fiduciary duty that

18   Anthem owes as a plan administrator to do all of those things

19   consistent with the plan terms.  Right?  So there's an

20   independent fiduciary duty to follow the plan terms.

21           And what we allege is that by developing these

22   extremely restrictive guidelines and deciding to adopt the

23   extremely restrictive MCG guidelines, Anthem violated those

24   duties.

25           It was not doing this in the interests of the

1      participants and beneficiaries and making sure that it could

2      cover benefits, you know, whenever the plan called for it.

3      They were careless.  They did not do enough analyses of these

4      issues.  They, you know, misinterpreted the plans.  They did

5      it in an arbitrary and capricious manner.

6              So that's really -- that's the fiduciary duty

7      claim.

8              It is, you know, it's related to, but it's not the

9      same as, and it doesn't overlap with the benefit claim, which

10     is -- and then when you use those guidelines to deny coverage

11     it made those denials arbitrary and capricious.  And, you

12     know, that the Court needs to address that.

13             And then, you know, to make sure it doesn't get

14     lost, we have a Parity Act claim which is that the Mental

15     Health Parity and Addiction Equity Act, which is incorporated

16     into ERISA, requires administrators to ensure and requires

17     plans to ensure that there are not more stringent

18     requirements on the mental health and substance use side than

19     there are for medical necessity, or sorry, than there are for

20     medical and surgical claims.

21             And it's very -- it's very well established that

22     medical necessity requirements are one of those treatment

23     limitations.  It's called a non-quantitative treatment

24     limitation.  And it can't be more stringent as written or in

25     operation on the mental health and SUD side than, excuse me,

1    substance use disorder side, I used the acronym, than for

2    medical and surgical.

3            And so that's the key part of our -- those are --

4    those are the three claims that we have asserted here and

5    they are redressable claims.

6            So breach of fiduciary duty, you know, we allege

7    that Anthem had a defective process and didn't adhere to its

8    duty of loyalty in adopting these guidelines, so, you know,

9    an injunction requiring Anthem to go back and reprocess for

10   people who have the backup of being injuries that the Court

11   determines ultimately at the remedies phase can be redressed,

12   you know, that is redress for that injury.

13           And then for people who are still members of the

14   plan, a prospective injunction.  Again, that is redress for

15   that injury.

16           The same thing for benefit denials.  Reprocessing

17   is redress, you know, sending back.  That is the remedy the

18   Second Circuit has prescribed.

19           And so it's sort of -- it's really a form over

20   substance kind of argument to say, well, you can't ask --

21           THE COURT:  Right.

22           MS. REYNOLDS:  -- for reprocessing.  You have to

23   ask for something else.  It's like, well, we asked for the

24   thing that the Second Circuit says you're supposed to do.

25           We alleged our benefit denials were wrongful.  We

1    brought a claim under the right part of ERISA, which is

2    Section (a)(1)(B).  And then we said and send it back and

3    have them apply the right standard.

4            And, you know, in terms of whether or not the Court

5    can ultimately limit that relief to people who paid out of

6    pocket, of course the Court can.  That's how class actions

7    work all the time.

8            You know, did you pay for X?  And then you put in a

9    receipt that says you paid for X, right?

10           I mean, ultimately it can be a class criterion,

11   part of a class definition, to say, you know, this type of

12   relief is going to go to people who paid money.  You know, we

13   think that's too narrow.

14           Plaintiffs, you know, stand by the fact that it

15   injured everybody to have the wrong standard applied to them.

16   And that it's important to people to have the right standard

17   applied.

18           It's not that -- it's not just the fact that they

19   were denied mental health treatment needs to be in their

20   file.  It's the fact that it was wrong, right, that they did

21   not get treatment that they did, in fact, need, right, that's

22   what needs to be reflected and corrected in the plan.

23           THE COURT:  Okay.  I'm sorry.  Go ahead.

24           MS. REYNOLDS:  Yes.  Well, if you have questions,

25   feel free to interrupt me, but I am going to try to touch on

1    the various things that Ms. Hanson covered.

2              Okay.  So let's go back to this issue of

3    discretion.

