UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
MARISSA COLLINS, on her own behalf, and
on behalf of all others similarly situated, and
JAMES BURNETT, on behalf of his son, and
on behalf of all others similarly situated, and
KARYN SANCHEZ, on behalf of her minor
son  and  all  others  similarly  situated,

                          Plaintiffs,

      -against-

ANTHEM, INC. and ANTHEM UM
SERVICES, INC.,

                      Defendants.
-------------------------------------------------------------------x
A.I., on behalf of his minor daughter and
on behalf of all others similarly situated,

                Intervenor Plaintiff,

      -against-

ANTHEM, INC. and ANTHEM UM
SERVICES, INC.,

                      Defendants.
-------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
20-CV-01969 (SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

    Presently  before  the  Court  in  this  ERISA-denial  of  benefits  class  action  is

Plaintiffs  Marissa  Collins's,  James  Burnett's,  Karyn  Sanchez's  and  Intervenor

Plaintiff  A.I.'s  (collectively,  "Plaintiffs"  or  "Named  Plaintiffs")  Motion  for  Class

Certification  ("Plaintiffs'  Motion"  or  "Pls.'  Mot.").  *See* DE [85].  Defendants Anthem,

Inc.  and  Anthem  UM  Services,  Inc.  ("Anthem  UM")  (collectively,  "Anthem"  or

"Defendants")  oppose.  *See* DE [88].

By way of Complaint ("Complaint" or "Compl.") filed on April 29, 2020, Plaintiffs Collins and Burnett commenced this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., alleging that: (i) Defendants breached their fiduciary duties as set forth in 29 U.S.C. § 1104(a); (ii) Anthem UM unreasonably denied requests for coverage for residential behavioral health treatment services submitted by Plaintiffs and putative class members; and (iii) Anthem UM violated the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA" or the "Parity Act"), incorporated into ERISA at 29 U.S.C. § 1185(a). *See* Compl., DE [1], ¶¶ 87-100.   Plaintiffs Collins and Burnett seek various forms of injunctive and declaratory relief. *See id.* at 34-35.  On February 1, 2021, Collins and Burnett filed their Amended Complaint, adding Plaintiff Sanchez. *See* Am. Compl., DE [29]. Defendants moved to dismiss the Amended Complaint on April 28, 2021, *see* DE [39], which motion was denied on February 24, 2022, by the Honorable Frederic Block. *See* DE [50].  "A.I." moved unopposed to intervene as a plaintiff on June 10, 2022.[1]  *See* DE [60]. This Court granted A.I.'s motion on June 21, 2022.  On February 22, 2023, the parties consented to this Court's jurisdiction for all purposes, *see* DE [82], which consent was So Ordered by Judge Block the next day. *See* DE [83].  Plaintiffs filed Plaintiffs' Motion on March 17, 2023. *See* DE [85].  Defendants oppose. *See* Defendants' Opposition (or "Defendants' Opp."), DE [88].   Oral argument was

---

[1] A.I.'s motion to proceed anonymously in this litigation and to seal or redact personally identifying information pertaining to himself and his minor daughter, *see* DE [58], was granted on June 21, 2022. Accordingly, this Intervenor Plaintiff is identified by a pseudonym, "A.I."

conducted on April 28, 2023. *See* DE [102]. For the reasons set forth herein, Plaintiffs' Motion is granted in part and denied in part. The Court certifies a class under Rule 23(b)(2), defined according to the class definition set forth in Plaintiffs' Reply, for the purposes of seeking retrospective injunctive relief and declaratory relief only, and appoints Plaintiffs' counsel as class counsel.

## I. BACKGROUND

### A. Relevant Facts

The following facts are taken from the Amended Complaint, A.I.'s Intervenor Complaint, and the parties' submissions, declarations, and exhibits with respect to Plaintiffs' Motion. *See* Amended Complaint; Intervenor Complaint, DE [64]; Plaintiffs' Motion; Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion ("Pls.' Mem."), DE [86]; Excerpts of the Deposition of Dr. Rowland Pearsall ("Pearsall Dep."), Pls.' Mem., Ex. 3, DE [86-2] and Declaration of Samuel Kadosh ("Kadosh Decl."), Defs.' Opp., Ex. D, DE [85-29], ¶ 4, Ex. D-1, DE [88-4]; Declaration of Caroline E. Reynolds in Support of Plaintiffs' Motion ("Reynolds Decl."), DE [87]; Defendants' Opposition; Kadosh Decl., Declaration of Robert Deegan ("Deegan Decl."), Defs.' Opp., Ex. B, DE [88-2]; Declaration of Dr. Rowland Pearsall ("Pearsall Decl."), Defs.' Opp., Ex. C, DE [88-3], Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion ("Pls.' Reply"), DE [89]; Second Declaration of Caroline E. Reynolds in Support of Plaintiffs' Motion ("2d Reynolds Decl."), DE [90]; Defendants' Surreply in Support of Opposition to Plaintiffs' Motion ("Defs.' Surreply"), DE [91].

### i. The Anthem Plans and Their Terms

Defendant Anthem, Inc. is an insurer that owns several subsidiaries and is an independent licensee of the Blue Cross and Blue Shield Association.  Am. Compl., ¶ 6.  Defendant Anthem UM is a wholly-owned subsidiary of Anthem, Inc., which Anthem, Inc. "designates to perform utilization management," described below.  Pls.' Mem., Ex. 9, at 3.  Anthem administers health benefit plans, some of which are self-funded, for which Defendants provide administrative services only, and some of which are fully insured by Anthem.  Pls.' Mem., Ex. 1, ¶ 11.  In this role, Anthem evaluates coverage requests for treatment, including residential mental health and/or substance use treatment, through a process it calls "Utilization Management," or "UM," the objective of which is to determine if the services for which an insured requests coverage are "medically necessary."  See Pls.' Mem. at 8-9; Defs.' Opp. at 4.

In this litigation, Defendants produced 383 "Member Samples," comprised of 379 randomly selected insured and the four Plaintiffs, pursuant to a joint stipulation between the parties.[2]  See Pls.' Mem., Ex. 1, ¶ 20; Ex. 2.  For each such Member Sample, Anthem produced, among other documents, "the summary plan description/benefit booklet" for each member's plan.  See Pls.' Mem., Ex. 1, ¶ 21; see, e.g., Reynolds Decl., ¶ 4, Ex. B-005.  Relevant here, each plan description explains both the scope of the plan's coverage and exclusions to that coverage and requires that services be "medically necessary" to be covered.  See Pls.' Mem. at 6; Reynolds

---

[2] The parties identified approximately 10,000 denials for residential mental health and substance abuse treatment coverage that cited one of the Guidelines used by Anthem UM to determine if requested coverage is medically necessary that are at issue in this litigation, as more fully explained below.  See Pls.' Mem., Ex. 2, ¶¶ 3-8.

Decl., ¶ 12, Ex. F.  Most of the plan descriptions define the term "medically necessary" (or "medical necessity").  *See* Pls.' Mem. at 7; Reynolds Decl., ¶ 13, Ex. G; Deegan Decl., ¶ 21(a).  The parties disagree as to whether the few plan descriptions that do not define this term are incomplete productions.  *See* Defs.' Opp. at 3; Pls.' Reply at 7-8.  Of those plan descriptions that define the term, most define "medically necessary" services to be those "in accordance with generally accepted standards of medical practice," or similar language, frequently in addition to other factors.  Pls.' Mem. at 7; *see* Reynolds Decl., ¶¶ 12–13, Ex. G.  Seven plan descriptions do not include this language in their definition of the term.  *See* Defs.' Opp. at 3-4; Deegan Decl., ¶ 22.