4              So now Anthem is conceding that I guess, well, I

5    guess their position is that the care managers used the

6    guidelines, but still that the peer reviewers do not.

7              And I submit, Your Honor, that that is not what the

8    denial letters say.

9              Those denial letters, you know, they may be drafted

10   only to comply with regulatory requirements and drafted in

11   such a way that Anthem can say that its checked the box, but

12   the point, the reason there are regulatory requirement, the

13   reason these written notifications are required, is so that

14   plan members will know why their coverage is being denied so

15   that they can appeal it and maybe sue, right?

16             So if you say, well, we applied this guideline and

17   you don't meet the guideline, that's the reason that people

18   are going to think their coverage was denied.

19             But if there was really some other reason -- you

20   know, I take the point that the guidelines -- that the denial

21   letters just say we used this guideline and they don't say

22   and we didn't use anything else, but they don't point to

23   anything else that is being used to make this decision.

24             And so if it's we used this guideline and then

25   somebody else looked at it with no standard whatsoever and

1       made it up on the spot, right, the letters are legal

2       notifications.  They are substantive.  They are there for a

3       very important reason.

4               It is not a full and fair review under ERISA.  And

5       under the statute it's required to have a full and fair

6       review.  And under the regulations it's required.  And part

7       of that is telling people really, really telling them, why

8       it's denied.

9               I'm not saying you have to give them the -- all of

10      your clinical notes.  I'm saying you have to give the actual

11      reason.  And when you tell people we used a guideline, you

12      should be held to the fact that that's the reason that you

13      told them.

14              And then I just, you know, unless the Court be

15      concerned that, oh, the real reason is, the secret real

16      reasons are in the -- are in the clinical notes that aren't

17      disclosed to the class, to the plan members, they've been

18      exchanged.  They're not in the record before the Court except

19      for in a few instances where Anthem submitted them, submitted

20      some clinical notes, or the -- I forget -- the utilization

21      review notes is really what I should be calling them -- they

22      submitted those notes to say, ha, ha, there are these other

23      reasons, right, that show that it wasn't the timeline.  But

24      literally, you know, when you look, this is set forth in the

25      second Reynolds declaration, and it's discussing the Sanchez

1       --

2               THE COURT:  Set forth where in the --

3               MS. REYNOLDS:  So if you look at paragraphs 28 I

4       think through the end --

5               THE COURT:  Okay.

6               MS. REYNOLDS:  -- of the second Reynolds

7       declaration it's sort of addressing these situations where

8       Anthem said if you look at the notes you can see that it's

9       not off the guideline.

10              But, you know, in the Anthem case, what the notes

11      say, the peer reviewer, this is not the care manager, the

12      peer reviewer writes the criteria/guidelines recognized by

13      Anthem as required for continued MHRTCNCG guidelines do not

14      appear to be met, passed, and then they state the last date

15      that they approved coverage, it appears latest clinical does

16      not meet all the required elements of the severity of illness

17      and/or continued continuity of stay criteria items.  Without

18      criteria met, I am not able to authorize, therefore, request

19      is denied.  So it's completely consistent with the letter.

20              And so the rest of the declaration goes through

21      each of the examples.  The only example that Anthem has cited

22      to say, you know, the notes prove something that the letters

23      don't say, but actually they're completely consistent and

24      demonstrate that this is -- these are the criteria that are

25      being applied.

1          And on that note, I do want to just -- counsel said

2    a couple of times that these aren't -- these aren't tick

3    boxes, they're not criteria, they don't make a decision, and

4    I'd just urge the Court to take a look at the guidelines.

5    They're all in the record.  They're attached to the first

6    Reynolds declaration, Exhibit C.

7          And if you look at C-1, I'll just give one example,

8    these are some of the ones that Anthem drafted itself, and if

9    you look at -- it's the paper the Bates number ends in 2903

10   and going on to 2904 these are the criteria for residential

11   treatment center.