### ii. *Anthem UM's Benefits Determination Process*

Anthem UM applies Behavioral Health Medical Policies ("Medical Policies") and Behavioral Health Clinical UM Guidelines ("Guidelines") to evaluate whether a requested behavioral health service should be covered.  Defs.' Opp. at 4; Pearsall Decl., ¶ 4; Pls.' Mem., Ex. 17 at 4.  These Medical Policies and Guidelines are Anthem-wide; they do not vary by plan.  *See* Defs.' Opp. at 4; Pearsall Decl., ¶ 4.  Medical Policies specify whether a given service—transcranial  magnetic stimulation, for example—is covered.[3]  *See* Defs.' Opp. at 4; Pearsall Decl., ¶¶ 4-5; Pls.' Mem., Ex. 17 at 19.  By contrast, the Guidelines at issue in this case are organized by broader categories.  At the start of the class period, Anthem used internally developed Guidelines for residential behavioral health treatment coverage, but began licensing

---

[3] Plaintiffs do not challenge specific Medical Policies here.

Guidelines from a company called MCG, Inc. on November 5, 2018.  *See* Pls.' Mem. at

5.  The six Guidelines that Plaintiffs challenge as "overly restrictive" are:  (1) CG-

BEH-03, developed by Anthem prior to November 5, 2018, and applicable to requests

for mental health treatment; (2) CG-BEH-04, developed by Anthem prior to

November 5, 2018, and applicable to requests for substance abuse treatment; (3) B-

901-RES (BHG), licensed from MCG, Inc. from November 5, 2018 to the present and

applicable to mental health treatment for adults; (4) B-902-RES (BHG), licensed from

MCG, Inc., applicable to mental health treatment for children and adolescents; (5) B-

903-RES (BHG), licensed from MCG, Inc., applicable to substance use disorder

treatment for adults; and (6) B-907-RES (BHG), licensed from MCG, Inc., applicable

to substance use disorder treatment for children and adolescents.  *See* Pls.' Mem. at

2, 5; Reynolds Decl., ¶ 7, Exs. C-01 to C-24.

The UM process that Anthem uses to evaluate requests for coverage is multi-

step.  First, an intake team gathers basic information about the request and the

patient.  Pearsall Dep. at 29:17-25, 30:1-4; *see* Ex. Pls.' Mem., Ex. 15 at 4.  Next, "Care

Managers," who are not physicians, discuss the request with the insured's medical

provider.  Pearsall Dep. at 30:9-13.  The Care Manager then reviews the relevant

Guidelines to determine if, based on the clinical information available, the request

can be approved.  *Id.* at 30:14-22; Defs.' Opp. at 5.  If the Guidelines are not met,

approval of the requested treatment "may be questionable," and Care Managers are

instructed to consider an alternative level of care—for example, outpatient care—or

consult with a physician.  Kadosh Decl., ¶ 10, Ex. D-7 at 15.  A Care Manager will not

6

*deny* a request merely because the requested treatment does not fit the relevant Guidelines.  *See* Pls.' Mem., Ex. 15 at 3-4; Pearsall Dep at 31:22-25, 32:1.

Instead, such a request will be escalated to a physician Peer Clinical Reviewer.  *See* Defs' Opp. at 5; Pearsall Dep. at 32:2-12; Pls.' Mem., Ex. 15 at 4.  The Peer Clinical Reviewer will discuss the requested care with a clinician who is part of the provider team treating the insured.  Pearsall Dep. at 32:3-12; Ex. 16 at 8.[4]  Using the available clinical information alongside relevant Guidelines and Medical Policies, as well as other guidelines that may be state-mandated, the Peer Clinical Reviewer may approve or deny benefits, or may refer the case to a more senior Medical Director.  Pearsall Dep. at 32:13-20, 90:16-24; Pls.' Mem., Ex. 16 at 4, 6, 8-11.  The 2017 and 2018 versions of the Behavioral Health Peer Reviewer Training Manual state that Peer Clinical Reviewers are required to make medical necessity determinations by: (i) "determin[ing] if the requested service is addressed in Anthem Behavioral Health Clinical UM Guidelines or Behavioral Health Medical Polices," (ii)  "determin[ing] if Anthem's criteria can be applied to the clinical presentation of requested services," and (iii) mak[ing] a determination of medical necessity for requested services based on our applicable criteria." Pls.' Ex. 16 at 4; Ex. 17 at 4.  The 2019 and 2020 versions of this Manual state:  "The role of the Peer [Clinical] Reviewer is to determine if the requested services are medically necessary as defined in the Member's certificate of coverage and appropriate medical policies and UM guidelines."  Pls.' Ex. 18 at 4; Ex.

---

[4] Plaintiffs' Exhibits 16-19 are different versions of the Peer [Clinical] Reviewer Training Manual.  *See* Plaintiffs' Index of Exhibits, DE [85-2].  Provisions cited in this Memorandum and Order as Exhibit 16 are substantially similar in each version of the Manual.

19 at 4. Peer Clinical Reviewers may also consider Medicare-related national requirements, benefit exclusions and investigational treatment, none of which are at issue here. Pls.' Ex. 16 at 4; Ex. 17 at 4; Ex. 18 at 5; Ex. 19 at 5.

A Peer Clinical Reviewer may apply his or her clinical judgment to the analysis, weighing factors that are not specifically enumerated in Anthem's Guidelines or Medical Policies, but are alluded to within. Pearsall Dep. at 184:18-25, 185:1-10, 188:9-25, 189:1-18. This application of clinical judgment is conducted using the "framework" of the Guidelines and Medical Policies, *see id.* at 83:8-20, 182:3-12, 184:16-25, 185, 186:1-12, 187:5-9, 189:14-18, but the Guidelines and Medical Policies do not act as "firm decision tree[s]." *Id.* at 83:21-25. "[W]ithin the Guidelines, there will be areas that are open to clinical interpretation, and the [P]eer [C]linical [R]eviewer is required to make that interpretation based on their [*sic*] clinical judgment and the guidelines to come to a determination" on the request for coverage. *Id.* at 85:1-9.

When a Peer Clinical Reviewer denies a claim for coverage, Anthem issues a denial letter to the insured. Pls.' Mem. at 12; Defs.' Opp. at 9; *see, e.g.,* Reynolds Decl. at Ex. A-001. Each letter states the reason for the denial, "in language a layperson would understand," and references "the specific plan provision(s), guideline(s), protocol(s) or similar criterion on which the determination is based." Pls.' Mem., Ex. 15 at 11; *see* Pls.' Mem., Ex. 16 at 8-9. If the criterion used for a denial is not a Medical Policy or a Guideline, that criterion nevertheless "needs to be specified" in the denial letter. *See* Pls.' Mem., Ex. 16 at 9. These denial letters are created automatically

using a database tool.  *See* Defs.' Opp. at 9.  Peer Clinical Reviewers also document their reviews and their rationale for approving or denying coverage within Anthem's "UM System." *See* Defs.' Opp. at 7; *see, e.g.,* Deegan Decl., ¶¶ 24-29, Exs. B-2 to B-7.