12         And it starts out severity of illness criteria.

13    Residential treatment center is considered medically

14   necessary when the member has all of the following.  And then

15   it lists four things.  And then continued stay.  And it says

16   residential treatment center is considered medically

17   necessary when the member continues to meet severity of

18   illness criteria and has A, and one of B, C or D.  And it's

19   got marked for criteria.  And then it says underneath that

20   not medically necessary.  Residential treatment center is

21   considered not medically necessary when the above criteria

22   are not met.

23         So I would submit, Your Honor, that those are, in

24   fact, criteria.  They are tick boxes.  They do list factors

25   that have to be satisfied.  And they are mandatory.

1          THE COURT:  Okay.

2          MS. REYNOLDS:  This other idea that, well, it only

3     becomes a question that maybe let's set aside what the

4     guidelines say, maybe this doesn't, this isn't the end of the

5     story, and really there are some situations where people get

6     approved even though they didn't meet the guidelines, that,

7     again, those people are not before you, Your Honor.

8          What is at issue in this case are people who did

9     have their claims denied pursuant to these guidelines.  And

10    the question we're asking is was that a standard that is

11    inconsistent with their plans?

12         THE COURT:  Okay.

13         MS. REYNOLDS:  The Dennis F case I want to touch on

14    just very --

15         THE COURT:  Yeah.

16         MS. REYNOLDS:  -- very, very briefly.

17         That is a case in which the class did not challenge

18    the guideline itself.  They challenged the application of the

19    guideline to the facts.

20         THE COURT:  Okay.

21         MS. REYNOLDS:  And the Court said, you know, how

22    can we do that?  It's through a fact-intensive,, blah, blah,

23    blah.

24         So Ms. Hanson got into some of Anthem's merits

25    arguments.

1          Whether the Court agrees with Anthem's

2     interpretation of the medical necessity definitions, that's

3     the merits question, right?  That's the question.  Are these

4     definitions -- or are these guidelines inconsistent with the

5     definitions?

6          THE COURT:  Right.

7          MS. REYNOLDS:  The question for now is are these

8     definitions so different from each other that we can't have a

9     class that hangs together, that's cohesive, and where we can

10    answer that question.  This clinical appropriate prong, and

11    there's another prong that Anthem points to, we discussed

12    substantively why those are actually, you know, when you read

13    everything together, which is how the Court should read the

14    plan terms, when you read everything together, they're all

15    just parts of the same inquiry and it doesn't mean that their

16    guidelines can then be -- can deviate from generally accepted

17    standards of care and somehow that's saved by the fact that

18    they're looking at clinical appropriateness.

19          But more to the point, that term is in 98 percent

20    of the plans that are in the claim sample so it's super

21    common.  It's not going to be an issue that sidetracks the

22    Court.  It's going to be part of the central decision making

23    in this case for everyone.  And we put in -- I think the

24    other -- for some reason I'm forgetting what the other prong

25    was, oh, not for convenience.  Again, this is another, you

1    know, just dropping yourself off for a vacation or whatever.

2    Like that's -- it's also consistent with generally accepted

3    standards of care that you do need to be actually getting

4    treatment.  And that term I think is in 93 percent of the

5    plan.  Something like that.  These figures are in my second

6    declaration.

7         But basically these are terms that are extremely

8    common.  They're in all of the named plaintiffs' plans.  You

9    know.  So when the Court is going to weigh what it means to

10   have a medical necessity definition that has those terms it's

11   going to be the, you know, the same question for the entire

12   class.

13        Sorry.  I'm just looking at my notes and trying to

14   decipher my handwriting.

15        Oh.  Again, this -- the assertion that in order to

16   obtain any sort of forward-looking relief that the class

17   would have to demonstrate that they still need residential

18   treatment, that is really not the right way to look at it.

19        The injunction that we would be seeking is, you

20   know, we'd be seeking declaratory relief that says Anthem

21   your medical necessity guidelines have to be consistent with

22   the plan terms including generally accepted standards.  And

23   then the intention would be use criteria that are consistent

24   with generally accepted standards going forward.

25        And, you know, that -- that is a clarification of

1    the rights of these plan members under their plans that

2    they're entitled to under ERISA so that in the future if they

3    come in and need additional care they will be -- their claims

4    will be determined under the right standards.