### iii.  Plaintiffs and the Proposed Class

From January 2018 through August 2019, Plaintiff James Burnett was a participant in, and his son was a beneficiary of, the Maine Education Association Benefits Trust Health Plan (the "first Burnett Plan"), which was sponsored by Burnett's then-employer and issued by Anthem Health Plans of Maine, Inc., a wholly-owned subsidiary of Anthem, Inc.  Am. Compl., ¶ 4.  Since September 2019, Burnett has been a participant in, and his son a beneficiary of, the Learning Skills Academy Plan (the "second Burnett Plan"), which is sponsored by Burnett's current employer and issued by Anthem Health Plans of New Hampshire, Inc., a wholly-owned subsidiary of Anthem, Inc.  *Id.*  On September 27, 2018, Anthem UM denied Burnett's son coverage for mental health residential treatment.  *See* Reynolds Decl., Ex. A-1. The denial letter Anthem UM sent to Burnett's son listed clinical criteria that Anthem UM used to determine if short-term residential treatment was "medically necessary," *see id.* at 1., and listed a specific Guideline used in the denial, *see id.* at 2.  The letter explained that the information available to Anthem UM did not show that Burnett's son met two of the criteria for medical necessity, and his request was denied as "not medically necessary."  *Id.* at 1. The letter also stated that this review was "completed by a clinical reviewer," who considered information "including" the

insured's "health status," "clinical criteria or guidelines," his "health plan," and "the latest findings in medical journals and proven research." *Id.* at 2.

Plaintiff Marissa Collins has been a beneficiary of the ADP Total Source Plan (the "Collins Plan"), which is sponsored by Collins's husband's employer and issued by Empire Healthchoice Assurance, Inc., a wholly owned subsidiary of Anthem, Inc., since May 2019.  Am. Compl., ¶ 3.  On August 28, 2019, Anthem UM denied Collins coverage for treatment at a psychiatric residential treatment center.  *See* Reynolds Decl., Ex. A-2.  Since August 2019, Plaintiff Karyn Sanchez been a participant in, and her son has been a beneficiary of, the Toyota Motor North America, Inc. Health & Welfare Benefit Plan (the "Sanchez Plan"), which is sponsored by Sanchez's current employer and administered by Anthem Health Plans of Kentucky Inc., a wholly-owned subsidiary of Anthem, Inc.  Sanchez's son was denied coverage by Anthem UM for an extension of treatment at a residential treatment center.  *See* Reynolds Decl., Ex. A-3.  During the time relevant to this action, Intervenor Plaintiff A.I. has been a participant in, and his daughter has been a beneficiary of, a self-funded health benefit plan sponsored by A.I.'s employer, Verizon Wireless (the "Intervenor's Plan").  *See* Intervenor Compl., ¶ 4.  On March 25, 2021, Anthem UM denied A.I.'s daughter coverage for an extension of treatment at a residential treatment center.  *See* Reynolds Decl., Ex. A-4.

As with the denial letter sent to Plaintiff Burnett's son, the denial letter sent to each other Plaintiff stated that Anthem UM had not received information to show that the individual seeking treatment had met certain criteria.  *See id.*, Exs. A-2, A-

10

3, A-4. The letter explained that each of these criteria was considered by Anthem UM to determine whether residential treatment was "medically necessary," and each request was denied "as not medically necessary." *Id.* The denial letters stated that Anthem UM reviewed each individual's request using a particular Level of Care Guideline, and that "an experienced health-care professional… considered [the individual's] health, [his or her] health plan, clinical criteria or guidelines, and may also have used the latest information from proven research and medical journals during the review." *Id.* Each letter cited a specific Guideline used in reviewing the request. *Id.*

Plaintiffs seek certification of a class using the following definition ("Class Definition"):

> Any member of a health benefit plan governed by ERISA (a) whose request for coverage of residential treatment services for a behavioral health disorder was denied by Anthem UM Services, Inc. on or after April 29, 2017; where (b) such denial was based on Anthem's Clinical UM Guidelines or the MCG Guidelines for Residential Behavioral Health Level of Care; and (c) such denial was not reversed on administrative appeal.

Pls. Mem. at 3. In their Reply, Plaintiffs propose an alternative class definition ("Alternative Class Definition"):

> Any member of a health benefit plan governed by ERISA, the terms of which require that covered services must be provided in accordance with generally accepted standards of medical practice, (a) whose request for coverage of residential treatment services for a behavioral health disorder was denied for lack of medical necessity by Anthem UM Services, Inc. on or after April 29, 2017[; where (b) such denial was based on Anthem's Clinical UM Guidelines or the MCG Guidelines for Residential Behavioral Health Level of Care; and (c) such denial was not reversed on administrative appeal.]

11

Pls. Reply at 10, n.13 (emphasis in original).[5]

### B. Procedural History

Based on the above, Plaintiffs Collins and Burnett commenced this ERISA-breach of fiduciary duty/denial of benefits class action on April 29, 2020, alleging that: (i) Defendants breached their fiduciary duties as set forth in 29 U.S.C. § 1104(a); (ii) Anthem UM unreasonably denied requests for coverage for residential behavioral health treatment services submitted by Plaintiffs and putative class members;  and (iii) Anthem UM violated the MHPAEA, incorporated into ERISA at 29 U.S.C. § 1185(a).  *See* Compl., DE [1], ¶¶ 87-100.  Plaintiffs Collins and Burnett sought various forms of injunctive and declaratory relief against Defendants.  *See id.* at 34-35.  On February 1, 2021, Plaintiffs Collins and Burnett filed their Amended Complaint, adding Plaintiff Sanchez.  *See* Am. Compl.

As to injunctive relief, Plaintiffs seek:  (1) a permanent injunction ordering Defendants to stop using the challenged Guidelines and instead use clinical coverage guidelines "that are consistent with generally accepted standards of medical practice"; and (2) an order that Anthem UM reprocess claims it previously denied (in whole or in part) for residential behavioral health treatment using these revised lawful guidelines.  Am. Compl. at 34; Intervenor Comp. at 32-33.  Plaintiffs also seek declaratory relief that:  (1) the Guidelines are inconsistent with generally accepted standards of medical practice; and (2) that Anthem's use of the Guidelines developed

---

[5] Plaintiffs' Alternative Class Definition is a composite class definition that incorporates portions of the original Class Definition, as indicated by the language in brackets.

by MCH violates the MHPAEA.  *Id.*  Finally, Plaintiffs seek "other appropriate equitable relief." *Id.*

Defendants moved to dismiss the Amended Complaint on April 28, 2021, *see* DE [39], which motion was denied on February 24, 2022, by the Honorable Frederic Block.  *See* DE [50].  A.I. moved unopposed to intervene as a plaintiff on June 10, 2022.  *See* DE [60].  This Court granted A.I.'s motion on June 21, 2022, and on June 22, 2022, A.I. filed his Intervenor Complaint, seeking the same relief as the other three Plaintiffs.  *See* Intervenor Compl.  On February 22, 2023, the parties consented to this Court's jurisdiction for all purposes, *see* DE [82], which consent was So Ordered by Judge Block the next day.  *See* DE [83].  Plaintiffs filed Plaintiffs' Motion on March 17, 2023, seeking class certification under Rule 23(b)(2) or, in the alternative, under Rule 23(b)(3).  *See* DE [85]; Pls.' Mem. at 3.  Defendants oppose.  *See* Defendants' Opposition (or "Defendants' Opp."), DE [88].  Oral argument was conducted on April 28, 2023.  *See* DE [102].