5            And to suggest that, you know, a person who,

6    especially a person who needed treatment and didn't get it,

7    that they are never going to need treatment in the future,

8    especially for a mental health condition or a substance use

9    disorder, that's just not accurate.

10           The evidence that we can and will prove at trial

11   will be that -- or will show that actually behavioral health

12   conditions like that are -- tend to be chronic and people

13   very often have relapses and need additional care in the

14   future.  But, again that's a--

15           THE COURT:  All right.  Let's wrap this up.

16           MS. REYNOLDS:  -- that's a merits issue.

17           THE COURT:  Let's wrap this up and not repeat.

18           MS. REYNOLDS:  Yes.  Sorry.  I think I've mostly

19   touched on everything.

20           THE COURT:  Okay.

21           MS. REYNOLDS:  The only other note I sort of have

22   here is this idea that other courts have looked at guidelines

23   and determined that they're only scaffolding or whatever.

24   That other courts have not looked at Anthem's guidelines and

25   how Anthem uses them.

1          THE COURT:  Okay.

2          MS. REYNOLDS:  And in our -- in the reply brief, we

3   cited the testimony of Anthem's 30(b)(6) designee where he

4   states very explicitly, you know, yeah, everybody has to use

5   a guideline.  They exercise clinical discretion within the

6   guidelines.  So there's a long block quote that really states

7   the actual facts on that issue.

8          THE COURT:  Okay.  Okay.

9          MS. HANSON:  Your Honor, may I have two minutes?

10         THE COURT:  Two minutes.  Please don't repeat what

11  you said before.  But the answer to your question is yes.

12         MS. HANSON:  I do want to read from the training

13  manual.

14         It says that the psychiatrist reviewer --

15         THE COURT:  What exhibit is this in the --

16         MS. HANSON:  This is Exhibit 16 to the plaintiffs'

17  opening brief.

18         THE COURT:  You mean her opening affidavit?

19         MS. HANSON:  Opening affidavit.  Thank you.

20         THE COURT:  Okay.  Got it.

21         MS. HANSON:  It says the psychiatrist reviewer,

22  peer clinical reviewer, should use the --

23         THE COURT:  Read it slower if you want to come out

24  in the record.

25         MS. HANSON:  The psychiatrist reviewer/peer

1   clinical reviewer should use the behavioral health clinical

2   UM guidelines in reviewing a requested service for

3   consistency, but must also use his or her discretion and make

4   professional judgment to make determinations when indicated

5   by a member's unique clinical circumstances.

6           Later that exhibit says these behavioral health

7   clinical guidelines are not meant to be exhaustive and will

8   not cover all clinical situations.

9           The MCG content guide to the -- for behavioral

10  health, Exhibit D-10 to our declaration, Rob Deegan's

11  declaration, says as always the care guidelines are designed

12  to assist the clinical review process that is needed to

13  render judgment about cases in which admission may be

14  appropriate.  Admission to a specific level of care may be

15  necessary even when the indications listed for that level of

16  care are not present.

17          And there are other examples.  There are a few

18  other exhibits that talk about how they are the guidelines,

19  but you have to do something else because the guidelines are

20  not outcome determinative.

21          Ms. Reynolds read, you know, there's -- you have to

22  meet all of the criteria, do all the things.  The MCG have

23  something similar in them.

24          But what Anthem and what MCG is telling their

25  reviewer is is that, sure, the member may not meet all of

1       those criteria, but then you need to use your peer clinical

2       -- your peer, excuse me, your clinical judgment to decide if

3       that's a yes or a no.

4               And we should keep in mind too, we're talking --

5       she's talking about all these, like, you know, extremely

6       restrictive guidelines, 93 to 96 percent of the requests for

7       residential treatment in this -- the case were, or, excuse

8       me, overall, so it includes some high-level data, includes

9       some claims that are not in this case, but 93 -- the approval

10      rate is 93 to 96 percent.

11              Now, the care manager approves 91 percent at that

12      level.  And then the small fraction that goes on to the peer

13      clinical review, 25 percent of that is approved.  So you have

14      7 percent at the most of claims going to the peer clinical

15      reviewer that the care manager already decided did not meet

16      the guidelines, and 25 percent of those get approved.