## II.   LEGAL STANDARDS

### A.  Class Certification

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 133 S. Ct. 1426, 1432 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01, 99 S. Ct. 2545, 2557 (1979)) (internal quotation marks omitted); *see also Jie Zhang v. Wen Mei, Inc.*, No. 14-cv-1647, 2017 WL 8813132, at *5-6 (E.D.N.Y. Dec. 28, 2017), *report and recommendation adopted*, 2018 WL 878988 (E.D.N.Y. Feb. 14, 2018).  "To establish that the exception is applicable to a given case, 'a party seeking

to maintain a class action must affirmatively demonstrate compliance with Rule 23'"

of the Federal Rules of Civil Procedure. *Perez v. Allstate Ins. Co.*, No. 11-cv-1812,

2014 WL 4635745, at *11 (E.D.N.Y. Sept. 16, 2014) (quoting *Comcast*, 569 U.S. at 34,

133 S. Ct. at 1432) (internal quotation marks omitted).   Further, "[t]he party

seeking class certification bears the burden of establishing by a preponderance of the

evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*,

624 F.3d 537, 547 (2d Cir. 2010).

Class certification pursuant to Rule 23 requires a two-step analysis.  First,

"the court must be persuaded, 'after a rigorous analysis, that the prerequisites

of Rule 23(a) have been satisfied.'"  *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 82

(S.D.N.Y. 2007) (quoting *Gen. Tel Co. of Sw. v. Falcon*, 457 U.S. 147, 161, 102 S. Ct.

2364 (1982)).  These prerequisites are:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims
> or defenses of the representative parties are typical of the claims or
> defenses of the class; and (4) the representative parties will fairly and
> adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see, e.g., Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010);

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196,

202 (2d Cir. 2008). In addition to the express requirements of Rule 23(a), the Second

Circuit has consistently recognized the "implied requirement of ascertainability."

*Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (quotations and

citations omitted); *Ruffo v. Adidas Am. Inc.*, No. 15-cv-5989, 2016 WL 4581344, at *2

(S.D.N.Y. Sept. 2, 2016).  "[T]he touchstone of ascertainability is whether the class is

sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher*, 806 F.3d at 24 (citations and quotation marks omitted).

"Once a court has concluded that Rule 23(a)'s four requirements have been satisfied, it must then proceed to the second step, *i.e.*, determine 'whether the class is maintainable pursuant to one of the subsections of Rule 23(b).'"  *Perez*, 2014 WL 4635745, at *13 (quoting *Vivendi*, 242 F.R.D. at 83); *see also Comcast*, 569 U.S. at 34, 133 S. Ct. at 1432.  "Rule 23(b) addresses the types of relief available, as well as the rights of absent class members." *Perez*, 2014 WL 4635745, at *13 (citing Fed. R. Civ. P. 23(b)).  Here, Plaintiffs seek certification pursuant to Rules 23(b)(2) and, in the alternative, 23(b)(3).  Pls.' Mem. at 3, 23-25.  To obtain certification of a Rule 23(b)(2) class, a party must demonstrate that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  A party seeking certification of a Rule 23(b)(3) class must establish that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### B. Standing

Under Article III of the United States Constitution, a federal court's jurisdiction is limited to "cases" and "controversies." U.S. Const. Art. III, § 2.  "For

there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. ___, 141 S. Ct. 2190, 2203 (2021) (citation omitted).  If a plaintiff in federal court lacks Article III standing, that court lacks federal subject matter jurisdiction.  *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).

In the Second Circuit, standing for prospective, or forward-looking, relief is analyzed differently than standing for retrospective relief, which aims to remedy an injury that has already occurred.  *See Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012).  "To obtain *prospective* relief…a plaintiff must show, *inter alia*, 'a sufficient likelihood that he [or she] will again be wronged in a similar way.'"  *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670 (1983)). Further, "[i]n establishing a certainly impending future injury, a plaintiff cannot rely solely on past injuries; rather, the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought."  *Id.* (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 1724-25 (1990)).  Establishing standing with respect to retrospective relief "requires a showing that:  (1) the plaintiff suffered an injury in fact that is concrete and not conjectural or hypothetical, (2) the injury is fairly traceable to the actions of the defendant, and (3) the injury will be redressed by a favorable decision."  *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136 (1992)).

In the class action context, "'no class may be certified that contains members lacking Article III standing'" and "any 'class must therefore be defined in such a way that anyone within it would have Article III standing.'"  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 459 (S.D.N.Y. 2018) (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)).

## III.    DISCUSSION

Initially, the Court applies the legal standards to class certification to the Alternative Class Definition in Plaintiffs' Reply:

> Any member of a health benefit plan governed by ERISA, <u>the terms of which require that covered services must be provided in accordance with generally accepted standards of medical practice</u>, (a) whose request for coverage of residential treatment services for a behavioral health disorder was denied <u>for lack of medical necessity</u> by Anthem UM Services, Inc. on or after April 29, 2017[; where (b) such denial was based on Anthem's Clinical UM Guidelines or the MCG Guidelines for Residential Behavioral Health Level of Care; and (c) such denial was not reversed on administrative appeal.]

Pls. Reply at 10, n.13 (emphasis in original).[6]

### A. Plaintiffs' and the Class's Article III Standing

Plaintiffs seek both retrospective and prospective forms of injunctive relief, as well as declaratory relief.  *See* Am. Compl. at 34-35.  Defendants do not challenge Plaintiffs' or the proposed class's standing as to the declaratory relief they seek, *see generally* Defs.' Opp; Defs.' Surreply.  Rather, Defendants argue that because certain class members lack standing to seek injunctive relief, Plaintiffs cannot certify a class. *See* Defs.' Opp. at 2, 21-22.  Because Plaintiffs and prospective class members have

---

[6] As explained below, the Court does not certify the original class definition proposed by Plaintiffs in their Memorandum.  *See* Pls.' Mem. at 3.

not shown that they "will again be wronged in a similar way" in the future, *see Marcavage*, 689 F.3d at 103, Plaintiffs have not established standing to pursue a prospective injunction ordering Defendants to stop using the challenged Guidelines and instead use clinical coverage guidelines consistent with generally accepted standards.  Plaintiffs and the putative class they seek to represent do, however, have standing to pursue a reprocessing injunction.

"To obtain *prospective* relief… a plaintiff must show, *inter alia*, 'a sufficient likelihood that he [or she] will again be wronged in a similar way.'" *Marcavage*, 689 F.3d 103 (citing *Lyons*, 461 U.S. at 111, 103 S.Ct. at 1670).  Further, "[i]n establishing a certainly impending future injury, a plaintiff cannot rely solely on past injuries; rather, the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought."  *Id.* (citing *Whitmore*, 495 U.S. at 158, 110 S.Ct. at 1724-25).  The class here is not defined so as to limit it only to class members who face future injury from Defendants.  Because Plaintiffs have not sufficiently alleged that class members will seek residential behavioral health treatment in the future, they have not established that class members will be harmed by Anthem's ongoing use of the challenged Guidelines.

Further, many putative class members' plans are no longer administered by Anthem.  *See* Deegan Decl., ¶¶  14-15.  Enjoining Anthem's use of the Guidelines will offer those class members no relief for future injuries, because their future requests for coverage will be administered by some other entity.  *See Garthwait v. Eversource Energy Co.*, No. 20-cv-00902, 2022 WL 1657469, at *5 (D. Conn. May 25, 2022)

(plaintiffs who were no longer enrolled in a plan and had no evidence that they expected to re-enroll lacked standing to seek prospective relief against plan administrator); *Meidl v. Aetna, Inc.*, No. 15-cv-1319, 2017 WL 1831916, at *5 (D. Conn. May 4, 2017) (a plaintiff with no future plans to seek coverage for a previously denied treatment lacked standing to pursue a prospective injunction); *Des Roches v. California Physicians' Serv.*, 320 F.R.D. 486, 511 (N.D. Cal. 2017) (class members who could not show that an insurance company would return to challenged guidelines lacked standing to pursue a prospective injunction).