17              THE COURT:  Is that 25 percent number in the

18      record?

19              MS. HANSON:  It's extrapolated from the math that's

20      in the Goldstein affidavit.

21              THE COURT:  And where in the Goldstein affidavit is

22      it extrapolated from?

23              MS. HANSON:  I'll pull that up.

24              MS. REYNOLDS:  And, Your Honor, I'd like to have a

25      word on this when you're finished.

1          MS. HANSON:  I'm actually -- I have a couple --

2          THE COURT:  No, no.  She means when you're done.

3          MS. HANSON:  Oh, I'm sorry.  That data is in Dr.

4    Pearsall's.  That's Exhibit C, Dr. Pearsall's declaration,

5    Exhibit C to the Deegan declaration.

6          THE COURT:  Okay.  And where --

7          MS. HANSON:  It talks about the statistics of

8    approvals.

9          THE COURT:  Where within the affidavit is it?  What

10   paragraphs?

11         MS. HANSON:  So Mr. Deegan's declaration is Exhibit

12   B to --

13         THE COURT:  Exhibit B as in boy?

14         MS. HANSON:  Boy.

15         THE COURT:  Okay.

16         MS. HANSON:  And the -- oh, actually, I'm sorry.

17   Dr. Pearsall's declaration is Exhibit C I believe.  Yes.

18   Exhibit C.

19         THE COURT:  Okay.

20         MS. HANSON:  It's a standalone exhibit.  It's not

21   the -- part of the Deegan declaration.

22         THE COURT:  Okay.  And what paragraphs in there?

23         MS. HANSON:  It is in paragraphs 11 through 20.

24         THE COURT:  Okay.

25         MS. HANSON:  I will also note that the LOCUS

1    guidelines that the plaintiffs want this court to tell Anthem

2    they have to use, they also say that these are just

3    guidelines, you have to use clinical judgment.  And they

4    specifically say that the guidelines, the LOCUS guidelines,

5    does not claim to replace clinical judgment.

6              THE COURT:  Okay.

7              MS. HANSON:  So even if Your Honor were to order

8    Anthem to use the LOCUS guidelines, they would still have the

9    discretion, still have the peer clinical judgment piece of

10   the analysis.

11             When Ms. Reynolds talks about being consistent with

12   plan terms, you should really look at what she's saying,

13   because she's saying consistent with one prong of the medical

14   necessity criteria.

15             And on the -- when in the letters, in the

16   administrative record, the UM notes whenever it said that the

17   member doesn't meet the guidelines, that can also be true

18   that it doesn't meet the peer clinical reviewer's clinical

19   judgment as well.  It's like a --

20             THE COURT:  Understood.

21             MS. HANSON:  -- venn diagram that sometimes it does

22   come together.

23             That is all I have, Your Honor.

24             THE COURT:  Okay.  Two minutes to respond, but you

25   get the last word.

1          MS. REYNOLDS:  Thank you.

2          First, this issue about, you know, the LOCUS

3    includes discretion and so on, these are, again, we're

4    talking discretion with respect to determining do the facts

5    fit within this guideline.

6          And also, you know, LOCUS says that -- the LOCUS

7    criteria and the other guidelines that we've pointed to are

8    used by professionals.  They're used by doctors who are

9    treating patients and by payors, right?

10         So it's important to keep in mind that the job of a

11    treating physician is very different than Anthem's peer

12    reviewers.

13         The treating physician is, you know, taking a

14    comprehensive history, trying to come up with a treating

15    plan, weighing different options, looking at the resources

16    available and so forth and coming up with an idea, a

17    prescription recommendation for treatment.

18         Anthem's job then is to take that recommendation

19    and decide is it covered under the plan?  Yes or no?

20         This is not, you know, it's not sort of, oh, you

21    know what Think would be great for you is this totally other

22    type of treatment.  They're not doing that.  They're taking a

23    claim and deciding is it covered or not?  And they use

24    criteria to make those decisions consistent.