An injunction remanding class members' denied claims to Anthem for reprocessing, however, is a retrospective injunction. *See Meidl*, 2017 WL 1831916 at *3-4 (collecting cases). Plaintiffs argue that Defendants' denial of coverage for residential behavioral health treatment was "arbitrary and capricious." Pls.' Mem. at 2. A remand for reprocessing is available injunctive relief where a court determines that a plan administrator's finding was arbitrary and capricious. *See Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 490 (2d Cir. 2013). As set forth above, to establish standing to seek this relief, Plaintiffs must show: (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 1547 (2016).

Defendants do not argue that Plaintiffs have suffered no injury in fact. Moreover, another court in this Circuit recently concluded that plaintiffs had stated an injury in fact for the purposes of Article III standing where they alleged that a

plan administrator had wrongfully denied coverage for certain fees associated with outpatient surgery:  "the injury here… is the alleged denial of contractual benefits, **not** alleged monetary harm."  *Med. Soc'y of the State of New York v. UnitedHealth Grp. Inc.*, No. 16-cv-5265, 2021 WL 4263717, at *3 (S.D.N.Y. Sept. 20, 2021) (emphasis in original).  Accordingly, Plaintiffs have alleged an injury in fact sufficient to support Article III standing for the putative class members.  "[A]t least five Circuits have held that 'the denial of plan benefits is a concrete injury for Article III standing even when patients were not directly billed for their medical services.'"  *Id.* (citing *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018); *Mitchell v. Blue Cross Blue Shield of N.D.*, 953 F.3d 529, 536 (8th Cir. 2020); *North Cypress Med. Ctr., Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 193 (5th Cir. 2015); *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1291 (9th Cir. 2014); *HCA Health Servs. of Ga., Inc. v. Emp'rs Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001), *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Bos.*, 542 F.3d 1352 (11th Cir. 2008)).  Anthem also does not argue that Plaintiffs' alleged injury is not traceable to Defendants, nor does any evidence in the record suggest that the putative class members' standing fails on traceability grounds.  Plaintiffs  have thus adequately alleged this element of Article III standing.

Because Plaintiffs' and the putative class's alleged injury is the denial of plan benefits based on Guidelines that conflicted with plan terms, and not monetary loss, *see* Pls.' Mem. at 3, this injury "is likely to be redressed by" a reprocessing order

requiring Anthem to apply Guidelines aligned with plan terms. *Spokeo, Inc.*, 578 U.S. at 338, 136 S. Ct. at 1547; *see Swartzendruber v. Sentara RMH Med. Ctr.*, No. 22-cv-055, 2023 WL 6279361, at \*7 (W.D. Va. Sept. 26, 2023) (holding that plaintiff had standing to pursue a reprocessing order to redress the injury he suffered when he was denied plan benefits); *Kazda v. Aetna Life Ins. Co.*, No. 19-cv-02512, 2022 WL 1225032, at \*6 (N.D. Cal. Apr. 26, 2022) (same); *Briscoe v. Health Care Serv. Corp.*, 337 F.R.D. 158, 162 (N.D. Ill. 2020) (same); *Bailey v. Anthem Blue Cross Life & Health Ins. Co.*, No. 16-cv-04439, 2019 WL 8333523, at \*4 (N.D. Cal. May 31, 2019) (same); *Meidl v. Aetna, Inc.*, 2017 WL 1831916, at \*6 (same). For the same reasons, Plaintiffs and putative class members also have standing to pursue their requested declaratory relief. *See Kazda*, 2022 WL 1225032, at \*1 (plaintiff who had standing to pursue reprocessing injunction also had standing to pursue declaratory relief).

Anthem asserts that Plaintiffs and putative class members lack standing because a reprocessing remedy would not redress their injuries. *See* Defs.' Opp. at 22; Defs.' Surreply at 8-9. Defendants' argument is unavailing. As explained above, ultimate monetary recovery is unnecessary to show redressability under the circumstances of this action, as numerous courts, including the Southern District of New York, have held. *See, e.g., Med. Soc'y of the State of New York v. UnitedHealth Grp. Inc.*, 332 F.R.D. 138, 147 (S.D.N.Y. 2019). Further, while Anthem cites to one case holding that a former administrator to a plan cannot reprocess claims under that plan, *Hall v. Lhaco, Inc.*, that case is out-of-circuit and twenty-six years old. 140 F.3d 1190, 1196 (8th Cir. 1998); *see* Defs.' Opp. at 22. Defendants have offered no

evidence to support the assertion that they are unable to reprocess claims, applying appropriate standards, for plans that Anthem no longer administers. Moreover, in *Medical Society of New York v. UnitedHealth Group Inc.*, the court certified a class seeking to obtain reprocessing relief from a denial of benefits without restricting the class to participants in plans that the plan administrator continued to administer. 332 F.R.D. at 158. The Court declines to restrict the class on this basis at this time. *See C. P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, No. 20-CV-06145-RJB, 2023 WL 8543495, at *7 (W.D. Wash. Dec. 11, 2023) (whether a plan administrator could reprocess claims related to plans it no longer administered had no impact at the class certification stage). As to Anthem's argument that some Sample Members' plans were never administered by Anthem, those Sample Members are not part of the class as defined, because their coverage was not "denied… ***by Anthem UM Services, Inc.***" Pls.' Reply at 10, n.13 (emphasis added). The class definition itself resolves this argument.

Further, Defendants' reliance on *Berceanu v. UMR, Inc.* is not persuasive. No. 19-cv-568, 2023 WL 1927693 (W.D. Wis. Feb. 10, 2023). *Berceanu*'s holding, that class members must show that reprocessing would ultimately result in a different benefits determination to establish standing, is directly contrary to the precedent above (including precedent within the Second Circuit), as well as to a recent Ninth Circuit case. *See Wit v. United Behav. Health*, 79 F.4th 1068, 1084 (9th Cir. 2023) (plaintiffs had standing to pursue a reprocessing order even if plaintiffs were not guaranteed to receive a different determination of their entitlement to benefits upon remand); *Med.*

*Soc'y of the State of New York¸* 332 F.R.D. at 147 (same); *Meidl*, 2017 WL 1831916, at *6 (same). *Berceanu* also relies heavily on non-binding Seventh Circuit caselaw and a Supreme Court case, *Thole v. U. S. Bank N.*A, 590 U.S. ___, 140 S. Ct. 1615, 1622, 207 L. Ed. 2d 85 (2020) (no standing where plaintiffs were "legally entitled to receive the same monthly payments for the rest of their lives" and therefore "winning or losing" their denial of benefits suit "would not change the plaintiffs' monthly pension benefits"). Another court in this District, however, has explicitly held that *Thole* does not apply "where the amount of the benefits to which plan participants are entitled is neither fixed nor guaranteed." *Hoeffner v. D'Amato*, 605 F. Supp. 3d 467, 480 (E.D.N.Y. 2022), *reconsideration denied*, 664 F. Supp. 3d 269 (E.D.N.Y. 2023). As all parties recognize, the amount of benefits to which putative class members in this case may be entitled is not guaranteed. Accordingly, this Court declines to follow *Berceanu*.

## B. Class Action Prerequisites

### i. *Rule 23(a)*

#### 1. Numerosity

Plaintiffs have met the numerosity requirement for class certification. Initially, Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Impracticable does not mean impossible, but "only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Central States Se. and Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244-45 (2d Cir. 2007). "[N]umerosity is presumed at a level of 40 members…." *Consolidated Rail Corp. v.*

23

*Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (citing 1 Newberg on Class Actions § 3.05 (2d ed. 1985)); *see Avila v. Ardian Corp.*, No. 18-cv-4795, 2022 WL 3370024, at *2 (E.D.N.Y. Aug. 16, 2022).