25         But I really, I wanted to talk about this 93 to 96

1    percent number --

2              THE COURT:  Okay.

3              MS. REYNOLDS:  -- because this came out in the

4    briefing.  And we served some discovery on it because it was

5    kind of a shocking number to us.

6              And what we just learned, we just got the discovery

7    responses this week, and confirmed this in a meet and confer,

8    it's funny math.  Okay.

9              So what Anthem does is it counts -- so if you have

10   a stay in residential treatment of let's say a month, you

11   don't get approval for 30 days right off the jump, right?

12             You have to keep coming in to justify continued

13   stay.  So you'll get seven days or five days or three days

14   approved at a time and then you have to come back until

15   finally --

16             THE COURT:  Come back to Anthem?

17             MS. REYNOLDS:  Yeah.  To come back to Anthem --

18             THE COURT:  Okay.

19             MS. REYNOLDS:  -- submit a new claim, say, you

20   know, I'd really like to stay in treatment.  And so then you

21   have to --

22             That's a new review.  Anthem comes back with a new

23   approval.  When they're giving you these numbers --

24             THE COURT:  So those would be two approvals instead

25   of one?

1          MS. REYNOLDS:  Yeah.

2          THE COURT:  Okay.

3          MS. REYNOLDS:  And so the discovery response that

4     we got just said, so, for example, for a one-month stay, a

5     person might have three approvals and one denial.  And that's

6     regardless of how much more treatment the person might have

7     needed.  Maybe they needed six months, right, but they only

8     count the denial once and they count every single request for

9     continued stay.

10         So when you hear those numbers, they don't give you

11    any indication whatsoever of how restrictive the guidelines

12    are or how many people were subjected to a denial.

13         We're trying to get to the bottom of the real

14    denial rate, but that may be -- may take us a little more

15    merits discovery to get there.

16         THE COURT:  I understand that in terms of the

17    merits.

18         What I'm wondering though is in terms of class

19    certification.  While it undermines one portion of their

20    position, it actually proves the other.  Because if they're

21    exercising discretion for 3 days and then 10 days and then

22    15, and then denying it from days 15 to 20 or 30, somebody

23    had to change their mind about something.

24         MS. REYNOLDS:  So the fact that Anthem may allow

25    some, you know, a short stay in residential treatment for

1    some people, for some people they just deny altogether.

2              THE COURT:  Forget those for the moment though.  I

3    understand.

4              MS. REYNOLDS:  For some people they allow some.

5    Some basic coverage like, for example, Sanchez.  But that

6    doesn't mean that their criteria for determining coverage are

7    not overly restrictive, right?  So you still have to show

8    that you meet --

9              THE COURT:  Yeah.

10             MS. REYNOLDS:  -- the initial admission

11   requirements --

12             THE COURT:  Okay.

13             MS. REYNOLDS:  -- and then the continued stay.  And

14   those can be -- they can cause --

15             THE COURT:  Okay.

16             MS. REYNOLDS:  -- treatment to be truncated

17   prematurely.

18             THE COURT:   Okay.  I get it.

19             MS. REYNOLDS:  And then just my very last word,

20   Your Honor, is that this a motion for class certification.

21   It's not summary judgment.

22             THE COURT:  Right.

23             MS. REYNOLDS:  It's not trial.  We have to show by

24   a preponderance of the evidence, so more likely than not,

25   that Anthem used these guidelines for these denials, that,

1    you know, that with all the criteria for class certification

2    are satisfied.  And, Your Honor, I'd respectfully submit that

3    we've done so.

4              THE COURT:  Okay.  Very good.  Thank you, all.

5    That was comprehensive.  I appreciate the time.

6              MS. REYNOLDS:  Thank you, Your Honor.

7              THE COURT:  All right.  I'm going to take two

8    minutes --

9         (Proceedings concluded 1:33 p.m.)

10              I, CHRISTINE FIORE, court-approved transcriber

11   and certified electronic reporter and transcriber, certify

12   that the foregoing is a correct transcript from the official

13   electronic sound recording of the proceedings in the above-

14   entitled matter.

15

16         *Christine Fiore*

17   _____         May 30, 2023

18       Christine Fiore, CERT

19

20

21

22

23

24