Here, the putative class includes at least 358 individuals, calculated as the 369 Sample Members and four Named Plaintiffs that Plaintiffs assert meet the original proposed class definition from the sample to which the parties stipulated, *see* Pls. Mem. at 18, minus those fifteen sample members whom Anthem asserts do not meet the Alternative Class Definition because their plans do not define Medical Necessity or do not reference generally accepted standards within the definition, or because Anthem's denial of coverage was not based on the Medical Necessity standard. *See* Defs.' Opp. at 3, 8-9. Because the original 379-person sample was taken from a pool of almost 10,000 denials, *see* Pls.' Mem. at 3, the class is likely much larger. Thus, the numerosity requirement for class certification is met.

### 2. Commonality

Plaintiffs have also adequately demonstrated commonality. The second Rule 23(a) requirement is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs must establish that class members have "suffered the same injury" and that their claims "depend upon a common contention ... of such a nature that it is capable of class[-]wide resolution—which means that determination of its truth or falsity will resolve ***an issue*** that is central to the validity of each one of the claims in one stroke." *Sykes v. Mel S. Harris and Associates LLC*, 780 F.3d 70, 80 (2d Cir. 2015) (emphasis in original) (citing *Wal-Mart Stores, Inc. v.*

24

*Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551 (2011)).  "A court may find a common issue of law even though there exists 'some factual variation among class members' specific grievances....'" *Han v. Sterling Nat'l Mortg. Co.*, No. 09-cv-5589, 2011 WL 4344235, at *3 (E.D.N.Y. Sept. 14, 2011) (quoting *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 240 (E.D.N.Y. 1998)).  "The commonality requirement may [thus] be met when individual circumstances of class members differ, but their injuries derive from a unitary course of conduct." *Han*, 2011 WL 4344235, at *3 (internal quotation marks and citations omitted).

As explained above, Plaintiffs allege that each Plaintiff and putative class member was injured because Anthem denied coverage for residential behavioral health treatment based on "Guidelines that were in direct conflict with [putative class members'] plans and flouted the Parity Act."  Pls. Mem.' at 19.  The Court's determination of the "truth or falsity" of this "common contention"—that is, whether Anthem breached its fiduciary duty, whether the challenged Guidelines are more restrictive than generally accepted standards of medical practice and whether they violate the MHPAEA—will "resolve an issue that is central to the validity of each one of the claims [in this litigation] in one stroke." *Sykes*, 780 F.3d at 80 (citing *Dukes*, 564 U.S. at 350, 131 S. Ct. at 2551); *see Hendricks v. Aetna Life Ins. Co.*, 344 F.R.D. 237, 246 (C.D. Cal. 2023) (a plan administrator "exercises fiduciary responsibility when creating internal guidelines to determine the scope of coverage").  This determination is central to each of Plaintiffs' claims:  (i) that Defendants violated their fiduciary duty by adopting these Guidelines; (ii) that Defendants' denial of

Plaintiffs' and putative class members' claims was arbitrary and capricious; and (iii) that their use of these Guidelines violated the MHPAEA. *See* Pls.' Mem. at 2.

It is not necessary for each putative class member to demonstrate that the relevant Guideline was applied to his or her claim in an identical way to establish commonality, because each denial resulted from "a unitary course of conduct"—the application of the challenged Guidelines. *See Han*, 2011 WL 4344235, at *3 (some factual variation among individual class members' injuries will not defeat commonality). The Ninth Circuit addressed this issue in *Wit v. United Behavioral Health*, explaining that where a plan administrator's application of the wrong standard to a benefits determination "could have prejudiced" the claimant, and the claimant "might be entitled to benefits under the proper standard," reprocessing is an appropriate remedy. 79 F.4th at 1084. Here, each denial at issue was based on a common action by Anthem: the application of a Guideline to the facts of each putative class member's claim. The evidence on the record shows that application of the Guidelines was the overarching structure governing physicians' analysis in each Plaintiff's and putative class member's claim denial.

A Guideline and specific rationale pursuant to that Guideline were cited in each such denial. *See* Reynolds Decl., Exs. A-1, A-2, A-3, A-4, D. The Anthem Behavioral Health Peer Reviewer Training Manual requires Peer Clinical Reviewers to document the criterion or criteria used in making a benefits determination and provides for circumstances where a Peer Clinical Reviewer denies a claim for reasons other than a Medical Policy or a Guideline. *See* Pls.' Mem., Ex. 16 at 8-9. The Peer

Clinical Reviewer must document in the denial letter any alternative criterion used. *Id*. Peer Clinical Reviewers are not required to cite a specific Guideline or Medical Policy if the denial was in fact based on an alternative criterion. Therefore, the presence of a Guideline and related rationale in each Plaintiff's and putative class member's denial letter indicates that his or her claim was denied based on that Guideline. Further, if that Guideline represented "the wrong standard," each claimant "could have been prejudiced" by Anthem's application of that Guideline. *Wit*, 79 F.4th at 1084; *see Meidl*, 2017 WL 1831916, at *8 (D. Conn. May 4, 2017) (determining commonality requirement was met where denials were based "in whole or in part" on a certain guideline and concluding that a "common question exist[ed] as to whether the creation and enactment of [that guideline] constituted a violation of ERISA fiduciary duties.")

Moreover, the evidence on the record demonstrates that while Peer Clinical Reviewers sometimes apply clinical judgment in addition to the Guidelines, they do so within the Guidelines, not outside them. The Behavioral Health Peer Reviewer Training Manual is emphatic that the Guidelines and Medical Policies must be applied during the medical necessity analysis. According to the first page of the 2017 and 2018 versions of Anthem's Behavioral Health Peer Reviewer Training Manual, Peer Clinical Reviewers are required to make medical necessity determinations by: (i) "determin[ing] if the requested service is addressed in Anthem Behavioral Health Clinical UM Guidelines or Behavioral Health Medical Polices," (ii) "determin[ing] if Anthem's criteria can be applied to the clinical presentation of requested services,"

and (iii) mak[ing] a determination of medical necessity for requested services based on our applicable criteria." Pls.' Ex. 16 at 4; Pls.' Ex. 17 at 4.  The 2019 and 2020 versions of this Manual state:  "The role of the Peer [Clinical] Reviewer is to determine if the requested services are medically necessary as defined in the Member's certificate of coverage and appropriate medical policies and UM guidelines."  Pls.' Ex. 18 at 4; Ex. 19 at 4.  Each description of the Peer Clinical Reviewer's Role centers application of the Guidelines and Medical Policies.  Moreover, each version of this Manual states that "in order to provide consistent, quality medical necessity reviews with a minimum of variation," Peer Clinical Reviewers should follow a specific hierarchy of tools, which include the Guidelines and Medical Policies, but do not include any reference to independent clinical judgment.  *See* Pls.' Ex. 16 at 6; Ex. 17 at 6;  Ex. 18 at 8; Ex. 19 at 8.

Defendants' corporate designee, Dr. Rowland Pearsall, testified similarly.  *See* Pearsall Dep.  According to Dr. Pearsall, a Peer Clinical Reviewer will "make a decision" that a claim "does meet the clinical guidelines" and can be approved, or "it doesn't meet the guidelines, and [in the physician's] clinical judgment, the patient could be treated at a different level of care."  *Id.* at 32:13-20.  Dr. Pearsall referred to the Guidelines and Medical Policies as "a framework" in which physicians make determinations on participants' requests for coverage.  *See, e.g., id.* at 83:8-10, 20-22. According to Dr. Pearsall, Peer Clinical Reviewers encounter "areas that are open to interpretation… within the guidelines" and must apply "their clinical judgment and the guidelines" to make coverage determinations.  *Id.* at 85:1-9.  He also reiterated

that denial letters must "include the specific clinical guideline" that was used. *Id.* at 114:13-15. Later in his deposition, Dr. Pearsall again explained that Peer Clinical Reviewers use "clinical judgment within the framework" of the Guidelines and Medical Policies. *Id.* at 187:5-9. Accordingly, "whether or not in [a physician's] clinical judgment… treatment… is medically necessary…. should fall within the guidelines." *Id.* at 188:9-17.

From this evidence, the Court concludes that the Guidelines are critical to each denial of coverage on medical necessity grounds for residential behavioral health treatment in which a Guideline is cited. The Court further determines that Peer Clinical Reviewers are not permitted to make coverage determinations that are "independent" of the Guidelines. *See* Defs.' Opp. at 24; *c.f. Wit*, 79 F.4th at 1085 (reversing certification of a denial of benefits class because defendant had shown that "some class members' claims may have been denied for reasons ***wholly independent*** of the Guidelines") (emphasis added). Anthem's adoption and use of the Guidelines, therefore, is a "unitary course of conduct" from which Plaintiffs' and putative class members' alleged injuries arose, even if the specific way in which a given Guideline determined each class members' denial varied. *See Han*, 2011 WL 4344235, at *3.

The first objection made by Defendants with respect to commonality, that not all putative class members' plans contain language that defines "Medically Necessary" services as those in accordance with generally accepted standards of medical practice, is remedied by Plaintiffs' Alternative Class Definition, which adds this requirement. *See* Defs.' Opp. at 10-11; Pls.' Reply at 10, n.13. Defendants are

correct that if the class were not restricted to participants in plans that include this definition of medical necessity, commonality would not exist, because the question whether the challenged Guidelines are more restrictive than generally accepted standards of medical practice is not central to the resolution of claims of participants whose plans did not contain that definition.

Defendants also cite to several examples of denials that they argue were not based on the cited Guidelines. *See* Defs.' Opp. at 7-9; Defs'. Sur-reply at 7-8. Upon review, however, the physicians' documented rationale for each such denial includes elements of the cited Guideline. For example, the physician review of Plaintiff Sanchez's son's request for continued residential behavioral health treatment dated May 18, 2020, cites Guideline B-902-RES and includes the following rationale that is present in this Guideline: Plaintiff Sanchez's son did not express suicidal intent, he could benefit from a lower level of care, he had "supports" outside residential care, and he had made little progress at the residential level of care. Kadosh Decl., ¶ 14, Ex. D-11 at 10-11; Reynolds Decl., ¶ 6, Ex. C-12. Similarly, the denial notes for Sample Member 181 cite Guideline CG-BEH-03 and explain the denial of her claim for coverage using specific factors from that Guideline: Sample Member 181 had "no reported symptoms of behaviors," must less any that "require[d] 24 hour care." *See* Deegan Decl., ¶ 27; Reynolds Decl., ¶ 6, Ex. C-1. Accordingly, the Court is persuaded that these denials were, in fact, based on the applicable cited Guideline.

### 3. Typicality

Further, the Named Plaintiffs' claims are "typical" of the proposed class.  *See* Fed. R. Civ. P. 23(a)(3).  The requirements of commonality and typicality "tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Marisol A. v. Giuliani*, 126 F. 3d 372, 376 (2d Cir. 1997) (citation omitted).  Typicality occurs when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).  "Any 'minor variations in the fact patterns underlying individual claims' do not overcome the fact that the same alleged 'unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented.'" *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 417 (S.D.N.Y. 2013) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993)).

Plaintiffs assert that their claims for coverage, and those of putative class members, were denied based on Guidelines that violated the MHPAEA and that were more restrictive than generally accepted standards of care for several reasons, including that those Guidelines—both those applicable to mental health and those applicable to substance abuse—wrongly "condition[ed] coverage for residential treatment on the presence of acute crises and symptoms."  *See* Pls.' Mem. at 2. Defendants argue that because no Plaintiff's claim, or that of his or her child, was denied under a Guideline applicable to requests for residential substance abuse

treatment, Plaintiffs' claims are not typical of the class.  The Court disagrees.  In their Amended Complaint and their Memorandum, Plaintiffs do not distinguish between the reasons that the MCG, Inc. mental health and substance abuse Guidelines are, respectively, overly restrictive.  *See* Am. Compl. at  ¶¶ 39-52.[7]  Accordingly, the distinction between Guidelines applicable to mental health residential treatment and those applicable to substance abuse residential treatment does not affect typicality in this case, because Plaintiffs will make the same legal arguments about each type of Guideline.  Another court considered a similar question in *Des Roches v. California Physicians' Service* and concluded that Plaintiffs who based their complaint on different versions of the mental health and substance abuse guidelines at issue than some putative class members nevertheless had claims typical of the class claims.  *See* 320 F.R.D. 486, 504 (N.D. Cal. 2017).  That court's reasoning is instructive:

> Of course, according to Plaintiffs' experts, there are several *reasons* that the Guidelines do not conform to generally accepted standards. However, the question that Plaintiffs ask the Court to resolve—whether the Guidelines conform to generally accepted standards—is a common question that the Court can resolve "in one stroke"…. Thus, the Court concludes that although the Guidelines did not affect every class member in the same way, the claims of the named Plaintiffs are nevertheless typical of the claims of absent class members.

*Id.* (citing *Dukes*, 564 U.S. at 351, 131 S. Ct. at 2551 (2011)).  Here too, Plaintiffs ask the Court to determine whether the challenged Guidelines are inconsistent with generally accepted standards of medical practice and whether they violate the

---

[7] Because Anthem-developed Guideline number CG-BEH-04, applicable to substance abuse, was not identified in the Amended Complaint, Plaintiffs do not address the common reasons they challenge CG-BEH-04 and its mental health corollary, CG-BEH-03, in the Amended Complaint.

MHPAEA.  The Named Plaintiffs make the same legal arguments and allege the same unlawful conduct as putative class members.  *See Howard v. Aetna Life Ins. Co.*, No. 22-cv-01505, 2024 WL 1098789, at *10 (C.D. Cal. Feb. 27, 2024) (determining that typicality existed where plaintiff and putative class members suffered "the same or similar injury" arising from plan administrator's medical policy excluding coverage for a certain treatment) (citation omitted); *Pritchard*, 2023 WL 8543495, at *7 (finding that commonality and typicality were met where plaintiffs showed that defendant plan administrator "applied the wrong standard against all class members when it enforced [unlawful] exclusions"); *In re Flag Telecom Holdings,* 574 F.3d at 35; *Jacob*, 289 F.R.D. at 417.  Accordingly, the typicality requirement for class certification is met.

*In re Omnicom ERISA Litig.*, No. 20-cv-4141, 2021 WL 3292487, at *6 (S.D.N.Y. Aug. 2, 2021), relied upon by Defendants, is inapposite.  In that case, the court held that plaintiffs lacked standing to sue on behalf of their plan with respect to funds in which they did not invest.  *Id.*  Plaintiffs here have standing to pursue retrospective injunctive relief and declarative relief in this action, as explained above. Moreover, the facts of *In re Omnicom* bear little resemblance to this case, not least because that case was not a denial of benefits action.  The plaintiffs in that case challenged investment decisions made by plan fiduciaries and fees allocated to recordkeeping and administrative expenses in a retirement savings plan.  *See id.* at *1.

### 4. Adequacy

Plaintiffs are adequate class representatives.  Rule 23(a) requires that the proposed class representatives will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The adequacy analysis inquires whether a plaintiff's interests are antagonistic to those of the class.  See *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).  This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625, 117 S. Ct. 2231, 2250 (1997). Defendants do not challenge class certification based on the adequacy prong of Rule 23(a).

Here, Plaintiffs are proffered as potential class representatives, and each affirms that he or she is prepared to protect the interests of all class members.  *See* Am. Compl., ¶ 90; Intervenor Compl., ¶ 82.  Moreover, Plaintiffs' interests are aligned with those of the class they seek to represent, and they have demonstrated a commitment to the class by participating in written discovery and being deposed.  *See* ESI Status Report, DE [87]; Pls.' Mem., Exs. 33-36 (deposition transcripts of Plaintiffs); *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 253 (2d Cir. 2011) (finding adequacy requirement met where "class representatives are prepared to prosecute fully the action and have no known conflicts with any class member"). As explained above, each Plaintiff's claim, or that of his or her child, for coverage of residential behavioral health treatment was denied by Anthem on medical necessity grounds pursuant to a challenged Guideline.  Accordingly, the Court finds that the

Named Plaintiffs' interests in pursing their claims are in line with other class members' interests in pursuing similar claims.

For these reasons, the Court concludes that the Named Plaintiffs will continue to adequately represent the interests of the class, thereby satisfying Rule 23(a)(4)'s requirements, and appoints Plaintiffs Collins, Burnett, Sanchez and A.I. as class representatives.

### 5. Ascertainability

Finally, Plaintiffs' revised proposed class is ascertainable. The Second Circuit has consistently recognized the "implied requirement of ascertainability" for class certification. *Brecher*, 806 F.3d at 24. "[T]he touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* (citations and quotation marks omitted). "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Huebner v. Midland Credit Mgmt., Inc.*, No. 14-cv-6046, 2016 WL 3172789, at *7 (E.D.N.Y. June 6, 2016) (citation and quotation marks omitted).

Plaintiffs seek to certify a class, within a specific time period, of individuals who participated in plans that included a certain definition of medical necessity and whose requests for coverage for residential behavioral health treatment were denied for lack of medical necessity based on one of the challenged Guidelines. The class definition is based on objective criteria. Further, the Court can determine who is in

the class without having to answer numerous individualized questions. Each putative class member's denial letter explains which Guideline was used to decide his or her claim, and each plan that defines medical necessity does so clearly in the text of the plan. The parties have already catalogued which Sample Member plans include a requirement that medically necessary treatment be "in accordance with generally accepted standards of medical practice." *See* Reynolds Decl., ¶¶ 12–13, Ex. G. As explained above, the Court's role is not to make an ultimate determination on any class member's entitlement to benefits—that task will lie with Anthem if Plaintiffs are successful in their request for injunctive relief. There is no reason for the Court to conduct "a multitude of mini-hearings" for each class member. *See* Defs.' Opp. at 19. Accordingly, the Court concludes that Plaintiffs' revised proposed class meets the implied ascertainability requirement. *See Des Roches v. California Physicians' Serv.*, 320 F.R.D. 486, 512 (N.D. Cal. 2017) (a class was ascertainable where the guidelines on which denials were based were easily identified in participants' files, and where whether plans were subject to ERISA could be determined by a cursory review of the plans).

### *ii. Rule 23(b)*

#### 1. Rule 23(b)(2)

To obtain certification of a Rule 23(b)(2) class, the movant must demonstrate that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2)

applies only when a single injunction or declaratory judgment would provide relief to each member of the class.   It does not authorize class certification when each individual class member would be entitled to a ***different*** injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360, 131 S. Ct. at 2557.

As explained above, Plaintiffs' and putative class members' alleged injuries are redressable through a single retrospective injunction:   a reprocessing order. Moreover, Anthem has "acted on grounds… that apply generally to the [putative] class" by adopting and implementing the challenged Guidelines, which it used to deny Plaintiffs' and putative class members' claims for coverage.   *See* Fed. R. Civ. P. 23(b)(2).   Other courts in similar cases have approved certification under this subsection for these reasons. *See*, *e.g.*, *Kazda*, 2022 WL 1225032, at *10; *Meidl*, 2017 WL 1831916, at *21;  *Escalante v. California Physicians' Serv.*, 309 F.R.D. 612, 620 (C.D. Cal. 2015) (certification under Rule 23(b)(2) was appropriate where putative class sought reprocessing of health care coverage claims based on a challenged standard); *Ballas v. Anthem Blue Cross Life & Health Ins. Co.*, No. 12-cv-0604, 2013 WL 12119569, at *13 (C.D. Cal. Apr. 29, 2013) (same).   Accordingly, certification under Rule 23(b)(2) is appropriate.

## 2.  Rule 23(b)(3)

A party seeking certification of a Rule 23(b)(3) class must establish that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Plaintiffs

seek certification of a Rule 23(b)(3) class only in the alternative to a Rule 23(b)(2) class. *See* Pls.' Mem. at 3, 24. Because the Court concludes that Plaintiffs have met the requirements to certify a class under Rule 23(b)(2), it does not analyze the availability of a Rule 23(b)(3) class. *See Meidl*, 2017 WL 1831916, at *23 (declining to make a finding as to whether Rule 23(b)(3) certification was appropriate where such certification was requested in the alternative to another Rule 23(b) subsection, under which the court had concluded certification was appropriate); *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 342 (S.D.N.Y. 2012) (same).

## C. Appointment of Class Counsel

Plaintiffs request that the Court appoint Plaintiffs' counsel to serve as class counsel. *See* Pls.' Mem. at 22-23. Defendants do not oppose this request. Pursuant to Rule 23(g), a court that certifies a class must appoint class counsel. Rule 23(g)(1)(A) sets forth four factors that must be considered in appointing class counsel:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). A court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

According to the biographies of lead attorneys Caroline E. Reynolds, D. Brian Hufford, and Jason S. Cowart of the law firm Zuckerman Spaeder LLP; attorney Meiram Bendat, founder and president of Psych Appeal; and attorneys Karen L.

Handorf and Julie Selesnick of the law firm Berger Montague PC, each has significant experience litigating ERISA class actions involving health insurance companies. *See* Pls.' Exs. 37-39. The Court also notes that counsel has done significant work in litigating this matter up until this point. Based on the resources counsel has already invested in this matter, and the quality of the work performed on Plaintiffs' behalf, the Court appoints Plaintiffs' counsel as class counsel.

## IV.   CONCLUSION

For the reasons set forth herein, the Court certifies the following class under Rule 23(b)(2):

> Any member of a health benefit plan governed by ERISA, the terms of which require that covered services must be provided in accordance with generally accepted standards of medical practice, (a) whose request for coverage of residential treatment services for a behavioral health disorder was denied for lack of medical necessity by Anthem UM Services, Inc. on or after April 29, 2017; where (b) such denial was based on Anthem's Clinical UM Guidelines or the MCG Guidelines for Residential Behavioral Health Level of Care; and (c) such denial was not reversed on administrative appeal.

This class is certified only as to the Plaintiffs' claims for a retrospective injunction in the form of reprocessing, and for declaratory relief. The Court also appoints Plaintiffs' counsel as class counsel.

Dated:    Central Islip, New York           **SO ORDERED.**
          March 19, 2024

                                            /s/ Steven I. Locke
                                            STEVEN I. LOCKE
                                            United States Magistrate Judge